UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DAVID LIPNICKI, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 3:10-CV-605 |
| | § | |
| MERITAGE HOMES | § | |
| CORPORATION, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiffs in this Fair Labor Standards Act (FLSA) collective action are over 100 former home salespeople who worked for Defendants Meritage Homes Corporation and Meritage Homes of Texas (collectively "Meritage"). Plaintiffs contend they were denied overtime pay and minimum wage in violation of the FLSA. The primary defense is that the Plaintiffs are "outside salespeople" to whom the FLSA does not apply. The parties have filed cross motions for summary judgment on the applicability of the "outside sales" exemption. Meritage also seeks rulings that any FLSA violations were not willful and that it acted in good faith in classifying Plaintiffs as exempt. Finally, Meritage asks this Court to dismiss those Plaintiffs who were part of a class action settlement in California that released any wage-related claims.

I.    BACKGROUND

   A.  Factual Background

   This much is undisputed:  Plaintiffs worked for Meritage selling new homes in various Meritage communities across several states.  Plaintiffs were assigned to sales offices located in model homes within the developments. Inside these model homes are desks, computers, telephones, and other office equipment used by the sales staff.  Also inside the model homes are plat maps that show the entire development and the lots available for sale.  Meritage set the hours when Plaintiffs worked, and in certain locations required Plaintiffs to record their hours using a time clock.  Plaintiffs were paid on a commission basis and did not receive time-and-a-half for time worked beyond 40 hours in a particular week.

   But how Plaintiffs spent their work hours is hotly disputed, in particular how much of their time was spent outside the sales office meeting with customers on the new home lots or engaged in other sales activities.  Meritage Houston Division President Steve Harding states that "Meritage's salespeople are trained and expected to leave their offices to conduct realtor and community outreach, marketing activities, and to 'shop the competition.'"  Docket Entry No. 143-18 at 6.  He contends that "Meritage's salespeople also are tasked with ensuring that the Meritage homes for sale within their communities are aesthetically appealing,

which requires them to leave their sales office to drive through the community and inspect the neighborhood, signage, homes and home sites." *Id.*

Plaintiff Donna Armstrong describes a much different working environment. She claims that the sales associates "were discouraged from leaving the sales office" and could face discipline for their absences. Docket Entry No. 143-6 at 9. Although she signed a compensation agreement that explained she "must customarily and regularly take customers to see model homes and sites, [] call upon customers at various locations . . . and travel to various locations to conclude the sales transaction," *see* Docket Entry No. 143-3 at 12, she has testified that she "rarely" showed inventory houses and vacant lots to prospective buyers, elaborating that "rarely" means approximately two or three times per month. *See* Docket Entry No. 143-1 at 12–13; Docket Entry No. 143-6 at 8–9. In fact, Plaintiffs have submitted 24 identical declarations that make this same claim. *See* Docket Entry No. 143-6 at 2–73. The declarations also explain that Plaintiffs "rarely visited local real estate agents and brokers," that shopping the competition was performed from the sales office via "internet research and by telephone calls to salespersons for other builders," and that "[o]nce a home was under contract, [they] rarely visited the home site." *See, e.g.*, *id.* at 3. Plaintiffs contend that other Meritage employees, such as construction managers, typically dealt with home

buyers once the contract was signed and that Meritage's Marketing Department handled promotional activities outside the sales office.

### B.  Procedural History

Contending that they are covered under the FLSA, four plaintiffs filed this lawsuit on behalf of themselves and others similarly situated.  *See* Docket Entry No. 1; *see also* Docket Entry No. 82 (amending the original complaint).  The prospective class was described as individuals who had worked as salespeople for Meritage within the three years preceding the date suit was filed.  *See id.* at 1.  The judge to whom this case was previously assigned allowed notice to be sent to other potential class members.  In response to that notice, more than 100 Plaintiffs joined the lawsuit.

After extensive discovery, the parties filed the summary judgment motions described above.

## II.  STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions

of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.   THE OUTSIDE SALES EXEMPTION

Both parties seek summary judgment on the outside sales exemption. It is not surprising that both sides believe they are entitled to summary judgment on this issue because, under their version of events, they would be. But at the summary judgment stage a Court cannot make credibility determinations. For that reason, as discussed in more detail below, neither side is entitled to judgment as a matter of law on this issue.

### A.   The "Outside Sales" Statute and Regulation

The FLSA requires that employers pay minimum wage to their employees and overtime pay when employees work more than 40 hours per week. 29 U.S.C. §§ 206(a)(1), 207(a)(1). But certain types of employees are exempt from these requirements, including those employed "in the capacity of outside salesman." *Id.* § 213(a)(1).

The statutory term "outside salesman" does not tell us much. As a result, the scope of the exemption soon led to litigation, just as it continues to do more than 75 years after the FLSA's enactment. In an early decision interpreting the exemption, the Tenth Circuit identified the reason for excluding outside salespeople from the FLSA:

> The reasons for excluding an outside salesman are fairly apparent. Such salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work … He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941); *see also Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2173 (2012) ("The [outside sales] exemption is premised on the belief that exempt employees 'typically earned salaries well above the minimum wage' . . . and performed a kind of work that 'was difficult to standardize to any time frame.'" (internal citation omitted)).  Classic examples of such outside salespeople are a traveling salesman like Willie Loman, a door-to-door saleswoman like the "Avon Lady," and a real estate agent who spends much of her time showing homes in various areas at times she schedules.   Plaintiffs in this case are a far cry from those examples and, under either side's version of their job duties, meet few of the justifications for the exemption that *Jewel Tea* identifies.  Plaintiffs do not set their schedule but must show up at the sales office when required, spend most of their time at their employer's sales office, and are subject to supervision. *See Billingslea v. Brayson Homes, Inc.*, 2006 WL 562198, at *8 (N.D. Ga. Mar. 7, 2006) ("*Billingslea I*") (explaining why home salespeople working at the homebuilder's sales homes and

lots do not qualify for the exemption when evaluated in light of the exemption's rationale).

But for situations that are not as clear cut as Willie Loman or the Avon Lady, Department of Labor (DOL) regulations tells us a little more about who qualifies as "an outside salesman." And those regulations, combined with DOL opinion letters applying them to certain situations, make the status of the Plaintiffs in this case a closer call than the *Jewel Tea* factors would indicate. *See Billingslea v. Brayson Homes, Inc.*, 2007 WL 2118990 (N.D. Ga. July 20, 2007) ("*Billingslea II*") (reconsidering its conclusion that the lots where the salespeople performed sales activity constituted the employer's "place of business" in light of DOL opinion letters). The regulation defines an "outside salesman" as an employee "(1) [w]hose primary duty is . . . making sales. . and (2) [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a). The parties agree that Plaintiffs' primary duty is making sales.[1] So the disagreement turns on

[1] Plaintiffs' motion for summary judgment on the outside sales exemption gets a bit confusing on this point. It appears to concede the first requirement—that the employee's primary duty is sales—but then relies on language in one of the 2007 DOL opinion letters that addresses this part of the test. See Docket Entry No. 142 at 40–42. In discussing whether the "primary duty" test is met, that letter notes that the employees at issue "spend at most one or two hours a week performing non-exempt work." Wage & Hour Op. Letter FLSA 2007-2, 2007 WL 506575, at *4 (Jan. 25, 2007) at *3. Plaintiffs incorrectly treat this "two hour" reference as dealing with the inside/outside issue of the second "customarily and regularly engaged away" requirement in the regulation. Docket Entry No. 142 at 4. To the extent the Court is confused and Plaintiffs are challenging the first element, the Court easily concludes that the "primary duty" requirement is

whether Plaintiffs meet the "customarily and regularly engaged away from the employer's place of business" requirement.  *Id.*  Another DOL regulation provides more detail on that question, defining "customarily and regularly" as "a frequency that must be greater than occasional but which, of course, may be less than constant," including "work normally and recurrently performed every workweek," but not "isolated or one-time tasks."  29 C.F.R. § 541.701.

### B.  DOL Opinion Letters

Because even that additional regulation speaks at a general level and there is little case law (and no binding precedent) applying the outside sales exemption to home sales, the parties focus their briefing on DOL opinion letters addressing how the exemption applies to certain employment situations in this industry.  The focus on these letters is so great that it sometimes seems the parties treat the opinion letters as if they have the force of law.  They do not.  Therefore, before describing what these letters say and how they apply to this case, it is helpful to discuss two reasons why they are informative but not binding.

One reason comes from administrative law.  Unlike a regulation, a DOL opinion letter is an informal agency interpretation.  In fact, the law on the deference due informal agency interpretations largely comes from Supreme Court cases involving informal DOL interpretations of the FLSA.  *Skidmore v. Swift &*

---

met for these employees.

*Co.* involved the question of how much weight should be given to a DOL Interpretative Bulletin addressing what qualifies as "work time" under the FLSA. Justice Jackson explained that:

> rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. 134, 140 (1944). Since that decision, the term "*Skidmore* deference" has described the deference due an agency's informal interpretation, which turns largely on its "power to persuade." *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1340 (2011) (Scalia, J., dissenting); *Luminant Generation Co., LLC v. U.S. E.P.A.*, 675 F.3d 917, 928 (5th Cir. 2012). Recent cases applying *Skidmore* deference, in which some justices have criticized the doctrine, also involve informal interpretations of the FLSA. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000)[2] (applying *Skidmore* deference to DOL's opinion letter interpreting the FLSA's compensatory time provision and ultimately finding it unpersuasive because at odds with the statutory language); *see id.* at 589–90 (Scalia, J., concurring) (referring to *Skidmore* deference as "an

---

[2] Both *Skidmore* and *Christensen* were filed in Texas federal courts. The former in the Northern District, the latter in the Southern District.

anachronism" and instead arguing for applying the more deferential *Chevron* standard); *see also Christopher*, 132 S.Ct. at 2168–69 (refusing to follow DOL view on whether pharmaceutical salespeople are engaged in "outside sales" because of inconsistent agency reasoning, which made DOL's interpretation "quite unpersuasive").  Most lower courts therefore afford *Skidmore* deference to DOL opinion letters.  *See, e.g.*, *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 241 (C.D. Cal. 2007) (giving deference to DOL opinion letters "to the extent that the opinion letters have the power to persuade").

But when a DOL opinion letter is expounding upon what the agency has said in a regulation, greater deference is likely due.  That seems to be the case here because the DOL opinion letters address how to determine whether a salesperson is "customarily and regularly engaged away from the employer's place of business" within the meaning of the regulation promulgated in 29 C.F.R. § 541.500(a).  Once again a case involving an informal interpretation of the FLSA is the seminal decision.  In *Auer v. Robbins*, the Supreme Court deferred to the Secretary of Labor's interpretation, expressed in an amicus brief, on how to apply an ambiguous DOL regulation defining who is an "administrative, executive, or professional" employee exempt from the FLSA.  519 U.S. 452, 461 (1997).  Thus "*Auer* deference" stands for the principle that a court should defer to an agency's reasonable interpretation of its ambiguous regulation.  *Id.* (holding that the

Secretary of Labor's interpretation of the FLSA regulation was "controlling unless 'plainly erroneous or inconsistent with the regulation'" (internal citations omitted)).   Though subject to sharp criticism of late, *see Decker v. Northwest Environmental Defense Center*, 133 S.Ct. 1326, 1339 (2013) (Scalia, J., concurring in part and dissenting in part) ("For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of 'defer[ring] to an agency's interpretation of its own regulations.'" (internal citations omitted)), *Auer* remains good law that this Court must apply, *see id.* at 1338 (Roberts, C.J., concurring) (stating that although Scalia's opinion raises "serious questions" about *Auer* deference, "this is not the case" to reconsider the principle).   Indeed, *Christensen* indicates that *Auer* deference applies to DOL opinion letters that interpret an ambiguous FLSA regulation.   *Christensen*, 529 U.S. at 588 (noting that "*Auer* deference is warranted [for DOL informal interpretations] when the language of the regulation is ambiguous," but ultimately applying the less deferential *Skidmore* standard because the regulation at issue was not ambiguous).   Therefore, while the DOL opinion letters do not have the force of law, this Court should follow them if they are reasonable interpretations of the ambiguous regulation concerning the "outside sales" exemption.

But their role is limited for another reason. By their own terms, the opinion letters are limited to particular facts.  The two main opinion letters the parties rely on state that they are "based exclusively on the facts and circumstances described" by those requesting the opinion and the express or implied representation that the requestor "provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented." *See* Wage & Hour Op. Letter FLSA 2007-1, 2007 WL 506574, at *5 (Jan. 25, 2007) ("FLSA 2007-1"); Wage & Hour Op. Letter FLSA 2007-2, 2007 WL 506575, at *4 (Jan. 25, 2007) ("FLSA 2007-2"). And they caution that "[e]xistence of any factual or historical background not contained in your letter might require a different conclusion from the one expressed herein." *Id.*  These disclaimers are consistent with DOL's general view that the outside sales determination is highly factbound. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22187 (Apr. 23, 2004) ("The term 'customarily and regularly' requires a case-by-case determination, based on all the facts and circumstances, over a time period of sufficient duration to exclude anomalies." (internal citations omitted)); *see also Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1156 (10th Cir. 2012) ("[D]etermining whether an employee is an outside salesman for the purposes of the FLSA can be a fact-intensive endeavor . . . ." (citations omitted)).

With those understandings, it is now time to turn to the contents of the opinion letters.  On the same day in 2007, DOL issued two opinions discussing the outside sales exemption in the context of the new home industry.  They address two questions.  The first is whether the time home salespeople spend not in the sales office but on lots meeting with customers is "inside" or "outside" time.  In other words, are the lots where the homes are built the employer's "places of business"?  29 C.F.R. § 541.500(a).  One could certainly answer "yes."  The lots are owned by the employer until title passes to the customer, so it is not akin to a traveling salesman visiting his customers' businesses or homes.  *See Billingslea I,* 2006 WL 562198, at *9.  But on this question the DOL has long held that sales work done on the lots constitutes "outside" time because a lot where a salesperson is meeting "prospects who may buy that house or another similar one on the tract may more properly be viewed as analogous to the hotel sample room of a traveling salesman . . . than to the actual place of business of the employer."  Wage & Hour Op. Letter, 1964 DOLWH LEXIS 198 (April 21, 1964); *see also* FLSA 2007-1, at *4 (explaining DOL's longstanding view that "the lots for sale are not part of the employer's place of business[,] but rather are the products to be sold by the sales associates"); Wage & Hour Op. Letter FLSA 2007-4, 2007 WL 506577, at *2 (Jan. 25, 2007) ("[T]he employer does not maintain a continuing interest in the subdivision lots once they are sold . . . and thus these areas are not part of the

employer's place of business.")   Even if this is not the better view, the Court
cannot say that it is an unreasonable one.  *See Billingslea II*, 2007 WL 2118990, at
*4; *Tracy v. NVR, Inc.*, 599 F. Supp. 2d 359, 363 (W.D.N.Y. 2009) (concluding
that given the deference due agency interpretations of their own regulations "the
Court is compelled to accept the DOL's reasoning" that home lots are not the
employer's "place of business").   Indeed, Plaintiffs do not dispute that the time
spent on the lots—time that they say was minimal—counts as "outside sales" time.

The issue thus becomes whether an employee meets the "outside sales"
exemption when some of her time is "inside" (in the model home sales office) and
some is "outside" (on the lots or other locations outside the sales office).  This is
the question on which the 2007 DOL letters provided more detailed guidance.  The
first letter involves a "multi-state real estate and construction company that
employ[ed] sales associates to market and sell single-family housing units to the
public."  FLSA 2007-1, at *1.  The employees worked at the company's sales
offices located within subdivisions in the process of being constructed or in
temporary trailers outside of the subdivisions, sometimes up to twenty miles away.
*Id.*  The employer described its associates as spending approximately half of their
time in the sales office.  *Id.* at *2.  The other half was spent outside the sales office,
participating in activities such as escorting prospective buyers to model homes,
ensuring that the model homes were ready for visits from prospective buyers,

meeting with realtors, familiarizing themselves with the surrounding communities, shopping the competition, and attending sales training programs. *Id.* at *1–2. The DOL found these employees to be exempt because, although they worked in a fixed sales office that was the employer's place of business, the activities away from the sales office "constitute[d] a significant amount of the sales associates' typical workweek." *Id.* at *4. "Thus, leaving the sales office to show properties, even properties located within the same subdivision, satisfies the requirement that the sales associates be engaged away from their employer's place of business in performing their primary duty of selling homes." *Id.*

Plaintiffs construe this letter as setting a 50 percent floor for the amount of time that an employee must spend outside the sales office to meet the exemption, a threshold that is likely not met here even under Meritage's view of the facts. Such a reading of the letter is not plausible. The letter says that spending half of one's work hours outside the sales office is sufficient to meet the exemption; it does not say that percentage is necessary. The standard the letter uses for the quantity of time that must be spent outside the sales office is a "significant amount of the sales associates' typical workweek," *id.*—no doubt a vague standard, but certainly not one that requires half of the employee's time to be spent "outside."

If any doubt remains about whether the first 2007 DOL letter sets a 50 percent floor, the second letter issued the same day dispels it. The second letter

addresses sales associates whose "primary duty [was] to sell newly-constructed homes" and who worked in model homes or trailers located in or near the community in which the homes were being sold.  FLSA 2007-2, at *1.  The associates generally spent "one or two hours a day, one or two times a week" outside the model home or trailer "to engage in selling or sales-related activities," such as

> meeting with prospects, realtors, or others involved in the home buying process; showing properties and communities to prospects; touring and demonstrating model homes and home sites; engaging in a wide variety of marketing efforts; and meeting with customers, realtors, construction personnel, and others to ensure customer satisfaction throughout the sale and construction of the new home.

*Id.*  The associates' remaining workweek was spent inside the sales office.  *Id.* Again, the DOL found these employees met the outside sales exemption, even though they were outside the employer's place of business merely "one or two hours a day, one or two times a week," nowhere near the 50 percent floor that Plaintiffs propound.  *Id.* at *3.  The DOL explained that the outside sales activities were "certainly critical, or . . . 'indispensable components' of the overall sales effort, and would almost always have to occur away from the model home."  *Id.*  In contrast to this "indispensable" sales work that took place outside the model home, the "inside" work is characterized as "activities in support of the sales employee's sales efforts" out on the lots.  *Id.* at *1.  This "inside" support work is described as "completing paperwork; prospecting customers; creating customer contact cards

and promotional materials; following up with the customers; scheduling appointments; calling realtors to generate interest in the homes . . . ; learning about the homes; and other similar sales-related tasks." *Id*.  In reaching its opinion, the DOL emphasized that it "is the nature of the time spent outside the model home, rather than the amount of time, that drives our conclusion.  Virtually all of the indispensable components of the sales efforts are concentrated in the outside period." *Id.* at *3 n.2.

### C. Applying The Exemption To This Case

Given the ambiguity of the regulation's standard that an employee must be "customarily and regularly engaged away from the employer's place of business" to be an outside salesperson, the Court will defer to how the DOL interpreted this requirement in its 2007 opinion letters.  Read together, the standard they seem to announce, with a more qualitative than quantitative focus on the outside activity, is that the exemption applies when most or "virtually all of the indispensable components of the sales efforts are concentrated in the outside period." *Id.*  In determining whether either side is entitled to judgment as a matter of law on that issue, the Court is mindful of the DOL's view that this is a fact intensive inquiry and the Supreme Court's guidance that FLSA "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and

spirit." *Arnold v. Ben Kanowsky, Ind.*, 361 U.S. 388, 392 (1960)[3]; *see also McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 424 (5th Cir. 2006) (same). As one court addressing the outside sales exemption for new home salespeople has explained, the "question [is] whether the opinion letters are sufficiently on point with the undisputed facts to support a grant of summary judgment." *Tracy*, 599 F. Supp. 2d. at 363.

When all credibility determinations and inferences are made against the movant, neither side can make that showing. As discussed above, the Plaintiffs and Meritage management paint starkly contrasting pictures of where the primary sales activity takes place. The tension between what Meritage claims it trained Plaintiffs to do and how Plaintiffs claim they actually performed their jobs is further demonstrated by Plaintiffs' own emails and testimony regarding mystery shoppers[4] and model homes. Meritage has submitted numerous emails from Plaintiff Armstrong indicating that she toured inventory homes with prospects, drove through the community, and sent updates to buyers after observing progress on their homes as they were being built. *See* Docket Entry No. 143-2 at 30–32, 50,

---

[3] In *Christopher*, the Supreme Court did not apply this presumption because the term "sales," on which the application of the exemption turned in that case, is a "general definition that applies throughout the FLSA." 132 S. Ct. at 2172 n. 21. That is not the case with the "outside" term at issue here which is limited to the exemption itself.

[4] According to Harding, mystery shopping "is a process by which Meritage hires persons to pose as prospects interested in purchasing a home. The mystery shopper captures his or her experience on video and audio, and Meritage uses the mystery shopper's experience, recorded in a scorecard, to evaluate its salespeople and improve their sales technique." Docket Entry No. 143-18 at 5 n.1.

56, 60–67; Docket Entry No. 143-3 at 3–5. Regarding mystery shoppers, named Plaintiff David Lipnicki testified that while he rarely showed inventory homes to prospective buyers, when he knew he was dealing with a mystery shopper, he drove the shopper around the community and demonstrated an inventory home. *See* Docket Entry No. 143-7 at 30–34. Florida Plaintiff Kristine Willocks gave similar testimony. Docket Entry No. 143-23 at 31–35. Plaintiff Carole Anderson testified that she used the model home sales office as her "sales tool" and would not take prospective buyers to inventory homes or lots, Docket Entry No. 143-29 at 88–90, whereas Plaintiff Darlene Skelton left the sales office, which was only one of the four models in her community, to demonstrate the other three models to customers. Docket Entry No. 143-29 at 7–9.

When faced with "diametrically opposed descriptions" of where key sales activity took place as is the case here, two federal district courts (including this one) have found fact issues concerning application of the exemption to new home salespeople. *Tracy*, 599 F. Supp. 2d at 364; *Krohn v. David Powers Homes, Inc.*, 2009 WL 1883989, at *6 (S.D. Tex. June 30, 2009) (Atlas, J.) (making a factual finding after a bench trial that plaintiff was not an exempt outside salesman because, although she had "job responsibilities that generally should require the employee to be customarily and regularly outside the office," she "performed her job in a manner that did not involve her being customarily and regularly away from

the office"); *see also Arnold v. Reliant Bank*, 932 F. Supp. 2d 840, at 857 (M.D. Tenn. 2013) (denying cross motions for summary judgment when evidence conflicted regarding the extent of outside sales activity by a bank employee). In *Tracy*, the plaintiff contended that he typically left the model home to visit lots only twice a month and the "overwhelming majority" of his contact with customers took place within the model home. 599 F. Supp. 2d at 364. His supervisor and a coworker, on the other hand, testified that he left the model home to show home sites to customers "an average of eight or nine times per week" and met with realtors and performed other sales activity outside the sales office. *Id.* The court denied the plaintiff's summary judgment motion because "[t]hese contested facts are central to the determination of whether Tracy was 'customarily and regularly engaged'" in sales activity outside the model home. *Id.*

It is true that the *Billinsglea* court reconsidered its previous ruling and granted summary judgment in favor of the employer on the exemption after seeing the 2007 DOL opinion letters. *Billingslea II*, 2007 WL 2118990, at *5. But that reversal stemmed from the court discovering that the 2007 letters reiterated DOL's decade-old view that time spent on lots is "outside" time, something that both this Court and Plaintiffs accept. That issue was determinative in *Billingslea II* because the plaintiffs "acknowledge[d] that they left the model home to participate [in the key sales activities described in the 2007 DOL letters] on a weekly basis, and many

on a daily basis." *Id*. at *4.  It is on that issue that the evidence in this case conflicts, as it did in *Tracy* and *Krohn*.  The applicability of the outside sales exemption will thus depend on whose version of events the factfinder believes.  If Plaintiffs' testimony is found to be credible, then the indispensable sales activity did not occur outside the sales office.  But if the jury finds the evidence Meritage points to credible, then the Plaintiffs would be exempt given the DOL's interpretation of the outside sales exemption.   Accordingly, both summary judgment motions on this issue are **DENIED**.

## IV.   THE STATUTE OF LIMITATIONS AND "GOOD FAITH" DEFENSE

Meritage's next summary judgment motion deals with two *mens rea* issues in the FLSA.  The first is whether there is any evidence that Meritage acted willfully, in which case it would face a three-year rather than two-year statute of limitations.  *See* 29 U.S.C. § 255(a).  The second is whether Meritage can establish the affirmative defense that it acted in good faith even if unlawfully, in which case a court has discretion to not impose liquidated damages for any violations.  *See* 29 U.S.C. § 260.

### A.   Willfulness

To show that an alleged violation of the FLSA was willful, Plaintiffs must present evidence "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *McLaughlin v.*

*Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636 (5th Cir. 2001) ("Generally, a plaintiff suing under the FLSA carries the burden of proving all elements of his or her claim.") "Willful" is synonymous with "voluntary," "deliberate," and "intentional," and "refer[s] to conduct that is [not] merely negligent." *McLaughlin*, 486 U.S. at 133.  When employers have knowledge that they are violating the FLSA and choose to continue to do so, their conduct is willful.  *See Singer v. City of Waco*, 324 F.3d 813, 821–22 (5th Cir. 2003) (upholding jury's finding of willfulness based on evidence that assistant fire chief told another supervisor he knew firefighters were being paid incorrectly, the city cancelled a training seminar that would have informed the firefighters about overtime issues, and the city attorney stated "we don't even want to open that can of worms" when questioned about overtime pay); *see also Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (finding willfulness when the local director of the Wage and Hour office had previously informed one of defendant's representatives that defendants were violating the FLSA).

On the other hand, if "an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful." *McLaughlin*, 486 U.S. at 135 n.13; *see also Halferty v. Pulse Drug Co.*, 826 F.2d 2, 3–4 (5th Cir. 1987) (concluding employer did not act willfully when it consulted with its attorney and examined a related DOL bulletin).  And even if an employer acts unreasonably, its

conduct cannot be considered willful, so long as it is not reckless.  *Id.*; *see also Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990) (upholding trial court's finding that, although defendant had acted unreasonably, it did not willfully violate the FLSA because it had "discussed minimum wage requirements with the Texas Employment Commission and reviewed some 'brochures and pamphlets' on the topic").

Under that standard, even the evidence viewed in Plaintiffs' favor does not support a finding that Meritage willfully violated the FLSA by classifying Plaintiffs as exempt outside salespeople.   Wade Thomas, Meritage's Vice President of Human Resources, testified that he relied on the two 2007 DOL opinion letters, as well as the *Billingslea II* opinion, in making this classification. *See* Docket Entry No. 145-4 at 5.  Thomas made the determination based on his belief that "[s]alespeople in the home-building industry are performing the same essential functions" and his knowledge of "what [Meritage's] expectations were of salespeople." *Id.* at 6.  Plaintiffs argue that because the facts presented in the letters and *Billingslea II* are different than their version of the facts of this case, only someone acting with deliberate indifference could base an exempt classification status on those sources.  The Court disagrees.  These distinctions exist only if Plaintiffs' testimony is true.  Meritage identifies substantial evidence showing that it trained and expected Plaintiffs to perform most, if not all, of the

same tasks as those performed by the salespeople in the letters and *Billingslea II*, and that Plaintiffs did, in fact, perform at least some of those tasks.   While Plaintiffs contend that their sales activity on the lots was much more limited than Meritage understood, they present no evidence that Meritage was told this prior to the filing of this lawsuit.   The evidence in this case is similar to that in *Krohn*, in which the employer believed the salespeople were spending significant time outside the sales office but Plaintiff testified she "stayed mainly in the office." 2009 WL 1883989, at *6.   Although finding that the outside sales exemption did not apply, Judge Atlas nonetheless found that the employer acted in good faith (which precludes a finding of willfulness) given its understanding of the salespeople's duties which would have rendered them exempt under the DOL opinion letters.   *See id*.

Plaintiffs further attempt to bolster their willfulness argument by pointing out that Meritage failed to obtain legal advice from in-house or outside counsel. But "[s]imply failing to seek legal advice concerning its pay practice does not evidence a willful violation of the statute."   *Mireles*, 899 F.2d at 1416.   Similarly unavailing is Plaintiffs' argument that Meritage acted willfully because it failed to conduct a survey regarding the amount of time Plaintiffs spent engaged in outside sales activities and compare those survey results to the FLSA letters.   The law places no such requirement on Meritage.   Furthermore, even if the law did require

Meritage to perform some type of audit, the evidence shows that Meritage attempted to ensure that Plaintiffs were performing their job duties as expected by using mystery shoppers, among other methods.

Finally, Plaintiffs contend that Meritage was on notice that its pay practices violated the FLSA because it had been sued for other FLSA violations and violations of California labor law, and because of similar lawsuits against industry competitors.  While courts in the Southern District of Texas have found that prior litigation can support a finding a willfulness, *see, e.g.*, *Sealey v. EmCare, Inc.*, 2013 WL 164040, at *4 (S.D. Tex. Jan. 14, 2013); *see also Villegas v. Dependable Constr. Servs., Inc.*, 2008 WL 5137321, at *27 (S.D. Tex. Dec. 8, 2008) (noting that, if the FLSA violations in the pending case resembled that of a prior lawsuit, "it is possible that Defendants had knowledge that they were violating FLSA"), those decisions relied on prior FLSA litigation against defendants regarding the same legal issue.  In *Sealey*, "[b]oth the district court and the Fifth Circuit" had previously "engaged in lengthy analyses of the relevant statutes and regulations" concerning overtime for midlevel practitioners of health care in lawsuits against the same defendant.  *Sealey*, 2013 WL 164040, at *2.  Plaintiffs have presented no evidence that the other cases Meritage has defended involved an outside salesman classification under the FLSA.  The California case, as discussed more thoroughly below, involved alleged violations of state law.  The remaining Meritage cases

involved project superintendents alleging misclassification under a different exemption and hourly independent contractors seeking overtime. In sum, the existence of other litigation against Meritage and its competitors under these circumstances does not demonstrate willfulness.

Because Meritage relied on the FLSA letters and *Billingslea II*, together with its knowledge of its salespeople's training and expected job duties, the Court concludes that it is entitled to judgment as a matter of law on the wilfullness issue. *See also Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 713–14 (S.D. Tex. 2012) (finding no willfulness when employer's interpretation of FLSA exemption was supported by applicable regulations). Meritage's motion is **GRANTED** and a two-year statute of limitations will therefore apply to the claims in this case.

### B.    Good Faith

The FLSA provides for an award of liquidated damages equal to the amount of unpaid overtime if an employer misclassifies an employee as exempt. 29 U.S.C. § 216(b). However,

> if the employer shows to the satisfaction of the court that the act or omission giving rise to [the FLSA violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [] section 216.

*Id.* § 260.   Thus, if the court finds the employer acted in good faith and with reasonable grounds, it has the discretion to award no liquidated damages, the full amount allowable under section 216, or an amount somewhere in between.   *See Lee v. Coahoma County*, 937 F.2d 220, 227 (5th Cir. 1991).   Unlike the wilfullness issue discussed above in which the plaintiff faces the burden, the employer has the burden of proving a section 260 good faith defense, *see id.*, and faces "the 'substantial burden' of proving to the satisfaction of the trial court that its acts giving rise to the suit are *both* in good faith *and* reasonable."  *Mireles*, 899 F.2d at 1415 (italics in original).

The good faith defense is considered a matter for the court to decide.   *See McConnell v. Thomson Newspapers, Inc.*, 802 F. Supp. 1484, 1506 (E.D. Tex. 1992) (noting that defendant may avoid liquidated damages if it "shows the court—not the jury—that the act violating the FLSA was taken in good faith, and that it had reasonable grounds for believing that the act was not a violation of the FLSA").   For that reason, courts do not need to make a good faith ruling until after the jury has rendered a verdict finding violations.   *See, e.g.*, *Wajcman v. Investment Corp. of Palm Beach*, 620 F. Supp. 2d 1353, 1358–61 (S.D. Fla. 2009) (discussing defendant's good faith defense and finding liquidated damages appropriate after jury determined defendant violated the FLSA but that the violation was not willful); *see also Riddle v. Tex-Fin, Inc.*, 2011 WL 1103033, at *5 (S.D. Tex. Mar.

22, 2011) (rejecting defendant's good faith defense following a jury liability finding).

Logic dictates that if a defendant is determined to have acted willfully, it cannot show that it acted in good faith. *Singer*, 324 F.3d at 823 (citing *Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999)). But the converse is not necessarily true. Meritage's entitlement to a good faith finding at summary judgment does not automatically follow from the finding above that it did not act wilfully. As already mentioned, this is an issue on which Meritage faces the burden and it is generally more difficult to obtain summary judgment on an affirmative claim than to obtain it defending a claim. Moreover, while there is certainly some overlap between the two determinations, it would not be logically inconsistent to conclude that an employer acted neither wilfully nor in good faith. *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008) ("Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present."); *Riddle*, 2011 WL 1103033, at *5 (awarding liquidated damages even though the jury found no wilful conduct); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 926 (E.D. La. 2009) (citing cases where defendants' actions were found to be neither wilful nor in good faith).

Other than explaining why the Court's rejection of a willfulness finding does not compel a finding of good faith, the Court does not think it prudent to rule on the good-faith issue at this stage. There has not yet been a finding of any FLSA violations, so the good faith issue is one that may never need to be decided. Even if the Court were to find at this time that Meritage acted in good faith, that would not preclude the award of liquidated damages in the event the jury finds FLSA violations. The good faith finding merely gives the Court discretion not to award liquidated damages which are otherwise mandatory. So even a ruling in Meritage's favor on this issue would not provide certainty on the question of whether liquidated damages are possible in this case. The Court therefore concludes that the good faith decision is better off being decided if it becomes necessary, when the Court will have the benefit of further factual development at trial. Meritage's motion regarding the good faith defense is therefore **DENIED** without prejudice to Meritage's ability to argue the defense in a post-trial motion.

## V.     WHETHER THE CALIFORNIA PLAINTIFFS SHOULD BE DISMISSED

Finally, Meritage asks the Court to dismiss fifteen plaintiffs[5] (the "California Plaintiffs") from this lawsuit who were members of a class action lawsuit against Meritage in California state court, or, in the alternative, to create a subclass of

---

[5] These are Plaintiffs Peggy Cummins, Cindy Detzel, Roberta Fonzeno, Andrew Harlow, Mahnaz Hemmati, Cheryl Holthouse, Debra Hughes, John Oyoung, Denise Phillips, Maryanne Smith, Robin Smith, Laurie Vernarecci, Wendy Wagner, Harvey Edwards, and Susan Zuber (collectively, the California Plaintiffs). Docket Entry No. 146 at 2.

these California Plaintiffs.   The California case alleged violations of California state labor laws, including Meritage's failure to pay overtime as required by California state law.   *Godinez v. Meritage Homes of California*, No. BC418843 (Cal. Sup. Ct.)[6]; *see also* Cal. Labor Code §§ 510, 1194.   Under the terms of the final settlement agreement in the California case, the plaintiffs agreed to:

> release, to the extent permitted by law, Defendant, and any of its parents, subsidiaries, affiliates, predecessors or successors, . . . including, but not limited to, Meritage Homes Corporation, . . . from any and all claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, attorneys' fees, damages, penalties, action or causes of action contingent or accrued for, or which arise from or are in any way connected with the factual allegations and claims asserted in the [California] Lawsuit, including, without limitation, any and all claims for [] alleged failure to pay wages and overtime compensation.

Docket Entry No. 146-2 at 19.   Meritage contends that this broad release language precludes the California Plaintiffs from recovering in this case.

Unlike this FLSA "opt in" collective action, the California case was a traditional "opt out" class action akin to those brought under Federal Rule of Civil Procedure 23.[7]   Because of the due process concerns for absent class members that exist in "opt out" classes, such a class "may be settled, voluntarily dismissed, or compromised only with the court's approval" and, if the settlement will bind

---

[6] See Docket Entry No. 146-1 for Plaintiffs' Third Amended Complaint in the California case.

[7] The class action was brought under the California Rules of Civil Procedure. *See* Ca. R. Civ. P. 382.   California state courts rely on the federal rule in interpreting California class action requirements.   *Dunk v. Ford Motor Co.*, 56 Cal. Rptr. 2d 483, 487 & n.7 (1996) (citing Rule 23(e) and noting "[i]n the absence of California law on the subject, California courts look to federal authority" (citation omitted)).

absent class members, "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e); *see also Dunk*, 56 Cal. Rptr. 2d at 487 ("The court must determine the settlement is fair, adequate, and reasonable.").

Under the applicable rules, the California Plaintiffs received notice of the class action litigation, which involved a bona fide dispute as to the amount of overtime wages due.  On October 20, 2011, the California court approved the settlement agreement, and in order to do so, had to find that the settlement was fair, reasonable, and adequate.  The named plaintiffs, their attorney, and attorneys for Meritage executed the settlement agreement containing the broad release, waiving the right to bringing any future claims related to the factual allegations in that case, including claims for unpaid wages and overtime.  The California Plaintiffs do not dispute that they failed to opt out of the California class action.  All but three submitted claim forms and cashed their settlement checks.

Such a court-approved settlement agreement is generally binding on and enforceable against absent class members, even those who fail to collect their recovery, thus the requirement that one must "opt out" to avoid being bound by the settlement.  *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 992 (5th Cir. 1981); *see* 5 Newberg on Class Actions § 16:25 (4th ed. 2009).  That much is obvious because otherwise parties would not enter into class settlements.  The Plaintiffs

argue, however, that the "FLSA statute and case law do not support that FLSA claims can be resolved . . . based on Rule 23 opt-out procedures," *Donatti v. Charter Commc'ns, L.L.C.*, 2012 WL 5207585, at *3 (W.D. Mo. Oct. 22, 2012), and instead may be settled only by supervised payment from the Secretary of Labor or pursuant to a stipulated judgment entered by a court in a case asserting FLSA claims. *See Lynn's Food Stores, Inc. v. U.S. ex rel U.S. Dep't of Labor*, 679 F.2d 1350, 1352–54 (11th Cir. 1982).

The California Plaintiffs' ability to avoid the release language in the prior settlement thus turns on their notion that there is something special about FLSA claims that takes them outside the ordinary rule that class action settlements are enforceable. Although there is some support for this proposition in case law from the Eleventh Circuit, *see id*; *Martinez v. Bohls Bearing Equip. Co.*, 361 F. Supp. 2d 608, 631 (W.D. Tex. 2005) (noting that only the Eleventh Circuit has expressly held that private compromises and releases of FLSA claims are impermissible), recent Fifth Circuit decisions do not support that view. The court of appeals recently held that a union's settlement of its members' FLSA claims precluded a subsequent private FLSA lawsuit by its members. *See Martin v. Spring Break '83 Prods. L.L.C.*, 688 F.3d 247, 255 (5th Cir. 2012). In doing so, it rejected the position that a "release is invalid because individuals may not privately settle FLSA claims" and instead held that "a private compromise of claims under the

FLSA is permissible where there exists a bond fide dispute as to liability." *Id.* at 254 (quoting *Martinez*, 361 F. Supp. 2d at 634).

By "private" the *Martin* Court is referring to settlements made outside of the court system without a lawsuit having been filed.  In that sense, the issue in this case is an easier call because the release was part of the settlement of a lawsuit, and one that required court approval. *See Piambino v. Pailey*, 610 F.2d 1306, 1327 (5th Cir. 1980) ("The purpose of this [review] requirement is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights." (citation omitted)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001) ("Under Rule 23(e), the District Court acts as a fiduciary guarding the rights of absent class members . . . ."); Fed. R. Civ. P. 23(e), Comments to 2003 Amendments ("[C]ourt review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.")  The California Plaintiffs, however, try to contrast *Martin*, in which the pre-suit settlement was reached by the union as "the exclusive agent for all employees in the bargaining unit," *id.* at 254 n.6, with their lack of a personal lawyer in the California class action.  But *Martin* relied heavily on the thorough district court opinion in *Martinez*, which did not involve a union but a private settlement entered into without a lawyer. *Id.* at 254–55; *Martinez,* 361 F. Supp. 2d. at 611–13; *see also Bodle v. TXL Mtg. Corp.*, 2012 WL 5828616, at *5–6 (S.D.

Tex. Oct. 2, 2012) (relying on *Martin* and *Martinez* in holding that employees' wage claims were barred by a private settlement agreement with the same employer).  The California class settlement was negotiated by class counsel, who had a duty to represent the interest of all class members, and approved by a court after a fairness hearing.  And the idea that there is something unique about the FLSA that requires its rights to be enforced only in a federal court is further undermined by the arbitrability of FLSA claims.  *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297–98 (5th Cir. 2004).

Even if there were no release of wage claims in the California settlement, courts have held that *res judicata* bars a subsequent FLSA suit when predicated on the same facts as a previously settled Rule 23 action.  *See Kuncl v. IBM Corp.*, 660 F. Supp. 2d 1246, 1252–53 (N.D. Okla. 2009); *Klein v. Ryan Beck Holdings, Inc.*, 2007 WL 2059828, at *7 (S.D.N.Y. July 20, 2007).  In *Kuncl*, the court addressed the preclusive effect of a settled "hybrid" Rule 23/collective action on a subsequent FLSA suit.  *Kuncl*, 660 F. Supp. 2d at 1251.  Kuncl was included in the Rule 23 class because he failed to opt out, but not included in the FLSA collective action because he failed to opt in.  *Id.* at 1249.  As a member of the Rule 23 class, Kuncl released IBM from all claims based on the same factual predicate as the settled claims.  Noting that, in the class action context, preclusion principles apply with equal force to a judgment on the merits and a settlement agreement, the court

concluded that Kuncl's subsequent FLSA suit was barred because section 216 "does not create an exception to the *res judicata* doctrine." *Id.* at 1252–53. Plaintiffs differentiate *Kuncl* from the present case on the ground that it was a "hybrid" action, but the court's analysis did not turn on the hybrid nature of the suit. In fact, the court noted "that the same *res judicata* issues would be present if a judgment was entered in a pure Rule 23 state-law class action if the facts giving rise to the class action were the same facts that formed the basis of a subsequent FLSA action." *Id.* at 1253 n.3 (citation omitted). That is precisely the case here. *See also Klein*, 2007 WL 2059828, at *7 ("No provision of the FLSA bars the application of *res judicata* when the same party requirement is satisfied, as would be the case when a person allows his state law claims to be adjudicated in a Rule 23 class action." (emphasis omitted)).

The Court acknowledges that a magistrate judge in the Western District of Missouri held that FLSA claims cannot be resolved through a Rule 23 class action settlement. *Donatti*, 2012 WL 5207585, at *5. The decision in that case is rooted in the premise that section 216 creates an exception to the enforceability of settlement agreements, *see id.* at *4 ("Without certification [of a collective action], the FLSA claims of the plaintiffs in this case, who did not opt in to the settlement agreement, were not resolved by the [prior class action] settlement agreement . . . ."), a premise that is inconsistent with the Fifth Circuit's approach to

FLSA settlement, *see Martin*, 688 F.3d at 255–56 (holding that parties may privately settle their FLSA claims); *Carter*, 362 F.3d at 297–98 (holding that FLSA claims can be subject to mandatory arbitration); *see also Kuncl*, 660 F. Supp. 2d at 1254 (finding that "[n]o language in [section] 216 or anywhere else in the FLSA provides for such an exception" to the normal *res judicata* analysis).

The Court is also aware of courts refusing to approve language in a Rule 23 settlement that would release FLSA claims for absent class members. *See, e.g.*, *La Parne v. Monex Deposit Co.*, 2010 WL 4916606, at *3 (C.D. Cal. Nov. 29, 2010). Those courts may well have taken the wise approach in exercising their discretion to determine the proper scope of the settlements in those particular cases, but such decisions do little to help with the problem here: how to apply a broad release in an opt-out class that a court has already approved and upon which parties have relied? Because there is no indication that the procedures followed in the California case—including the fairness determination—were improper, this Court must give the settlement legal effect. *Cf. Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981) ("[A]n erroneous conclusion reached by the court in the first suit does not deprive the defendants in the second action of their right to rely upon the plea of *res judicata* . . . ." (internal quotation marks omitted)).

Given the generally binding effect of class action settlements, the Fifth Circuit's view that FLSA claims can be settled privately, and a court's duty to

scrutinize a class action settlement for fairness to absent class members, the Court finds that the settlement agreement in the California case is enforceable against the California Plaintiffs and bars their successive FLSA claims.  Meritage's motion to dismiss the California Plaintiffs is therefore **GRANTED**.

## VI.   CONCLUSION

For the reasons discussed above, Plaintiffs' and Meritage's cross motions for summary judgment on the outside sales exemption (Docket Entry Nos. 142 and 143) are **DENIED**.  Meritage's motion for partial summary judgment on the statute of limitations (Docket Entry No. 145) is **GRANTED IN PART** with respect to the statute of limitations where a two-year period will apply, but **DENIED IN PART** with respect to the good faith defense without prejudice to re-urging the defense in a post-trial motion if there is a liability finding.  Lastly, Meritage's motion for partial summary judgment regarding the California Plaintiffs (Docket Entry No. 146) is **GRANTED**, and the California Plaintiffs are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**SIGNED** this 13th day of February, 2014.

_____
Gregg Costa
United States District Judge