UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| DAVID LIPNICKI, *et al*, § <br> § <br> Plaintiffs, § <br> VS. § <br> § <br> MERITAGE HOMES CORPORATION, § <br> *et al*, § <br> § <br> Defendants. § | CIVIL ACTION NO. 3:10-CV-605 |

# **MEMORANDUM AND ORDER**

Plaintiffs David Lipnicki, Neil Alba, and Donna Armstrong filed this case as a collective action under the Fair Labor Standards Act (FLSA). The named plaintiffs are three Sales Associates for Meritage Homes Corp. who allege they were denied overtime pay and minimum wage in violation of the FLSA. After the Court conditionally certified the collective action, 104 Meritage Sales Associates opted in but only 70 remain.[1] Defendants now seek decertification (Docket Entry No. 187), which the Court granted in a brief order on September 29, 2014 (Docket Entry No. 205). This opinion further explains the Court's reasons for decertifying the case and addresses whether the opt ins should be allowed to intervene and participate in this case on an individual basis.

---

[1] The Court's ruling that there was no evidence to support a finding of willfulness eliminated 34 opt-ins who did not work for Meritage in the two years prior to the filing of the lawsuit. That left 70 remaining opt-in plaintiffs and 3 named plaintiffs.

## I. BACKGROUND

Many of the relevant facts are discussed in the Court's order denying cross motions for summary judgment on liability. *See Lipnicki v. Meritage Homes Corp.*, 2014 WL 923524, at *1–9 (S.D. Tex. Feb. 13, 2014). Those motions focused on the central issue in this case: whether Meritage properly classified the Sales Associates as "outside salesm[e]n" who are exempt from the FLSA's wage requirements under 29 U.S.C. § 213(a)(1). Inside salespeople, on the other hand, are covered by the FLSA. Plaintiffs' jobs certainly involve sales; the difficulty is determining whether that sales work is "inside" or "outside." Part of the Sales Associates' duties are considered "inside" work because they take place in a Meritage office located inside a model home, but duties performed on the new home lots are deemed "outside" work pursuant to Department of Labor (DOL) opinion letters. The DOL opinion letters also provide guidance on how to classify a new home salesperson who performs this mix of inside and outside duties. Finding that the DOL guidance announces a "more qualitative than quantitative" standard, the Court determined the exemption applies "when most or 'virtually all of the indispensable components of the sales efforts are concentrated in the outside period.'" *Lipnicki*, 2014 WL 923524, at *7 (quoting Wage & Hour Op. Letter FLSA 2007–2, 2007 WL 506575, at *3 n.2 (Jan. 25, 2007)). Because "Plaintiffs and Meritage management paint[ed] starkly contrasting pictures of where the

primary sales activity takes place," the Court found that summary judgment was unwarranted as the "applicability of the outside sales exemption will . . . depend on whose version of events the factfinder believes." *Id.* at *8–9.

Defendant's Motion to Decertify (Docket Entry No. 187) was filed soon after the Court denied the cross motions for summary judgment on the classification issue. In arguing that the Sales Associates are not similarly situated, Defendants point to deposition testimony. Defendants contend that, despite having the same job description and training, the opt-ins work in different communities and physical settings, participate in varied outside sales activities, and generally conduct their day-to-day duties in an individualized manner. Docket Entry No. 187 at 3. Plaintiffs argue that the Sales Associates have the same primary job duties and perform those duties using Meritage's standardized sales procedures, which require Sales Associates to be physically present in the model home during business hours. Docket Entry No. 190 at 9–24. Additionally, Plaintiffs point to Meritage's uniform classification of Sales Associates as exempt outside salespeople to support its position that the case can be adjudicated collectively. *Id.* at 25–30.

## II.  LEGAL STANDARD

Under the FLSA, employees who bring suit may do so individually or as a collective action on behalf of "themselves and other employees similarly situated."

29 U.S.C. § 216(b). FLSA collective actions operate on an "opt-in" basis in which potential class members must give affirmative notice of their consent to join the suit. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The collective action tool allows plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

Courts typically follow the two-step certification process for collective actions set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). *See, e.g., Mooney*, 54 F.3d at 1213–14. The first step, known as conditional certification, results in notice being provided to potential plaintiffs who can then choose to opt in. *Id.*; *Vanzzini v. Action Meat Distribs., Inc.*, 995 F. Supp. 2d 703, 719–20 (S.D. Tex. 2014) ("[T]he first-stage test requires a minimal showing by the plaintiff that (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt-in to the lawsuit." (citing *Albanil v. Coast 2 Coast, Inc.*, 2008 WL 493765, at *6 (S.D. Tex. Nov. 17, 2008))). The standard for this initial notification phase is fairly loose, as it is "usually based only on the pleadings and any affidavits which have been submitted." *Mooney*, 54 F.3d

at 1213; *Vanzzini*, 995 F. Supp. 2d at 720 ("[T]he standard is lenient and typically results in conditional certification.").

After the opt-in period and discovery, defendants often move for decertification. This second step results in a more rigorous determination whether the plaintiffs are similarly situated such that the action should be tried collectively. *Mooney*, 54 F.3d at 1214. To determine whether there is sufficient similarity, courts consider three relevant factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (quoting *Mooney*, 54 F.3d 1213 n.7).

## III. ANALYSIS

Meritage claims that the opt-ins are not similarly situated because of substantially different accounts of how and where they perform their sales duties. Plaintiffs respond that a collective trial is appropriate because they are all subject to the same Meritage decision to treat the Sales Associate position as an exempt "outside sales" one. The first and second certification factors—the disparate factual and employment settings of the individual plaintiffs and the various individualized defenses available to the defendants—thus largely merge into one inquiry because the disparate factual and employment settings are relevant to

whether the common "outside sales" defense can be tried collectively.

It is true that FLSA exemption cases are often tried collectively when employees are subject to a common classification and perform similar duties that resulted in that classification. *See, e.g.*, *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1262–63 (11th Cir. 2008) (denying motion to decertify because discovery showed that the plaintiffs shared similar job duties and day-to-day work); *Clark v. Centene Co. of Tex., L.P.*, 2014 WL 4385412, at *13 (W.D. Tex. Sept. 3, 2014) ("Yet despite these vast swaths of uniformity among Plaintiffs' job duties and daily responsibilities, Centene maintains each Plaintiffs['] position must be analyzed individually to determine liability and assess damages. Hogwash." (citation omitted)); *Jancich v. Stonegate Mortg. Corp.*, 2014 WL 1011480, at *3 (D. Kan. Mar. 17, 2014) ("Because all Plaintiffs performed substantially similar duties, and Defendant classified all of its loan officers as exempt employees during this time period, whether the claimed administrative exemption is indeed applicable could be determined across the board."). What was key to the "similarly situated" finding in each of these cited cases, however, was not just the employer's common exemption decision, but that the employees performed their jobs pursuant to the employers' prescribed duties or in an otherwise uniform way. *See also Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536–37 (S.D. Tex. 2008) ("Plaintiffs have also provided significant evidence in support of their claim that all of the opt-ins

either worked off-the-clock or had time shaved off of their hours by Store Managers . . . This is true despite the fact that Starbucks had an official 'time worked is time paid' policy."). Absent similarity in actual job performance, a uniform classification alone may be insufficient to meet the certification standard. *See Stevens v. HMSHost Corp.*, 2014 WL 4261410, at *5 (E.D.N.Y. Aug. 27, 2014) ("[I]t is well established 'that blanket classification decisions do not automatically qualify the affected employees as similarly situated, nor eliminate the need to make a factual determination as to whether class members are actually performing similar duties.'" (citing *Gardner v. W. Beef Props., Inc.*, 2013 WL 1629299, at *7 (E.D.N.Y. Mar. 25, 2013) (collecting cases))).

That is the case here. In spite of Plaintiffs' uniform classification, Plaintiffs' testimony about their day-to-day routines is often inconsistent with Meritage's prescribed job duties that resulted in the classification. For example, Steve Harding, Meritage's Houston Division President, explained that "Meritage's salespeople are trained and expected to regularly and customarily engage in a non-exhaustive list of outside sales activities as part of their primary duty of selling Meritage homes." Harding Decl., Docket Entry No. 143-18 at 6. Sales Associate Daniel McManaman describes something much different, explaining that he did not customarily and regularly take customers to see homesites because he "had so much business [he] didn't need to leave. [He] had people coming in wanting to

buy homes. There was no reason to leave." McManaman Dep., Docket Entry No. 190-4 at 2–3. As the Court observed in denying summary judgment, the evidence reveals "tension between what Meritage claims it trained Plaintiffs to do and how Plaintiffs claim they actually performed their jobs." *See Lipnicki*, 2014 WL 923524, at *8. This benefitted Plaintiffs at the summary judgment stage, but has adverse consequences for them when it comes to certification.

The record is replete with varying accounts of how the sales job is performed. Most importantly, there are vast discrepancies in how much time the salespeople say they spent on the home sites. Some opt-ins testified how they unlocked model homes, staked out home sites with prospective buyers (to demonstrate where a home would be built on an empty lot), did walk-throughs with homebuyers, or checked on construction. *See* Willocks Dep., Docket Entry No. 143-23 at 21–22 (unlocking and staking a lot for various clients); Anderson Dep., Docket Entry No. 143-25 at 10 (stating she did a walk-through with the homebuyer of every spec home under contract); Skelton Dep., Docket Entry No. 185-9 at 21 (explaining she went to see the construction process "a few times" but was "very leery" of overstepping her role and encroaching on the construction manager's duties). And emails detail numerous instances of the Sales Associates meeting clients on the lots to demonstrate a home or a home site. *See* Armstrong Dep., Docket Entry No 143-1 at 60–69; Willocks Dep., Docket Entry No. 143-23

at 18–23. But some of the deponents testified that they rarely or only occasionally demonstrated a model home site to a potential buyer. *See* Kelly Dep., Docket Entry No. 143-26 at 14–15; Bond Dep., Docket Entry No 143-28 at 11–12 (defining "occasionally" as twenty percent of the time); Hughes Dep., Docket Entry No. 143-30 at 11 (stating that on "rare occasion" she would take prospective homebuyers to see a spec house and defining "rare occasion" as around two to three times per month). One Sales Associate testified he almost never took clients to the lots as "there was no reason to leave" because business was good enough. McManaman Dep., Docket Entry No. 190-4 at 2–3. Other Sales Associates claimed they rarely visited home sites once the homes were under contract or during construction. *See* Lipnicki Dep., Docket Entry No. 190-1 at 40 (stating that "[o]n rare occasion" he checked on houses under contract before the customer did the "final walk" prior to closing); Hughes Dep., Docket Entry No. 143-30 at 12 (explaining she visited a home site under construction about once every two months).

As for marketing efforts and contact with realtors, the record again contains disparities. Several of the deponents utilized realtor relationships to increase sales. *See* Hughes Dep., Docket Entry No. 143-30 at 10 (discussing her attendance at "Realtor Palooza" in California to generate business, placing flyers in her office for realtors to take to their offices, and visiting one realtor's office); Armstrong Dep.,

Docket Entry No. 185-11 at 61 (explaining an email stating she took a realtor to visit a home); Skelton Dep., Docket Entry No. 185-9 at 15 (stating she would "make the rounds to drop off fliers" at realtor offices every couple of months). On the other hand, some Sales Associates neither dropped flyers with realtors nor generated traffic through realtors' offices. *See* Kelly Dep., Docket Entry No. 185-7 at 32–33 (testifying that although she "could" leave her sales office to meet with Realtors to generate traffic, dropping off flyers was not something she chose to do).

Finally, some opt-ins testified that they "shopped the competition" by visiting competitors' homesites. *See* Hughes Dep., Docket Entry No. 185-14 at 13 (detailing her visit to a competitor's grand opening to ascertain whether "they had all the people and see if that's why I didn't have anybody in my development"); Willocks Dep., Docket Entry No. 185-12 at 43 (explaining she drove through a competitor's property to "count their inventory"). In contrast, another opt-in relied on phone calls and booklets that she collected instead of visiting the homes in competitor communities. Skelton Dep., Docket Entry No. 185-9 at 17–18.

As these samples from the record demonstrate, Plaintiffs' testimony regarding what actually occurred "on the ground" varies significantly with respect to considerations relevant to the outside sales determination. These disparities convince the Court that all of the opt-ins are not similarly situated. Like many

legal standards, "similarly situated" is vague. Given the concerns that animate the certification inquiry, the Court believes it can best be analyzed by answering the following question: is there a strong likelihood that a juror considering the individual circumstances of all 70 opt-ins would reach the same result on the applicability of the exemption? If so, the efficiency gains and remedial purposes of collective actions warrant a single trial posing a single liability question to the jury. Based on the current record in this case, however, the Court concludes that there is a fair probability that a jury would find that some of the opt-ins conduct most of the indispensable components of the sales process in "outside" areas, while others do not. As another federal court explained in decertifying a similar case involving new home salespeople who performed a mix of inside and outside work, "broad variations" in the duties performed by individual plaintiffs made it "impossible to make a blanket determination concerning the FLSA exempt status of the entire class of putative plaintiffs . . . or to extrapolate the experiences of the exemplar [salespeople] to the more than one hundred opt-in plaintiffs." *See Tracy v. NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013) ("The record demonstrates a wide variety of employment practices and time management requirements among the individual plaintiffs, which would require dozens of mini-trials to determine whether each employee's particular time away from the model home or trailer meets the . . . threshold indicated by the Department of Labor for outside

salespersons."). Posing a single question to the jury in a collective action would thus undermine the interests of both Meritage and those opt-ins who have the strongest claims that they engaged in little or no substantial outside work.

In terms of the procedural and fairness considerations that are considered in the decertification decision, the Court notes that this is not a case in which the claims are so small that there is no incentive to proceed individually. *See Hoffmann-La Roche*, 493 U.S. at 170 (noting that collective actions allow plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources"). Although the incomes of Plaintiffs vary widely (if the employees are covered by the FLSA, weekly income would be used to calculate the hourly wage which would then be used to determine the overtime wage due), some had incomes exceeding six figures. *See* Docket Entry No. 152 at 20, 28 (over $128,000); Docket Entry No. 152-1 at 27 (over $240,000). Those who made much smaller amounts are likely to still have sufficient damages to make a trial cost-effective given the Court's plan, discussed below, to have joint bellwether trials.

The Court's decertification decision is made based on the current record and the Court's best guess about the issues that are likely to affect the "outside sales" determination. It may turn out, however, that the numerous differences in job duties discussed above are not outcome determinative. Perhaps the jury will conclude that even Sales Associates with the fewest outside contacts still

conducted most indispensable parts of their sales jobs "outside" and thus are properly classified. Or maybe the jury will conclude that even Sales Associates with the most outside contacts of the group are nonetheless improperly classified because most of the indispensable aspects of their jobs were performed inside the model home office. Therefore, if the evidence and verdict in the first bellwether trial indicate that the exemption question can be answered collectively, the Court may reconsider its decertification determination. *See Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 2000 WL 1364358, at *1 (E.D.N.Y. Sept. 20, 2000) ("After [the bellwether] trial is completed, the parties will be in a better position to address manageability and other requirements for certification.").

## IV. INTERVENTION BY OPT-INS

In most cases, once a court decertifies a collective action, the opt-ins are dismissed without prejudice. *See, e.g.*, *Mooney*, 54 F.3d at 1214; *Tracy*, 293 F.R.D. at 401. As with Rule 23 class actions in which certification is denied, however, members of a prospective FLSA collective action may intervene if they satisfy the Rule 24 intervention requirements. *See Stone v. First Union Corp.*, 371 F.3d 1305, 1312 (11th Cir. 2004) (reversing district court decision denying motion to intervene from opt-in members of an ADEA collective action that had been decertified); *Roussell v. Brinker Int'l, Inc.*, 2009 WL 6496504, at *10 (S.D. Tex. Jan. 26, 2009) (not allowing intervention of opt-in class members after

decertification, but acknowledging its general availability in that situation by engaging in an extensive analysis of both mandatory and permissive intervention); NEWBERG ON CLASS ACTIONS § 16:11 (4th ed.) ("Intervention is liberally allowed after the denial of class status for the protection of absent class members' interests."). Accordingly, after issuing the decertification order, the Court issued an order directing any opt-ins wishing to participate in this case as individual plaintiffs to file a motion to intervene under Rule 24(b), *see* Docket Entry No. 210, and 70 opt-ins did so. Docket Entry No. 215. Meritage filed a response raising only a venue objection as to the opt-ins who worked for Meritage outside Houston. *See* Docket Entry No. 219 at 2.

The Court will allow permissive intervention of the opt-ins. "On timely motion, the court may permit anyone to intervene who: . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). If these conditions are met, the court then exercises its discretion in deciding whether intervention should be allowed. *See Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1289 (5th Cir. 1987) ("Permissive intervention 'is wholly discretionary with the [district] court . . . even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." (alterations in original) (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 470–71 (5th Cir. 1984) (en banc))). "In exercising its

discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The application in this case is timely. It was filed soon after the decertification decision. *See Roussell*, 2009 WL 6496504, at *5–6 (finding timely a motion to intervene filed by opt-ins within two months of decertification). Prior to that time, there was no reason to intervene, as the case had been conditionally certified. *Id.* ("Like class members of a class action, opt-ins to a collective action are passive beneficiaries whose rights are protected by the class until it is decertified." (citing *Am. Pipe & Constr. Co. v. Utah*,[2] 414 U.S. 538, 553–54 (1974) (recognizing that requiring potential class members to file "protective" motions to intervene prior to the certification decision would "breed needless duplication of motions"))).

One of the conditions set forth in Rule 24(b)(1) is also met, as there are at least two significant common questions of law in this case on which the Court has already ruled. The first common legal issue is the meaning and applicability of the DOL opinion letters discussing the outside sales exemption in the new home industry. *Lipnicki*, 2014 WL 923524, at *7–9. The second is whether Meritage

---

[2] Although *American Pipe* is a Rule 23 case, its reasoning makes even more sense in the context of an "opt in" collective action that had been conditionally certified. Because of the opt-in requirement, the parties who now wish to intervene had previously made themselves known to the Court, as opposed to the Rule 23 "opt out" class action in which absent class members may have no awareness of or involvement in the case before seeking to intervene after a decision denying certification.

willfully violated the FLSA, assuming there was a misclassification. *Id.* at *9–11. These two rulings, on which the parties and Court invested significant resources, would apply to all those who seek to intervene. *Cf. Adams v. Big Lots Stores, Inc.*, 2009 WL 2160430, at *2 (E.D. La. 2009) (recognizing in Rule 20 permissive joinder analysis that individual cases of former opt ins "unquestionably [involve] some common questions of law and/or fact" even though court had decertified FLSA collective action for failure to meet "similarly situated" standard).

That leaves the question of whether the Court will exercise its discretion to allow intervention. Allowing the intervention results in little delay or prejudice to the rights of the original parties. Two of the named Plaintiffs will have their cases tried this month. The trial for the third will be scheduled soon thereafter. And the cases between the opt-ins and Meritage will be resolved sooner in this single forum than if the opt-ins are required to file numerous individual actions in courts that are not already familiar with and have not already made key rulings in the case. Nor is a case involving approximately 70 individual plaintiffs unmanageable. The Court has another FLSA case on its docket in which approximately 70 individual plaintiffs filed suit (never seeking collective treatment), and the Court is managing that case through bellwether trials. *See Davis v. Legend Energy Servs. LLC*, No. 6:13-CV-1, Minute Entry (S.D. Tex. Oct. 7, 2014) (requiring both parties to submit the names of four plaintiffs to go to trial in the first bellwether trial). Outside the

FLSA context, the Court recently had on its docket a toxic tort case in which hundreds of individuals filed suit, and such a case involves far more technical and complex evidence than an overtime case. *See Boyd v. BP Prods. N.A. Inc.*, No. 3:13-CV-175 (S.D. Tex. filed May 10, 2013).

That leaves Meritage's venue objection to the opt-ins who are not from the Houston area. A venue determination is not incorporated directly into the Rule 24 analysis. The Court therefore concludes that the best approach is to grant the motion to intervene, and then treat Meritage's objection as a Rule 12(b)(3) challenge to venue for the non-Houston plaintiffs (just as the venue of regular plaintiffs would be challenged after they are already parties to the case). Because there "is almost no law on how the requirements of venue apply when intervention is sought," 5B CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. § 1918 (3d ed.), this will allow the Court time to fully consider this issue. If the Court determines that venue does not exist over the non-Houston intervenors, then the Court can employ either of the two remedies for improper venue: transfer to another forum or dismissal without prejudice. 28 U.S.C. § 1406(a).

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Decertify Collective Action (Docket Entry No. 187) is **GRANTED** and the Motion to Intervene (Docket Entry No. 215) is **GRANTED**.

SIGNED this 4th day of November, 2014.

                                                    Gregg Costa
                                     United States Circuit Judge[3]

---

[3] Sitting by designation