1          IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3    _____
                                     )
4    DAVID LIPNICKI, ET AL.,         )
               Plaintiffs,           )
5                                    ) CIVIL ACTION NO.
     VS.                             ) 3:10-CV-605
6                                    )
     MERITAGE HOMES                  )
7    CORPORATION, ET AL.,            ) 9:25 A.M. TO 10:07 A.M.
               Defendants.           ) 11:04 A.M. TO 11:16 A.M.
8    _____)

9

             CLOSING ARGUMENT BY MS. WILLS
10         BEFORE THE HONORABLE GREGG COSTA
                  NOVEMBER 18, 2014
11
     APPEARANCES:
12

     **FOR PLAINTIFFS:**
13   MS. RHONDA HUNTER WILLS,
     MS. GENEVIEVE ESTRADA, AND
14   MR. ANTHONY WILLS
     Wills Law Firm, PLLC
15   1776 Yorktown, Suite 570
     Houston, Texas  77056
16   (713)528-4455

17   MR. JOHN M. PADILLA, AND
     MR. J. MOISES CEDILLOS
18   Padilla & Rodriguez, L.L.P.
     1776 Yorktown, Suite 110
19   Houston, Texas  77056
     (832)740-4301
20
     **FOR DEFENDANTS:**
21   MR. SCOTT ROBERT MCLAUGHLIN,
     MS. MARLENE WILLIAMS,
22   MS. KATHERINE SILVER, AND
     MR. CHEVAZZ BROWN
23   Jackson Walker LLP
     1401 McKinney, Suite 1900
24   Houston, Texas  77010
     (713)752-4200

25

1    APPEARANCES CONTINUED:

2    **ALSO PRESENT:**
     MR. DAVID LIPNICKI
3    MS. DONNA ARMSTRONG
     MR. TIM GONZALEZ
4    MR. MARK HOPKINS
     MR. MARK REYNOLDS, ESQ.
5    MS. LAURA GOODWIN
     MR. TIM HERNDON

6
     **COURT REPORTER:**
7    Heather Alcaraz, RMR, FCRR
     Official Court Reporter
8    515 Rusk, Room 8004
     Houston, Texas  77002
9    (713)250-5584

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

3

1        THE COURT:  So with that we're ready for closing

2   arguments.

3      Ms. Wills, you're going to go first.  Whenever you are

4   ready, you can begin.

5        MS. WILLS:  Thank you, Your Honor.

6        THE COURT:  Give you a minute to set up.

7        I think what we'll do, ladies and gentlemen:  After

8   Ms. Wills goes, we'll take a break -- short break and then go

9   through the rest of the closing arguments.  And then, like I

10  said, we'll order lunch for you.

11        Art, did we get the order forms?

12        THE CASE MANAGER:  I have them.

13        THE COURT:  Okay.  So during the break, you can take

14  care of that.

15        All right.  Ms. Wills, whenever you're ready.

16        MS. WILLS:  Thank you, Your Honor.

17        Good morning, ladies and gentlemen.  Well, it's been

18  about a week, and it's been a very interesting week.  And I

19  really want to thank each and every one of you for coming here

20  early every morning, sitting here patiently listening to all the

21  evidence, listening to the witnesses, carefully paying attention

22  to everything that was going on because I can tell you that this

23  case means a great deal to these three plaintiffs that we're

24  here representing.

25        This case means a great deal to Donna Armstrong, to

1   Tim Gonzalez and to David Lipnicki, and I'd like to thank you on

2   their behalf for coming here, for listening to the evidence, for

3   keeping an open mind, and for paying such close attention.  We

4   thank you so much.

5           This is my opportunity to kind of summarize for you

6   the things that the evidence has shown, what we believe were the

7   really important key pieces of evidence, and to point out to you

8   some of the things that we believe, based on the Court's

9   instructions, will help guide you in making the right decisions

10  here.

11          So as Judge Costa just told you, there are -- there

12  are two basic issues, right?  The first issue is:  Were the

13  plaintiffs inside salespeople or were they outside salespeople?

14  And you really can't be both.  You're either inside salespeople

15  or you're outside salespeople.

16          And I submit to you, based on all the evidence that

17  you've heard from the witness stand, from the deposition clips

18  that you've seen of witnesses that also testified under oath,

19  this was an inside sales position.

20          The second question that you're going to be asked is:

21  How many hours did these plaintiffs work?  And the judge just

22  told you it's based on an estimation.  There are no records.

23  It's not their fault that there are no records.

24          Meritage didn't keep records.  They could have kept

25  records, but they didn't.  So now we're left with their

1    reasonable estimation, and that's -- that's our only burden, to

2    give you a reasonable estimation of the number of hours that

3    they worked.

4           So I'd like to talk about this very first question

5    that you're going to need to answer.  Were the plaintiffs inside

6    salespeople or were they outside salespeople?  And I will tell

7    you that the answer to that question of this being an outside

8    salesperson job is absolutely no.

9           So the judge just went over the jury instructions with

10   you, and I just want to hit on some of the key ones.  I noticed

11   you-all were paying very close attention when he read them, but

12   I just want to focus on some of the key instructions.

13          So what is the outside sales exemption?  It has two

14   basic components.  First, the plaintiffs have to have a primary

15   duty of making sales, and here we agree that was the their

16   primary duty, making sales.  And we believe and it's our

17   position and the evidence has shown that they actually had two

18   products that they had to sell.

19          First, they had to sell the new homes, and, secondly,

20   they had to also sell the Meritage MTH mortgages.  Meritage

21   required them and actually gave them an uptick on their

22   commissions if they not only sold the new house, but they also

23   sat them down and convinced them to buy a Meritage mortgage as

24   well.  So that was their primary job duty.

25          Now, the second issue is whether the plaintiffs were

1    customarily and regularly engaged away from the employer's place

2    of business in performing their sales duties.  So what's the

3    employer's place of business?

4            Well, as the judge just outlined, the employer's place

5    of business includes any fixed site, whether it's the

6    plaintiff's home or whether it's an office.  And for purposes of

7    this case, that model home that you've heard so much about,

8    including the sales office that's within the model home, that's

9    inside sales.

10           The Houston corporate office that you've heard about

11   where they had the Monday morning meetings, they did the

12   call-a-thons and the phone solicitations and sometimes they'd

13   have realtors come there to the corporate office, that's all

14   inside sales.  The time that they spent in these places, that's

15   inside sales.

16           So what does "customarily and regularly" mean?  Well,

17   what does that mean?  Well, the phrase "customarily and

18   regularly" means it has to be a frequency that's greater than

19   occasional.  In other words, if you think it's just occasional,

20   you know, maybe they did some sales activity occasionally,

21   that's not enough.  If you think it was just something that

22   happened occasionally, that's not outside sales, and that's not

23   customarily and regularly.  It has to be greater than

24   occasionally.

25           Customarily and regularly includes work that is

1   normally and recurrently -- normally and recurrently performed

2   every workweek.  Workweek after workweek after workweek,

3   normally and recurrently.

4          As the Court also just instructed you, when you're

5   looking at outside versus inside -- what's happening outside and

6   what's happening inside, you have to look at the amount of time.

7   Where were they spending their time?  Were they spending their

8   time inside -- inside that model, inside their sales office or

9   inside the corporate office, or were they spending their time

10  outside?  You've got to look at where was their time being

11  spent.

12         And then you have to also look at the relative

13  importance of anything that they did if they ever were outside.

14  Were they outside doing something important, something critical,

15  something that mattered, or were all of the important things

16  being done inside that model home sales office, inside the

17  model, in the corporate office?

18         If you believe that they're spending most of their

19  time inside, that the important things are being done inside,

20  these ladies and gentlemen are inside salespeople and the

21  outside sales exemption does not apply to them.

22         So as you get this charge and as you think about this

23  case, ask yourselves -- you heard them all testify.  You heard

24  them say the word "rarely."  Rarely.  You heard them say that

25  they rarely did anything outside of that office.

1          They were required to be there.  That's where they

2     were supposed to be.  That's where they made their sales.  In

3     considering customarily and regularly, ask yourself:  Were any

4     outside things being done normally and recurrently workweek

5     after workweek after workweek?

6          I think the evidence is exactly the opposite.  If you

7     look at what they were doing normally and recurrently, that was

8     all inside the office, inside the model, inside the retail store

9     that they were supposed to man, they were supposed to operate.

10    That's what this job is about.  That's what the evidence has

11    shown.

12         And then, finally, when you're trying to decide

13    customarily and regularly, you need to weigh the amount of time.

14    Are they spending their time inside of the office, or are they

15    spending their time outside of the office?  Where are they

16    spending their time?

17         You heard them testify.  They're spending their time

18    in that office because that's where they were required to be.

19    That's where they had to be if they wanted to get an "up," if

20    they wanted to get any sales.  They had to be inside.

21         And then, also, you need to weigh:  Where are the

22    important things being done?  Are the important things being

23    done inside where they have all their tools, where their model

24    is, where their showroom is, where their retail store is?  Are

25    the important things being done inside the office?  And if the

1    important things are being done inside, these are inside

2    salespeople and the outside sales exemption does not apply to

3    them.

4              So I'd just like to kind of remind you of some of the

5    facts as to why these people are inside salespeople because,

6    again, you can't be both.  You can't be inside salespeople and

7    outside salespeople.  You can only be one or the other.

8              And these people, Donna Armstrong, Tim Gonzalez and

9    David Lipnicki, they were inside salespeople.  So they worked

10   inside of this beautiful model home.  I know you guys are

11   probably tired of hearing about the "wow" factor and how

12   beautiful it is, but they really are stunning and they really

13   are gorgeous.  And they're done that way for a reason.

14             You heard about all the psychoanalytical data that

15   goes into just selecting which model home you're going to have.

16   They actually have study groups and marketing people.  They

17   spend thousands and thousands of dollars just trying to make

18   sure that they build the right model home because this model is

19   critical.

20             This is the heart of what they do.  They spend 60, 70,

21   $80,000, and that's a lot of money just to furnish and decorate

22   these models.  This is the heart of what they do, and that's

23   where these people were working, and that's where they were

24   required to work.  They are inside salespeople.

25             All of their tools -- and I won't go into this

1  *ad nauseam*, but you've heard repeatedly about their sales tools.

2  That's where they are, okay?  You can't sell somebody a home

3  until you sit down with them and you go through your floor

4  plans, you go over the elevations, you go through the feature

5  sheets, you go through the price list, you go through the plat

6  maps.

7          After you figured out a floor plan, after you figured

8  out an elevation, after you figured out the features, then you

9  have to sit down with the plat map, figure out where you have an

10  available lot and whether or not you can even build that home on

11  that lot.  And all of this, ladies and gentlemen, happens inside

12  because these are inside salespeople.

13          The lot fit analysis, which is what really has to be

14  done before you ever know if the home is actually going to fit

15  on a lot, again, all done inside, ladies and gentlemen.  The

16  community information, the tax rates, all of that -- again,

17  these are tools that are inside, ladies and gentlemen.

18          And it has been unequivocal, unquestionable, all the

19  contracts -- and you can't have a sale unless it culminates in a

20  contract.  You've got to have a contract.  Every single contract

21  is done inside the model home sales office.  Those form

22  contracts are right there on the computers.  The salesperson

23  sits there with the buyer, types in the information into the

24  form on the computer.

25          They print it out right there in the sales office.

1    They sit there in the sales office.  They go through the

2    contract with the buyer, and the buyer signs and executes that

3    contract right there inside the sales office.  These are inside

4    salespeople.

5           I mentioned to you earlier that they had two products

6    that they were selling, and you've heard about this over the

7    last week.  The second product that they had to sell was the

8    mortgage.  And I don't care if Meritage wants to couch it as

9    encouraging, explaining, trying to get them to do it.  Bottom

10   line is they required them, as a part of their job evaluation,

11   to sell the mortgage.

12          They required a sit-down rate.  For everybody that

13   came in there to buy a new home, they had to also try to

14   convince them to buy the Meritage mortgage through MTH Lending,

15   and they would have the mortgage applications right there in the

16   sales office.

17       *(Excerpt of video deposition of Mr. Wade Thomas played*

18       *as follows)*

19   Q   (BY MS. WILLS)  And the time that these salespersons spent

20   encouraging, trying to get, trying to capture, trying to get

21   these folks to not just buy that new house but to buy that MTH

22   mortgage as well, that time was spent in the sales office,

23   wasn't it?

24   A   Uh -- oh, first of all, you know, their responsibility was

25   to encourage, uh, and I -- I believe, for the most part, that

1    that time would be in a sales office.

2    Q    Do you believe or did Meritage believe that its new home

3    salespersons were customarily and regularly selling the

4    mortgages outside of the sales office?

5    A    No, ma'am.

6    Q    (BY MS. WILLS)  So then Meritage knew that their

7    salespersons were not customarily and regularly selling the

8    mortgages outside of the sales office?

9    A    That's correct.

10        *(End of deposition excerpt.)*

11        MS. WILLS:  So you -- you heard it from the vice

12   president of human resources for Meritage, out of his own mouth,

13   that Meritage knew that the mortgage work was all being done

14   inside of the sales office.

15        He was specifically asked were they customarily and

16   regularly selling mortgages outside, and his answer was

17   unequivocally no.  These are inside salespeople, ladies and

18   gentlemen.

19        Now, you've heard this model home referred to as a

20   Meritage store, and you've heard evidence over the last week

21   that -- that they had to man this store, that that's where they

22   had to be because they were there to man a store.  Just like if

23   they worked at Dillard's or Macy's, they had to man a store, and

24   this store had to be pristine.

25        They had to even pick up -- it was apparently

1   unacceptable if there were a couple of pieces of litter right

2   there in the flower bed as you walked in.  They had to fluff

3   pillows.  They had to straighten towels.  This place had to be

4   pristine.  It had to be perfect because this was the Meritage

5   store.  This model, that's -- that's how they sold homes and

6   mortgages.

7          It was even compared to being a store by -- you saw

8   her -- Laura Goodwin, their sales trainer.  She -- one of her

9   sales jolts that she sent out was, "If I worked at a department

10  store, would I be able to leave early to take care of a personal

11  matter if no one else were there to take care of my customers?"

12         This was a store, ladies and gentlemen, and Donna

13  Armstrong, Tim Gonzalez and David Lipnicki, they were working

14  inside of that store manning that store.

15     *(Excerpt of video deposition of Mr. Richard Harvey played*

16      *as follows.)*

17  A   It's our model home.  It's what we're using to sell homes,

18  so it needs to be pristine.

19  Q   Because that's what Meritage wants to do with its model

20  homes, they want to have a showcase?

21  A   Yes.

22  Q   Why is that?

23  A   Because that's representing our product and so it's our --

24  it's the way that we -- it's -- it's a -- a -- I guess the

25  physical vehicle we use to sell homes.

1          *(Excerpt of video deposition of Mr. Jeff Grobstein played*

2          *as follows.)*

3     Q    Is it important to you as a regional vice president that if

4     you go and visit a sales office in a community that you're

5     responsible for, that the sales office and model home appear

6     neat and tidy?

7     A    Yes.

8     Q    Why is that important?

9     A    Because it is our -- it's our store, it's our showroom.

10    It's, you know, where people come and learn about what we do.

11         *(Excerpt of video deposition of Mr. Steve Harding played as*

12         *follows.)*

13    A    It's a retail store and so we would, ideally, allow our

14    prospects to come through those -- those sales offices during

15    those two days a sales associate would be off.

16    Q    In other words, because it is a retail store, you need

17    someone to man the store during business hours?

18    A    That would be ideal.

19         *(End of video deposition excerpts.)*

20         MS. WILLS:  So, ladies and gentlemen, you heard it

21    from Rick Harvey.  He's the guy that's been with Meritage 25

22    years.  He's over all of Texas, not just Houston.  He's over all

23    of Texas.

24         Rick Harvey, the very first man that you saw, he said,

25    "This is our store.  This is what we're using to sell homes."

1    Then you heard from Jeff Grobstein, an officer of the company, a

2    regional vice president.

3         He said, "It's our store."  And then you heard from

4    Steve Harding.  You also heard from Steve Harding here on the

5    witness stand.  He is the current Houston division president.

6    There's no question that that model is the store, and they were

7    supposed to be manning the store.  This is an inside sales job.

8         We also know from the compensation agreement that they

9    were required to be present at the sales office.  They had to be

10   present there for all business hours on all days.

11        They were responsible for this Meritage model, this

12   store, seven days a week, and the only way they could get two

13   days off is if they had someone to cover the store when they

14   were going to be out.  This is an inside sales position that

15   required them to man this store.

16        They were also subject to being written up if they

17   were out of the store, outside of the model.  You heard Bobby

18   Allen talking about he could remember the 11 people that he

19   actually counseled for being outside of the model.  You heard

20   Jeanne Conger tell you, "It's a possibility.  I could have

21   written somebody up for being out of the model."

22        If we look at this one disciplinary action form, this

23   salesperson is being written up and told that she has to make

24   sure the sales office is covered daily from 10:00 to 7:00 and

25   that she would have to inform them prior to being out of the

1   office for any reason.  Any reason that she's out of that

2   office, she's got to give prior notice to management.

3          She's told in this formal written disciplinary action

4   form that this is a serious situation and that she has to make

5   immediate improvement.  And this is a written -- you've heard

6   write-ups were done with human resources.  You couldn't just

7   write somebody up.

8          You had to have human resources.  It had to be

9   documented.  This is a serious situation, and she's being told

10  in writing if you're going to be out for any reason, you must

11  notify management before you can be gone for any reason.

12         Here's another disciplinary action form.  "Dan is

13  expected to be on time to work every day and work regular

14  business hours."  This is an inside sales job.  You've got to

15  show up, and you've got to work regular scheduled business

16  hours.

17         He's also told in this formal disciplinary action

18  form, "The model home must be attended at all times" -- "all

19  times during business hours.  Leaving the model unattended by a

20  salesperson and unpresentable leads to a potential loss in sales

21  and a decrease" -- "decrease in profitability for the company."

22         It's clear, ladies and gentlemen, Meritage wanted

23  their salespeople to be inside that model home sales office.

24  This is an inside sales job.  All of the evidence points to this

25  being an inside sales position.

1        Now, you've heard the evidence.  The plaintiffs were

2   paid on a straight commission basis.  They didn't get a sale,

3   they weren't going to get a commission.  And you -- you heard

4   Steve Harding say, "You know, sometimes we'd give them a draw."

5        A draw was basically a loan, which meant that Donna

6   Armstrong could sit there running the Meritage model for 55, 60,

7   70 hours a week, and at the end of that week she could actually

8   be in the hole to Meritage.  She could be there for up to 70

9   hours that week, and at the end of that week, if she hasn't sold

10  anything, the only thing she might get, if she's lucky, would be

11  a loan from Meritage that she would have to pay back to Meritage

12  later.

13       That's the way the Meritage system -- their

14  compensation worked.  Now, the only way -- the only way under

15  Meritage's system -- and you've heard it repeatedly.  The only

16  way you could possibly get a sale was to be present in that

17  sales office.  If you weren't there, you weren't going to get a

18  sale, you weren't going to get an "up."

19       So it is, frankly, preposterous and it strains

20  credibility to believe that somebody is going to be out, I don't

21  know, running around the neighborhood with a walk book and a big

22  plat map or, I don't know, maybe going by a realtor office and

23  dropping off some fliers where they're going to call the call

24  center, that they're going to be out doing those things when the

25  only way -- the only way they're going to earn a commission is

1    to be right there in the sales office.

2              Not only are they contractually required to be there,

3    not only will they be written up if they're not there, but it's

4    the only way that they're going to earn a commission.  It's the

5    only way under the system that Meritage has devised.

6              In order to get a commission, you must be the person

7    right there to register traffic when it comes in, to get that

8    prospect to fill out a guest card.  That's the only way that

9    you're going to get a commission.  And the only evidence you've

10   heard is that those guest cards are done right there in the

11   model -- inside the model, inside sales activity.

12             Under their "up" system, there is no question that a

13   prospect is somebody who physically walks into the sales office.

14   The sales consultant that is onsite that day is the person who's

15   going to get the commission.  So if you're not the person that's

16   onsite that day, you're not going to get a commission.

17        *(Excerpt of video deposition of Mr. Steve Harding played as*

18        *follows.)*

19   Q   So it's really the person who's in the office that's going

20   to get the prospects, typically?

21   A   What I would characterize that with is -- yes.

22        *(Excerpt of video deposition of Mr. Jeff Grobstein played*

23        *as follows.)*

24   Q   Do you believe that getting an up or a prospect that walks

25   in the door, being the person to get to greet that person, do

1   you believe that that's important to a salesperson?

2   A   Yes.

3   (By Ms. Wills)

4   Q   Why?

5   A   If you don't have an up, you don't get a sale.

6        *(End of video deposition excerpts.)*

7        MS. WILLS:  If you don't have an "up," you don't get a

8   sale, and if you're not in that model home sales office, you're

9   not going to get an "up."  This is an inside sales position.

10       Now, I wanted to point out something else from the

11  instructions that Judge Costa just read to you.  I think it's

12  really important that you understand that in order to be exempt

13  outside sales work, you have to only look at the work that --

14  that an employee does with respect to their own outside sales,

15  their own solicitations, their own sales efforts.

16       So, for example, if they're dropping off a flier at a

17  realtor's office, if you even consider that to be important --

18  because you're supposed to weigh is this important or is this

19  not important.  But -- but even if -- if you were to believe

20  that's important -- I'll tell you it didn't seem important to

21  me.

22       But if you were to do that and somehow they got stuck

23  in a box, didn't get thrown in the trash can, they're going to

24  be not trying to develop their own sales, this is for Meritage.

25  The evidence is going to show that these fliers they drop off,

1  they direct people to call who?  To call this Jennifer lady, the

2  online person.  And you heard Steve Harding.  Now they have them

3  call the call center.

4          This isn't work that they were doing to -- if they did

5  it on a rare occasion, to promote their own sales.  This was to

6  promote Meritage.  And in order to be considered outside sales

7  work, it has to be something in conjunction with their own

8  sales, not something where maybe somebody else is going to get

9  the phone call or maybe somebody else is going to get the sale.

10 It has to be their own work, their own sales.

11         Which means that all that teamwork you've heard

12 about -- Meritage believes in teamwork.  Hey, you got to do

13 teamwork.  I don't care if you're not going to get the

14 commission.  I don't care if it's not your sale.  You still got

15 to pitch in and do teamwork.

16         That means customer comes in, they're not your buyer,

17 you still got to help them regardless.  That means you've got to

18 do customer service even if you never even sold these people a

19 home.  They're calling, you got to help them.  You've got to do

20 warranty work.  They're not my buyer, you still got to do

21 warranty work.

22         All those things, ladies and gentlemen, those are

23 inside sales activities.  The only way they can be outside

24 exempt sales activities is if it's somehow specifically for

25 their own sales.

1          Now, you heard a lot about marketing.  And I'm not

2     going to belabor this, but needless to say, this is a big

3     outfit, okay?  They're pretty sophisticated.  They've got the

4     realtor relationship manager or business development manager

5     people, whatever you want to call them, but those are the folks

6     that are going out actually forming the relationships with

7     realtors.

8          They're the ones taking people out to lunch.  They're

9     the ones taking people to play golf.  They're the ones

10    developing this relationship.

11         These people didn't even have a budget for something

12    like that -- didn't have a budget.  You saw the e-mail.  We're

13    not paying any money for you to do any realtor relationship

14    things.

15         No, the -- the only thing that these folks were

16    allowed to do was maybe have some donuts in their model and

17    invite some realtors to come.  You know, host some events right

18    there in their model.  That -- that was -- that was what they

19    did, or, you know, they -- they would interact with realtors

20    when they come in with their customers.

21         I mean, that's the best time to interact with them.

22    Here they are.  They're in your model.  They're in your store.

23    You can show them your product.  That's when you interact with

24    them.

25         They also call them right there from the model home

1    sales office.  They e-mail them right there from the model home

2    sales office.  Inside sales.  This is an inside sales position.

3        All of the big marketing stuff -- you saw the "wow"

4    commercial -- wow -- the billboards, the advertisements, the

5    website, the call center, the promotions, all of that, that's

6    all done by the marketing department.  And what's the marketing

7    department trying to do?  They're trying to drive people to go

8    to the model home sales office where that's where they're going

9    to find the salespeople.

10       Now, the plaintiffs are inside salespeople.  Just to

11   summarize, they worked in a model home sales office selling new

12   homes and mortgages.  They were responsible for operating the

13   store.  They rarely took customers out for any reason.

14       So when you're looking at customarily and regularly,

15   it has to be more than occasional.  This doesn't even rise to

16   the level of occasional.  It has to be more than occasional.

17       It has to be normally and recurrently done workweek

18   after workweek after workweek.  The evidence that you've seen --

19   the only evidence you've seen is that if they ever took anybody

20   anywhere, it was very rare.  And if they did, I mean, I don't

21   even know that it was anything important.

22       You heard from one home buyer of Tim Gonzalez who

23   said, "Yeah.  I came in.  He had the one perfect home for me.  I

24   knew immediately that's the home I want.  I want to go see this

25   house."

1          Now, she wasn't from that area.  Her realtor wasn't

2     from that area.  So Tim Gonzalez took them over and showed them

3     that inventory home.

4          Now, that's one buyer, only buyer that Meritage

5     brought in here to you.  Now, you heard that an average week,

6     about ten people come into a model home sales office.  That's

7     average.  Frankly, that's probably low.  But that means that

8     over 500 buyers are going to come in a year, and you heard Tim

9     Gonzalez worked there two years.

10          So in two years he saw over a thousand prospective

11     buyers, and they provided you with one person out of over a

12     thousand where he took her and showed her and her realtor this

13     inventory home -- one in a thousand.  He told you he could

14     remember three occasions, and we're talking about over a

15     thousand prospective buyers.

16          That is not customarily and regularly.  I would tell

17     you that is the rarest of rare, and that does not rise to the

18     level of outside sales.

19          It's very clear that they rarely even dropped off

20     these fliers and gave them to the receptionist, but if they did,

21     they weren't making presentations.  The realtors weren't even

22     there.  They were dropping off some fliers where maybe -- maybe

23     one day they'd get a call from that, but more likely than not

24     they were going to call the number on there, which went to the

25     toll free number to the online center.

1          The evidence is also undisputed that they never ever

2    went to any customer's home or any customer's place of business

3    in order to sell them a new home or a mortgage.

4          So the very first question you're going to get -- the

5    very first question, question No. 1, is going to be on the

6    outside sales exemption.

7          Do you find that Meritage -- not us, Meritage.  We

8    didn't have to say a thing.  This is Meritage.  Meritage has to

9    prove to you by a preponderance of the evidence that these three

10   plaintiffs, Donna Armstrong, Tim Gonzalez and David Lipnicki,

11   that they were employed in the capacity of an outside

12   salesperson under the outside sales exemption, and they can't be

13   both.

14         You're either inside sales or you're outside sales.

15   And it's very clear here that the outside sales exemption does

16   not apply to these three plaintiffs.  So we would ask, when you

17   get this question, for all three of them please check "No."

18         So the next question you're going to be asked is how

19   many hours did they work each workweek.  You heard Donna

20   Armstrong's testimony.  She conservatively estimated that she

21   worked an average of 55 to 60 hours a week.

22         I would submit that Donna deserves to get the higher

23   end of that because she was being conservative in her estimate.

24   Tim Gonzalez estimated 70 hours a week.  David Lipnicki

25   estimated 65 to 70 hours a week, and, again, he was being

1    conservative.  I would submit that he should get the higher end

2    of that estimate.

3           So what are hours worked?  Hours worked include all

4    time spent by an employee that was primarily for the benefit of

5    the employer or the employer's business, and it's whether or not

6    the employer knew or had reason to believe that the employee was

7    doing the work.

8           Well, the evidence shows that -- that they knew.  They

9    knew the long hours that they were working.  They knew that that

10   sales office was going to be open 363 days out of the year.

11   They only close two days, Christmas Day and Thanksgiving Day.

12          That means that New Year's Eve, New Year's Day,

13   Mother's Day, Father's Day, Fourth of July, Labor Day, Easter,

14   that sales office was open and these folks were working.

15          Now, in terms of coming up with a number of hours, I

16   don't want you-all to believe that somehow they have to give you

17   some sort of figures.  They can't do that, and the reason that

18   they can't give you an exact number is because Meritage didn't

19   keep time records.

20          You heard them say they could have kept time records.

21   They even looked at alarm codes.  They could have kept records,

22   but Meritage did not follow their requirement to keep records.

23   The law requires the employer to keep the records.

24          Because they failed to keep records, now we only have

25   their reasonable estimation.  And that's all the law requires,

1    that they give you a reasonable estimate of the number of hours

2    that they worked.  That's all, just a reasonable estimate.

3            Now, their reasonable estimate is based on the fact

4    that they worked beyond even the stated business hours.  They

5    would arrive early to do those opening procedures you heard

6    about.  They worked through lunch.

7            They would stay late.  Then they would do the closing

8    procedures.  Sometimes they worked six to seven days a week.

9    They worked holidays, and they worked weekends.  And Meritage

10   knew this.

11       *(Excerpt of video deposition of Ms. Jeanne Conger played as*

12       *follows.)*

13   Q   And how many hours a week did your husband work when he

14   worked at Pulte?

15   A   Probably 70 hours a week.

16   Q   With your experience in the industry, did you find your

17   husband's work hours of 70 hours a week as a salesperson to be

18   pretty much the norm for the industry?

19   A   Yes.

20       *(Excerpt of video deposition of Mr. Steve Harding played as*

21       *follows.)*

22   Q   (BY MS. WILLS)  So it's true that some salespeople work more

23   than five days a week?

24   A   That is possible.

25   Q   Isn't [sic] also true that in advertising for this position

1    Meritage says that salespersons must be able to work over 40

2    hours a week, work weekends and nights if necessary?

3    A    Yes, ma'am.

4    Q    And, in fact, they also advertise this position as being one

5    where they have to be available to work, as needed, seven days a

6    week?

7    A    Um, yes, ma'am.

8         *(End of video deposition excerpts.)*

9              MS. WILLS:  So the very next question you're going to

10   get -- after you answer question one "no," the next question

11   you're going to get is:  How many hours did they work?  And the

12   very first person's going to be Donna Armstrong because it's in

13   alphabetical order, and you're going to have a workweek for each

14   week that's within the relevant time period.

15             So you're not going to have a workweek for the entire

16   time that she worked there.  It's only going to be for the time

17   that the Court has determined is the relevant time period.

18             So you're going to have to put a number into each and

19   every one of those blanks in order for Ms. Armstrong to be able

20   to recover for those hours worked.  We're asking that when you

21   get to this question two for Donna Armstrong, that you fill in

22   the number 60 in each and every one of those blanks for each and

23   every week because that is Donna Armstrong's reasonable

24   estimate, and the law says that's -- that's all she's required

25   to do, give you a reasonable estimate.

1      Her reasonable estimate has in no way been

2  contradicted by Meritage.  They've not contradicted her

3  reasonable estimate.  Jeanne Conger, who was over Houston who

4  actually worked with Donna -- didn't supervise her but was two

5  levels above her -- said 70 hours is the norm.  So 60 hours for

6  Donna is certainly reasonable.

7      Then you're going to get also as a part of question

8  two -- and Donna Armstrong's going to be two or three pages of

9  just blanks with weeks.  Then you're going to get to Tim

10  Gonzalez, which is a shorter period.

11      We're asking that for each and every blank there for

12  Tim Gonzalez, that you put 70 hours in for Tim, which is the

13  reasonable estimate that he gave.  And that's basically what

14  Jeanne Conger told you, 70 hours is the norm for the industry.

15      Same thing for David Lipnicki.  We're asking that you

16  put 70 hours in for each week for David Lipnicki.

17      Now, I'd like to conclude by sort of stopping where

18  Mr. McLaughlin started with you last week.  Do you remember when

19  he did his opening statement?  He told you that this case was

20  going to be about credibility, and I believe that it is about

21  credibility.

22      And based on everything you've sat here and listened

23  to, what you've seen, what you've heard, I want you to ask

24  yourselves about the credibility of Meritage.  Let's look at

25  their credibility.  Now, they would have you believe that the

1   outside sales exemption applies to this clearly inside sales

2   position, so let's take a look at what they did in order to try

3   to one day convince a jury like you of this.

4           Well, on the very first page of their compensation

5   agreement, they have something that, frankly, defies all

6   credibility.  They say, "The associate must customarily and

7   regularly take customers to see model homes."

8           Well, they're stationed in a model home.  They're not

9   going to customarily and regularly take anybody to see a model

10  home because that's where they are.  And the evidence has shown

11  that if they wanted somebody to see another model home, they

12  give them directions and send them over to that model home so

13  that the other salesperson could do teamwork and help with

14  somebody else's sale.

15          Then they go on to say they're also supposed to take

16  them to see sites.  Well, ladies and gentlemen, the only way to

17  pick out a site was to select a floor plan, an elevation, and to

18  use that plat map.  It completely defies logic that you're going

19  to go out there with some kind of a weird tool kit that nobody

20  ever provided to them with some cones -- and Donna's going to be

21  out there.  She's going to put on her boots.  I think Amy Fisher

22  said her boots were knee high.

23          You're going to put on some boots and some spray, and

24  you're going to spray out the pool and have some rope.  That's

25  not -- that's not credible at all.  That's not even logical.

1        You're not going to take folks out there when you need

2    a surveyor, you need construction people, you need an engineer.

3    They can't go out there and tell you where your house is going

4    to be built.  Completely illogical.

5        Then they go on to say -- just to show you what little

6    credibility Meritage has, they go on say then they're supposed

7    to call upon customers at their homes.  Have you heard a shred

8    of evidence of any salespeople going to somebody's house to sell

9    them a new house?  Absolutely defies all credibility.

10       And then they say --

11       THE COURT:  About five minutes, Ms. Wills.

12       MS. WILLS:  -- you're supposed to travel to various

13   locations -- thank you, Your Honor -- in order to conclude the

14   sales transaction.  Ridiculous.

15       The only evidence that you heard was that the

16   contracts -- which is obviously how you're going to conclude a

17   sales process, right?  You got to get the contract -- they

18   happen 100 percent of the time inside of the office.

19       You heard their vice president of human resources

20   admit the mortgages, 100 percent of the time those were done in

21   the office.  They already knew, no, they're not customarily and

22   regularly out selling mortgages.

23       I ask you to look at the credibility of Meritage and

24   what they brought before you and the kind of evidence that they

25   brought in this courtroom before you.  Look at their

1   credibility.  They're telling you the outside sales exemption,

2   ladies and gentlemen, they don't even know what the outside

3   sales exemption is.

4        I want you to listen again to Rick Harvey, the guy

5   who's over all of Texas.  Twenty-five years he's been with

6   Meritage.  I want you to listen to what he has to say about the

7   outside sales exemption.  Then I want you to listen to Jeff

8   Grobstein, regional vice president, officer of Meritage.

9        I want you to listen to what they have to say about

10  the outside sales exemption, and then I want you to evaluate the

11  credibility of Meritage.

12     *(Excerpt of video deposition of Mr. Richard Harvey played*

13      *as follows.)*

14  Q   What's the outside sales exemption?

15  A   I don't know.

16  Q   So is it fair to say that you have never undertaken to do

17  anything to determine whether or not any of the salespersons

18  working, in any of the divisions that you've been in charge of,

19  whether or not they are workers that would fall under the

20  outside sales exemption?

21  A   Uh, I -- I haven't done anything personally, no.

22  Q   (BY MS. WILLS)  Do you know of anything that's been done?

23  A   No.

24  Q   As you sit here today, do you have a belief as to whether or

25  not the outside sales exemption applies to the -- all those

1   salespersons that work in your various divisions that you're

2   responsible for?

3   A    I don't know what that is.

4   Q    (BY MS. WILLS)   So you have no idea whether that exemption

5   would apply to them?

6   A    I have no idea.

7        (Excerpt of video deposition of Mr. Jeff Grobstein played

8         as follows.)

9   Q    What's the outside sales exemption to the Fair Labor

10  Standards Act?

11  A    I don't know.

12       (End of video deposition excerpts.)

13       MS. WILLS:   The reason that they don't know, the

14  reason they've never heard of it is because it doesn't apply.

15  These are inside salespeople, ladies and gentlemen, and we ask

16  that when you get that jury form, you indicate on there this is

17  not an outside sales position.

18       They don't even know what it is.   They don't know what

19  it is because it doesn't apply.   They're inside sales.

20       I'd like to thank you for your time and your

21  attention.   And I'll get one more opportunity to talk to you

22  again, but, again, we ask that you look at the credibility of

23  Meritage.   Look at what they did.   Look at the evidence that

24  they gave you and ask yourselves whether or not you can believe

25  anything that they say.

1      *(Other matters pertaining to jury trial heard.)*

2           THE COURT:  All right.  Ms. Wills, your rebuttal?

3           MS. WILLS:  Yes, Your Honor, just a brief rebuttal.

4           Ladies and gentlemen, one thing I'd agree that

5      Mr. McLaughlin said.  I'd like you to use your common sense

6      here.  He's right, your common sense.  I want you to use your

7      common sense and ask you:  Does your common sense tell you that

8      they're inside sales or outside sales?  Because they can't be

9      both.

10          You have to decide:  Is this an inside sales job?

11     Because if it's an inside sales job, Meritage should have been

12     keeping up with all those alarm codes that they were checking

13     that they can't seem to find these days.  Meritage should have

14     been keeping time records because this is an inside sales job.

15          Now, for some strange reason Meritage wants you to

16     believe that the "up" system was just something that only

17     happened when you had two people in an office and there were

18     altercations, which you heard about those.

19          People were fighting over customers.  They weren't

20     going to be out dropping off some fliers or, I don't know,

21     wandering around with that look book or wandering around with

22     that kit.  They were actually fighting over the customers that

23     came into the office.

24          The "up" system -- and you heard the executive say it.

25     Not my words, you heard the words straight out of their mouths.

1    The "up" system meant that you had to be present to get a sale.

2    There's no question about that.  If you weren't there, you

3    weren't going to get a sale.  You had to be there in the model

4    home sales office because this is an inside sales job.

5         Now, he made -- Mr. McLaughlin made a big deal of

6    saying Wade Thomas -- you remember him?  Vice president of human

7    resources.  I showed you the clip from him, Wade Thomas, vice

8    president of human resources.

9         Now, it's interesting that plaintiffs are the only

10   ones that showed you any testimony from Mr. Thomas.  He's their

11   vice president of human resources.  Why wasn't he here

12   testifying to you?

13        You know, I -- I showed you -- I showed you testimony

14   from the vice president of human resources, and I specifically

15   asked him the question about whether or not these mortgages were

16   being customarily and regularly sold outside of the office, and

17   he said no, of course not.  Meritage knew that.  This was all

18   inside sales work that they were doing with these mortgages.

19        We're not running away from anything, ladies and

20   gentlemen.  We're the only ones that showed you testimony from

21   their executives, and I mean the high-up executives.

22        I'm talking Rick Harvey, the guy that's been with

23   Meritage for 25 years who's over all of Texas, the guy that can

24   hire and fire a whole bunch of people, the guy that was in

25   charge of everything.  We're the only ones that presented his

1    testimony to you.

2         We're not the ones who are running away here.  We're

3    not the ones who are running away from the truth here.

4         Now, you've seen a lot of e-mails.  You're going to

5    get them.  You're going to have a chance to look at them.  When

6    you look at these e-mails, you'll see things like Donna

7    Armstrong, 8:09 at night, saying, "Sorry my report is late.  I

8    was working with a buyer that couldn't decide tonight."

9         Another e-mail she sent at 7:28 p.m.  "Sorry, David.

10   My last customer just left."

11        When you read those e-mails, it's going to be very

12   clear to you these inside salespeople, Donna and David and Tim,

13   they're in the office.  This is an inside sales position.

14        Now, I just want to be clear about customarily and

15   regularly.  We talked about that.  Customarily and regularly

16   must be greater than occasional, more than occasionally, okay?

17        If it's just occasionally, that's not enough.  It's

18   got to be more than occasionally.  It also has to be work that

19   is normally and recurrently performed every workweek -- normally

20   and recurrently performed every workweek.

21        And when you're trying to decide customarily and

22   regularly, you've got to do a balancing.  That's the Court's

23   instruction to you.  You're supposed to consider the relative

24   amount of time spent inside the office versus outside of the

25   office.

1          Now, Mr. McLaughlin showed you their declarations.

2     They've always maintained that, "I spent well over 90 percent of

3     my time in the model home sales office," and they later added

4     most of the other time was spent up at the corporate office.

5     Both of those are inside sales.  They're Meritage's places of

6     business.  We're not running away from anything.

7          What you didn't hear and what you haven't seen any

8     evidence of is -- they're the ones with the burden.  Why didn't

9     they come in here and show you what percentage of time they

10    claimed they're working outside of the office?  That's because

11    this is an inside sales position.

12         And then the other thing that the Court's instructions

13    tell you to do:  Look at the amount of time.  I mean, some

14    workweeks they told you, "I spent 100 percent of my time in the

15    sales office, in the model home or at the corporate office."

16         So the second thing you've got to do is you've got to

17    weigh the importance.  Where are the important things happening?

18    Are they happening inside Meritage's places of business, that

19    model home, that sales office, or are they happening outside?

20         You have seen it.  Everything that's important, that's

21    critical is happening right there inside that model home sales

22    office.

23         Even Mrs. McClellan, the home buyer you saw, she sat

24    right there and told you, "It didn't matter whether Tim Gonzalez

25    showed me and my realtor that house or not.  I was going to buy

1    it.  What he did didn't matter.  That wasn't important to me."

2    No.  The important things here happened inside the model home

3    sales office.

4          Now, finally, I have to tell you I was shocked -- I

5    was shocked when I heard Mr. McLaughlin get up here and talk to

6    you about credibility, talk to you about fleeing the scene and

7    running away.  I think he just told you Meritage is now ready to

8    flush -- I think his words were "flush away" Amy Fisher's

9    testimony.

10          Amy Fisher, that young woman that you saw here, she

11   was handpicked by Meritage.  All the salespeople they had, they

12   went and they handpicked this young woman.  Six weeks ago they

13   had their lawyers meeting with this young woman.

14          Then, just before her testimony, they were sitting --

15   they were meeting with her.  These lawyers were meeting with

16   Amy Fisher, and now they're ready to flush her away.  They put

17   that young woman on the stand -- after meeting with her, sitting

18   down with her, talking to her, then they put her up here on the

19   stand.

20          This young woman worked there 12 years, and they

21   handpicked her.  They put her on that stand.  Their lawyers met

22   with her.  They talked to her, and then they put her up here.

23          And what did Amy Fisher do?  There's no question.  She

24   wasn't honest with you.  She was completely dishonest.

25          But Meritage put her on that stand.  The only reason

1    she got on that stand and she said the things that she did was

2    because she was trying to support a ridiculous story that

3    Meritage came into this courtroom to tell you.

4           So she sat up there, and she said, "Sunday" -- just

5    two days ago Sunday -- "was a typical workday for me, my normal,

6    typical workday," and from then on she lied about everything,

7    what she did that day.

8           She told you, "I took three customers out to see

9    inventory homes."  She told you their names, the addresses where

10   she took them, the inventory homes that she took them to see,

11   and she did all this because she was trying to support this

12   ridiculous story that Meritage wants you to believe.

13          So she sat up there saying all these things.  "Oh, my

14   gosh.  I had just a few pieces of traffic, and I was taking

15   people out and they were following me in my car.  And I had my

16   car seat in the back, and so they followed me."  I mean, a whole

17   story -- a whole fabricated story.

18          But we know what the truth is.  You actually got to

19   see, for the first time, a real day in the life of a Meritage

20   salesperson.  A real-world day, okay?  You heard from Shelly

21   Schiebe, HP -- former HPD officer, 30 years.  She does fraud

22   investigations.

23          You heard from her.  She put Amy Fisher under

24   surveillance.  We wanted to see what is a real -- what does a

25   real day look like.

1       She sat there, and she watched Amy Fisher go into that

2  model home at 11:54 a.m.  Amy Fisher never left the entire day.

3  She stayed in that model home sales office the entire day, and

4  she didn't leave until 6:15 when it was time for her to go home.

5       She didn't leave.  Her trainee assistant didn't leave.

6  They both were in that model home sales office the entire day,

7  and that's real world, and that's what really happens when

8  you're a Meritage home salesperson.  You can sit if you want and

9  watch the surveillance tape.  Her car doesn't move.

10      She doesn't go get in her car and go show anybody

11 anything.  She doesn't go out with a big bag of tools that

12 nobody seems to have.  She didn't do any of that.  She sat in

13 that model home sales office because that's a typical day.

14      That's what they do.  That's what this job is about.

15 And the sad thing is Meritage knew that, but they put that young

16 woman on the stand.

17      They put that young woman on the stand to support

18 their ridiculous story, and you saw her sitting up there.  And

19 at the end of the day, after this HPD former officer, 30-year

20 veteran, fraud investigator has put her under surveillance,

21 called her out, shown her to be completely fabricating her whole

22 story, she had to come back in here.  And that young woman that

23 Meritage put on the stand had to sit there and take the Fifth

24 Amendment to try to avoid incriminating herself on a possible

25 penalty of perjury.

1        That's what Meritage did.  That's what they did.

2   Those are the lengths that they are willing to go to to support

3   a ridiculous, fabricated story.  The day that we saw Sunday for

4   Amy Fisher, that is a typical day because this is an inside

5   sales position.

6        Please don't let Meritage get away with this.  Don't

7   let them get away with this.  We want you to do what's right.

8   This is an inside sales job, and what they did with Ms. Fisher

9   wasn't right.

10       It wasn't right.  They had their lawyers meet with

11  her, put her up there knowing full well that this is an inside

12  sales job.  It was not right.

13       What they're trying to do to Donna Armstrong, to Tim

14  Gonzalez, to David Lipnicki, it's not right.  We're asking you

15  to do what's right.  This is an inside sales job.  Please tell

16  them that this is an inside sales job.  Make them comply with

17  the law of how you're supposed to pay inside salespeople.

18       I thank you so much.  I thank you for listening to

19  this case because this case is so important to these

20  salespeople.  I appreciate your time and your attention, and we

21  are very hopeful that you-all are going to do the right thing

22  and not let Meritage get away with this.  Thank you.

23                              ***

24       *(End of requested transcript.)*

25                             -o0o-

1          I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above matter.

3

4    Date:  April 22, 2015

5                              /s/ Heather Alcaraz
                               Heather Alcaraz, RMR, FCRR
6                              Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25