```
 1                IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION


 3   _____
                                            )
 4   DAVID LIPNICKI, ET AL.,                )
                 Plaintiffs,                )
 5                                          ) CIVIL ACTION NO.
     VS.                                    ) 3:10-CV-605
 6                                          )
     MERITAGE HOMES CORPORATION,            )
 7   ET AL.,                                )
                 Defendants.                )
 8   _____)


 9

         JURY TRIAL TESTIMONY OF AMY FISHER AND MICHELE SCHIEBE
10               BEFORE THE HONORABLE GREGG COSTA
                         NOVEMBER 17, 2014
11
     APPEARANCES:
12
     FOR PLAINTIFFS:
13   MS. RHONDA HUNTER WILLS,
     MS. GENEVIEVE ESTRADA, AND
14   MR. ANTHONY WILLS
     Wills Law Firm, PLLC
15   1776 Yorktown, Suite 570
     Houston, Texas  77056
16   (713)528-4455

17   MR. JOHN M. PADILLA, AND
     MR. J. MOISES CEDILLOS
18   Padilla & Rodriguez, L.L.P.
     1776 Yorktown, Suite 110
19   Houston, Texas  77056
     (832)740-4301
20
     FOR DEFENDANTS:
21   MR. SCOTT ROBERT MCLAUGHLIN,
     MS. MARLENE WILLIAMS,
22   MS. KATHERINE SILVER, AND
     MR. CHEVAZZ BROWN
23   Jackson Walker LLP
     1401 McKinney, Suite 1900
24   Houston, Texas  77010
     (713)752-4200

25
```

1    APPEARANCES CONTINUED:

2    **ALSO PRESENT:**
     MR. DAVID LIPNICKI
3    MS. DONNA ARMSTRONG
     MR. MARK HOPKINS
4    MR. MARK REYNOLDS, ESQ.
     MS. LAURA GOODWIN
5    MR. TIM HERNDON

6    **COURT REPORTER:**
     Heather Hall, CSR, RMR, FCRR
7    Official Court Reporter
     515 Rusk, Room 8004
8    Houston, Texas  77002
     (713)250-5584

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

25

**CHRONOLOGICAL INDEX**

**DEFENDANTS' WITNESS:**

|  | **DIR** | **CROSS** | **RDIR** | **RCRS** | **V/DIRE** |
|---|---|---|---|---|---|
| AMY FISHER | 4 | 31 | 51 | 53 | |

**PLAINTIFFS' WITNESSES:**

|  | **DIR** | **CROSS** | **RDIR** | **RCRS** | **V/DIRE** |
|---|---|---|---|---|---|
| MICHELE SCHIEBE | 62 | | | | |
| AMY FISHER | 74 | 77 | 78 | | |

**PLAINTIFFS' EXHIBITS**

| NO. | DESCRIPTION | OFFRD | ADMTD | W/DRAW |
|---|---|---|---|---|
| 103 | Videotape surveillance footage | 71 | 71 | |

**DEFENDANTS' EXHIBITS**

| NO. | DESCRIPTION | OFFRD | ADMTD | W/DRAW |
|---|---|---|---|---|
| 86 | Meritage training material | 16 | | |

1          THE COURT:  Call your next witness.

2          MR. BROWN:  Your Honor, we call Ms. Amy Fisher.

3          THE COURT:  All right.  Let's get Ms. Fisher.

4      Does someone have her coming?

5          MR. MCLAUGHLIN:  She should be here.

6          THE COURT:  All right.  Ms. Fisher, come forward.

7      Stop there and get sworn in.

8      *(Witness sworn.)*

9              **AMY FISHER, DEFENDANTS' WITNESS, SWORN**

10                   **DIRECT EXAMINATION**

11   BY MR. BROWN:

12   Q    Good afternoon, ma'am.  How are you?

13   A    Good afternoon.  Fine, thank you.

14   Q    Please introduce yourself to the jury and tell them how you

15   are employed, please.

16   A    Hi.  My name is Amy Fisher.  I'm a sales associate with

17   Meritage Homes.

18   Q    Ms. Fisher, how long have you been a sales associate?

19   A    Since April of 2003.  Almost 12 years.

20   Q    About 12 years?

21   A    Yes, sir.

22   Q    Okay.  Were you a sales associate during the 2007, 2008,

23   2009, 2010 time period?

24   A    Yes, I was.

25   Q    Can you speak to the sales associate position at that time?

1    A    Yes.

2    Q    Really, at any time since 2003?

3    A    Correct.  Yes, sir.

4    Q    Do you know Ms. Armstrong -- Donna Armstrong?

5    A    I do.

6    Q    Do you know Mr. Lipnicki?

7    A    I do.

8    Q    Do you know Mr. Gonzalez?

9    A    Sorry to say no.

10   Q    You ever worked with Ms. Armstrong?

11   A    She also was a sales associate.  We were in different

12   communities.  We were cordial in sales meetings, but yes.

13   Q    How about Mr. Lipnicki?  Have you ever worked with him?

14   A    Same capacity, yes.

15   Q    Okay.  What about Mr. Bobby Allen?  Do you know Mr. Bobby

16   Allen?

17   A    Yes.

18   Q    Who is he?

19   A    He was -- originally, I believe he was hired as a sales

20   associate.  After a brief period, maybe a month or two, he was

21   promoted to a sales manager position, kind of under the VP of

22   sales, and he was over my division, the central divisions.  So

23   he was my sales manager for a period of time.

24   Q    Okay.  And we'll get to Mr. Allen in just a little bit.

25        What about Ms. Laura Goodwin?  Do you know her?

```
 1    A    I do, yes.

 2    Q    Who is she?

 3    A    She is our corporate sales director, so I've known her

 4    through the various training events at the company.

 5    Q    Okay.  Did you take training courses with Ms. Goodwin?

 6    A    Among other people, yes.

 7    Q    Okay.  Did you receive training while you -- you're employed

 8    at Meritage?

 9    A    The training's been ongoing, yes.

10    Q    Okay.  Do you consider yourself well trained?

11    A    Yes, I do.

12    Q    Do you consider Meritage having a well-developed training

13    program?

14    A    I do.

15    Q    Even in the 2007 to 2010 time period?

16    A    Again, it's been -- it's been ongoing and ever evolving, but

17    yes, it's been a comprehensive training program.

18    Q    Did you take the MSSP training program?

19    A    I did.  I've taken every training program.

20    Q    You've taken Gold Tier training?

21    A    Yes, I have.

22    Q    Silver training?

23    A    Yes, sir.

24    Q    Platinum training?

25    A    Yes, sir.
```

1    Q    Have you attended any seminars with Jeff Shore?

2    A    Among others, yes.  In addition to Jeff Shore, we've had a

3    seminar on how to interact with different demographics.

4    We've -- I don't remember the presenters' name, I'm sorry, but

5    there've been others I don't recall.  But, yes, in addition to

6    Jeff Shore, I've done others.

7    Q    Besides sales associate, do you hold any other positions at

8    Meritage?

9    A    Two, I guess, technical positions.  I'm -- I'm an MPC, which

10   is a Meritage Platinum Associate.  In addition to the required

11   training, I have gone above and beyond and done additional

12   training opportunities that earn me the ability to have

13   increased income, an increase in my sales commission rate.  And

14   I'm also now a -- a mentor, like a -- a field trainer within the

15   company.

16   Q    Okay.  What --

17   A    I train new sales associates.

18   Q    Okay.  What sort of things do you do as a sales trainer?

19   A    As a sales trainer?

20   Q    Yes.

21   A    Just teach them the -- the day-to-day aspects of the job

22   from how to speak to customers, how to do the paperwork portion

23   of what we do, how to cultivate relationships within the realtor

24   community.  Just basically teach them to do what I do.

25   Q    Okay.  Over the course of your almost 12-year career at

1    Meritage, have you worked in different types of communities and

2    different stages of development?

3    A    Yes.  I believe I'm probably one of the most well-rounded.

4    I've been in, I believe, eight different communities over my

5    tenure, and I've been in everything from brand new, selling dirt

6    out of a trailer surrounded by coyotes, to more of the luxury

7    level of homes that we offer.

8         You know, we consider that to be, you know, a -- a luxury

9    move-up.  You know, typically, it's your third or fourth home.

10   I've been in established communities.  I've been in brand-new

11   communities.  I've been in closeouts.  I've done everything we

12   offer.

13   Q    Okay.  Let's -- let's explore that just a little bit more.

14   When you say closeout community, what are you referring to?

15   A    Typically, when a community is down to the last few

16   opportunities, there's not any future sections coming -- I don't

17   think there's a specific number of lots that define a closeout,

18   but maybe, I don't know, the 10 to 15 range.  Normally, it's,

19   you know, not -- not a long future in a community, just a few

20   opportunities left.

21   Q    Okay.  And when you say an established community, what does

22   that mean?

23   A    To me that means a community that we already have a

24   presence.  You already have some traction in the neighborhood.

25   Typically, your models are complete.  There are some residents

1   living within the community.

2       Some type of infrastructure is there.  Maybe not all of it,

3   but maybe the community pool, community parks.  It's -- it's a

4   community that customers can walk into and already have a

5   feeling for the vision, not just a dream.

6   Q   Okay.  Did I also hear you say a start-up community?  Was

7   that another type of stage of development?

8   A   Yes.

9   Q   Okay.  What is a start-up community?

10  A   A start-up is basically you're coming in with nothing.

11  Typically, we open in a sales trailer.  We -- the -- the two --

12  or the three start-ups I've been in, I opened the neighborhoods

13  prior to the completion of the model homes.  None of the

14  amenities are in the community.  In two situations, the streets

15  weren't even finished.  I mean, we literally were selling dirt.

16  Q   Okay.  Ma'am, what type of mentality does Meritage expect

17  its sales associates to have?

18  A   I mean, the overall culture of the company is that of an

19  owner mentality, you know, an entrepreneurial spirit.  We are

20  given a great deal of flexibility in organizing our day and in

21  how we conduct our presentations to our customers.

22      We're each allowed to -- I mean, we have -- we have

23  criteria for, you know, the path the company wants us to take,

24  but beyond that we're allowed to do what we excel in, and

25  it's -- it's a wonderful company.  I love my job.

1  Q   Earlier I had used the term "career."  Would you agree that

2  being a sales associate is a career?

3  A   I would, yes.  It's -- I can consider my career a privilege,

4  yes.

5  Q   Okay.  Why would you consider it a career versus a summer

6  gig or some other type of temporary employment?

7  A   Well, it's -- it is a profession that does require a great

8  deal of motivation.  One has to be a self-starter and have that,

9  you know, internal desire for excellence.  It's a very

10 competitive market.  It's a very competitive city, so we have to

11 be willing to go above and beyond and do what others are not to

12 capture the sale.

13      It's -- it's a -- it's a career that evolves over time.

14 It's -- every transaction I conduct I learn something new, and

15 my experience grows and no two buyers are the same or lead you

16 down the same path.  So it's constantly evolving.  I've -- I'm

17 still not bored today.

18      I love going to work every single day and, like I said,

19 I -- what -- what I do is -- it's truly a privilege.  You know,

20 home ownership is a dream for most families, and to be a part of

21 that experience and to be involved in families at that critical

22 juncture in their life, it's a tremendous responsibility and one

23 that I take great pride it.

24 Q   And it is who you are?

25 A   From -- yes.  It's very life encompassing, and I -- when I'm

1  not in the office, I am watching "House Hunters."  I -- I am

2  that person that goes to timeshare presentations when I'm on

3  vacation just to kind of see how homes are built in different

4  areas.

5       That's just who I am.  It's what I love.  It's what I

6  enjoy.  I'm very passionate about it, and it's, thankfully, what

7  I get to do every day for a living.

8  Q   Ms. Fisher, an analogy has been drawn in this case between

9  Meritage Homes and a department store such as Macy's.

10       Would you agree with that analogy?

11  A   No.

12  Q   Why not?

13  A   Well, in Macy's you can walk in and buy a pair of jeans and

14  hopefully find a register that's open and leave.  Homes don't

15  sell themselves.  Homes involve people forging relationships

16  with other people and helping them to understand not only the

17  aspects of the floor plan, but how it's going to impact their

18  family and how it's going to improve their lives, not only the

19  home itself, but the community, the homesite.

20       It's -- a person is required in order to facilitate that

21  process, at least to facilitate it well, and I don't believe you

22  can get that kind of service just randomly at Macy's.

23  Q   In facilitating that process, Ms. Fisher, do you perform

24  both inside and outside sales activities?

25  A   It's -- yes.  I mean, both -- both aspects.  There are a

1    number of things that I do within the community and within my

2    model home, and there are a number of activities that I do

3    outside of the community, outside of the model home and, many

4    times, even out of the neighborhood all together.  It's -- it's

5    a combination of -- of a lot of different tools.

6    Q    And so you don't deny using tools inside the sales office to

7    bring about a sale?

8    A    No.  Until they invent a printer that'll work out of my car,

9    I'm afraid I do have to go to the office.

10   Q    And you don't deny, from time to time, demonstrating a model

11   home, do you?

12   A    No, of course not.  No, they're a beautiful product that

13   expresses our -- the quality that we provide and our ability to

14   personalize and the level of finishes that we offer.  So it's

15   definitely a very, very useful tool, but it's one of many that I

16   use.

17   Q    Okay.  I would like to explore your outside sales

18   activities.

19        What does the term "generate traffic" mean to you, ma'am?

20   A    What does it mean to me personally?

21   Q    Yes.  In the context of your job.

22   A    Well, I believe it to be actions that I would take to help

23   procure traffic for my community myself that would have not come

24   to me otherwise through the efforts of our marketing department.

25   Q    Does Meritage expect and encourage you to engage in

1   traffic-generating activities?

2   A   Of course.  It's certainly encouraged.

3   Q   How did Meritage communicate that expectation to you, ma'am?

4   A   Through our training program.

5   Q   Any other -- through any other means?

6   A   It's part of the core culture of who we are.  The

7   entrepreneurial spirit is definitely encouraged amongst our

8   sales team.  We're -- we're encouraged to do realtor outreach,

9   to connect with employers in our area, to connect with other

10  places, day cares in the area that referrals could come from.

11      We're reimbursed for it.  Marketing department provides us

12  complete support, anything we need or want.  I draft a proposal,

13  and it comes out of marketing.  I'm fully reimbursed for it.

14  So, yes, it's definitely a crucial piece of what I do.

15  Q   You mentioned the marketing department.  If you would,

16  please explain to the jury what role the marketing department

17  plays in your efforts to generate traffic.

18  A   Okay.  The marketing department helps with the name

19  recognition to our customers.  We have a -- a logo and a -- I

20  guess kind of a motto that is used consistently throughout all

21  of our communities to kind of brand the image.  They provide us

22  our floor plans and our feature sheets and color copies of our

23  inventory.  Basically, all the pieces that we would hand out.

24      They run promotional pieces like radio ads or newspaper

25  ads, direct mail-outs that are more company themed.  Anything

1    very specific, like a specific event that I'm hosting, would

2    come from me with their support.  But that's the type of role

3    that they play within our company, one of supporting the sales

4    staff.

5    Q   You mentioned realtors.  Are realtors important to the sales

6    process?

7    A   Crucial, yes.

8    Q   Why is that, ma'am?

9    A   I would say that probably 90 percent of my transactions have

10   a realtor in some capacity, either one that was brought to me by

11   a realtor or that currently has a home to sell.  And even though

12   they've decided they want to buy my house, they reach back to

13   their realtor and mention my name or my product or seek their

14   help in selling their resale house.  We call those like kind of

15   backdoor realtors.

16       Between those two types, I -- I would equate 90 percent of

17   my sales to have a realtor involved.

18   Q   What sort of activities do you engage in to outreach to the

19   realtor community, ma'am?

20   A   Lots of -- I frequently visit area realtor offices, and I

21   attend sales meetings where I have kind of a captive audience.

22   And I usually bring like a fruit tray or, you know, dessert or

23   something to that effect, and I'm normally given a 15- to

24   20-minute time on the floor to explain who I am and where my

25   community is and, you know, highlights on the company.  So

1    that's one thing that I do.

2         I drop off inventory fliers usually with a treat, you know,

3    brownies, doughnuts, things of that effect with my card and my

4    logo on it so they know who it's coming from.  I do that at

5    least on a monthly basis to about 30 different realtor offices

6    in my targeted area.

7         I've, over the years, developed many relationships with

8    realtors that now I'm the first person they call when they have

9    a client.  They don't go to the Internet.  They call my cell

10   phone.  And those realtors, you know, I've taken to happy hour,

11   I've treated to lunch just one on one.

12        I've coordinated and hosted quite a few realtor events

13   within my model home, grand opening events or new section

14   events.  I'm working on right now that's -- kind of a year-end

15   push.  I've got a number of homes that are coming up on

16   completion and inviting a bunch of realtors out to tour them as

17   well.  So lots of different things.

18   Q   Okay.  And while you do that -- before you answer that --

19   while you answer that, I'm going to ask Tim to bring up

20   Exhibit -- Defendants' Exhibit 86.

21        Why do you do those things, Ms. Fisher?  Why do you engage

22   in those type of outside sales realtor outreach activities?

23   A   I think it's a crucial part of my job.  It's crucial to my

24   success.

25   Q   Ma'am, if you can take a look at Defendants' Exhibit 86?

```
1              MR. BROWN:  And, Tim, if you can show her the full

2   document first.

3   A    Uh-huh.  Yes.  I'm familiar with this one.

4   BY MR. BROWN:

5   Q    Okay.  You are familiar with this document?

6   A    Yes.

7   Q    What is this document, Ms. Fisher?

8   A    This is one of the pieces that's provided to us in one of

9   the training courses.  I believe it's Silver Tier.

10             THE WITNESS:  Laura, forgive me if I'm wrong.

11  A    But I believe it's Silver Tier.  It's one of the early

12  training courses.  This is one of the fundamental things we do,

13  so it's in one of the earlier classes.  But it's provided to us

14  by the training department.

15  BY MR. BROWN:

16  Q    You did receive this Exhibit 86 -- Defendants' Exhibit 86?

17  A    Yes, I have.

18             MR. BROWN:  Your Honor, at this time I'll move to

19  admit Defendants' Exhibit 86.

20             THE COURT:  Any objection?

21             MR. PADILLA:  No objection, Your Honor.

22             MR. BROWN:  Okay.  Tim, if you can, just blow it up

23  quite a bit on the first slide.

24  BY MR. BROWN:

25  Q    And, Ms. Fisher, if you would please explain to the jury
```

1    what this laundry list of items represent.

2    A    These specific five or just in general?

3    Q    In general, please.

4    A    These are just suggestions of different ways that we can

5    connect with area realtors.  It's -- it's not -- it's not saying

6    verbatim this is what you have to do.  It's more, you know,

7    these are some suggestions of other ways that you can connect

8    with area realtors.  It's kind of a suggestion sheet.

9    Q    Okay.  So we see here visit local realtor offices, No. 2?

10   A    Yes.

11   Q    We see No. 4, attend realtor award banquets?

12   A    Yes.

13   Q    Was this the way -- one of the ways that Meritage

14   communicated to you the expectation to get out and hustle and to

15   create and entrench relationships with the realtor community?

16   A    Yes.

17              MR. PADILLA:  Your Honor, objection.  Leading.

18              THE COURT:  Sustained.

19   BY MR. BROWN:

20   Q    Would you agree that face-to-face interaction is more

21   important than calling someone or e-mailing someone?

22   A    I --

23              THE COURT:  Still leading.  Just ask her what -- how

24   she does her job, what she thinks is effective.

25   BY MR. BROWN:

1    Q   How do you go about developing the realtor relationship?

2    A   I connect with various realtors at different offices, either

3    some that specialize in relocation or that specialize in my

4    specific market.  I provide service to them.  I offer my model

5    home as a free WiFi location for them if they're ever on the

6    road and need somewhere to stop by and plug in their computer.

7        I've voiced that you're welcome to come use my desktop any

8    time you want to print something.  So I kind of aligned myself

9    as a service provider to area realtors.  Of course, the

10   marketing efforts, the hosting events, delivering gifts and

11   inventory.  My objective is to keep my name and my company in

12   front of them.  I --

13   Q   Okay.

14   A   I want to be the person they call when they have a client

15   without having to look for my information.  I want my cell phone

16   number programmed in theirs.

17   Q   And why --

18   A   That's why -- I'm sorry.

19   Q   And why is it, Ms. Fisher, you actually go to them?  Why is

20   that?  Is that important, that you actually go to them versus

21   e-mailing them?

22   A   I don't think there's any substitute for one-on-one

23   interaction.

24   Q   And why is that, ma'am?

25   A   Well, an e-mail and a phone call don't convey your

1    sincerity.  They don't -- they don't show your passion about the

2    company.  They don't show your genuine desire to provide them or

3    their client a -- a wonderful process.

4        An e-mail is very easy to discard.  A person in front of

5    you that's contagiously excited about what they offer you might

6    listen a little bit more than reading an e-mail.

7    Q    Besides realtors, Ms. Fisher, do you engage in outreach

8    activities to other persons or establishments?

9    A    Any opportunity I get, yes.

10   Q    Okay.  To the community?

11   A    Yes.

12   Q    What sort of activities do you engage in, in which you are

13   reaching out to the community?

14   A    I've identified area apartment complexes where I see a

15   number of prospective buyers coming from.  I've facilitated,

16   like, campaigns to those -- to those complexes.  I've had color

17   copies made of fliers that, you know, your rent is this, and for

18   this you can afford this and have a picture of the home with a

19   backyard and a garage.

20       You know, the things that you don't typically have in an

21   apartment and show that for this, you can have this.  And then,

22   of course, all my contact information, directions to my

23   community.  That's one of many.  Do you --

24   Q    In doing those things, were you trained to do those things?

25   A    Was I trained to do those things?

1   Q   Yes, ma'am.

2   A   Again, there's been many suggestions of things that we can

3   do to procure traffic.  I don't honestly recall if that specific

4   example is one that anyone taught me to do or one that I thought

5   of my own, but it certainly is encouraged.  It's reimbursed for

6   and something I do regularly.

7   Q   Ms. Fisher, what does it mean to demonstrate a home?

8   A   To demonstrate?

9   Q   Yes, ma'am.

10  A   To -- for me, it's to walk a customer through a home and

11  help them to experience it the way that they should experience

12  it.  Instead of just, you know, looking at a bedroom count or a

13  bathroom count, you know, we're having conversations about how

14  this certain room is going to function and how their children

15  will interact in these spaces to help them kind of visualize

16  moving themselves emotionally into the home.

17      I talk about things you can't see, things behind the walls,

18  like the quality of construction that we utilize, the type of

19  insulation that we use, the accolades of the builder, you know,

20  the integrity of the person building the home.  These are all

21  things you can't see on a floor plan but I, you know, am sure to

22  point out as I am demonstrating a home.

23  Q   As part of your job as a sales associate, do you demonstrate

24  inventory or spec homes?

25  A   I do, yes.  Of course.

1   Q    Is there a distinction between the two?  Is there a

2   distinction between an inventory home and a spec home?

3   A    No, just a prettier word.

4   Q    Okay.  Why do you demonstrate the inventory or spec home?

5   A    The same reason.  I want to ensure that they're not

6   overlooking something about the home.  I want to ensure they

7   understand the home and that I'm memorable.

8        When they have finished their day of looking and all of

9   their brochure packages are spread out at the kitchen table, I

10  want them to remember the home with the nice girl that talked to

11  us about energy innovation and our dog in the backyard.  I mean,

12  it's -- it's an integral part of what I do.

13  Q    Were you trained and are you encouraged to demonstrate an

14  inventory or spec home?

15  A    Yes.

16  Q    Do you ever demonstrate a lot or homesite?

17  A    Do I ever demonstrate?

18  Q    Yes, ma'am.

19  A    Always, yes.

20  Q    Why is it that you do demonstrate a lot or homesite?

21  A    Well, just like the home itself, there's many things you

22  can't gather by just looking at a map.  You can't look at a map

23  and understand how the -- what kind of view it has from the

24  backyard or where a sewer inlet is in relation to the yard,

25  where a fire hydrant is, where the mailboxes are.

```
1        These are all things that customers care about above and
2   beyond lot No. 11.  So going out onsite and ensuring that
3   they're looking at the right piece of land and demonstrating how
4   that piece of land relates to them and how the home would
5   orientate on that piece of land is a major tool that I use.
6   Q   I'm a prospect and I walk into your sales office and I say,
7   "Ms. Fisher, I would like a home, and privacy is my number one
8   priority."  With that information, what would you typically do
9   if you're trying to sell a home lot -- a homesite or a lot?
10  A   I would identify homesites that have no rear neighbors, that
11  perhaps back to greenbelts or fields.  If they have no neighbors
12  to the side or single stories on the side, that would be
13  advantageous as well.
14       I would use my tape measure and measure out how much of the
15  yard the house would take and then put a cone indicating the end
16  of the home, and then measure on from the end of the home to
17  where the fence would be to show the customer that, you know,
18  your backyard is completely private.  You can sit on your porch
19  in your bath robe.  There's no two-story overlooking you and
20  what you're doing, very private.  Help them visualize themselves
21  in that position.
22  Q   Would the measuring tape and some of the other items be part
23  of a demo kit?
24  A   Yes.  Yes, it's --
25  Q   Do you have a demo kit?
```

1   A    I do, yes.

2   Q    What is that?

3   A    It's just trinkets that we've put together.  It was a

4   suggestion in one of our training -- one of our training

5   classes, and it's been invaluable.  It's -- I have a -- mine is

6   a Home Depot paint bucket, the big orange bucket.

7       I've got knee-high mud boots in it for when it's raining

8   and I don't feel like getting my shoes muddy.  I have a

9   flashlight.  I have a measuring tape.  I have hand wipes.

10       I do keep a spare copy of the community plat map with me,

11   and it's something I keep in the trunk of my car that I utilize

12   when I'm demonstrating a homesite.  Got band-aids in it, things

13   like that.

14   Q    What about the community?  Are there ever occasions where

15   you would demonstrate the community versus a homesite or an

16   inventory home?

17   A    Demonstrate the community versus?

18   Q    Yes, ma'am.

19   A    Of course, yes.  I can think of circumstances, yes.

20   Q    Can you give us some examples of how you would demonstrate

21   the community?

22   A    Well, we -- we're visited by people at many different points

23   in the buying process.  You know, clients sometimes visit that

24   are relocating to the Houston area in three years.  They're out

25   visiting their daughter and want to just kind of get a feel for

1    the area.

2        Showing them a specific homesite or specific inventory home

3    would not be the best utilization of my time.  It would be best

4    for me to get them hooked on the community and on the area and

5    on the builder, and then we could hone in that search when the

6    timeline is more relevant.  That would be the best example I

7    could think of.

8    Q    Are there ever occasions when you would visit a home under

9    construction, not yet quite to the completion stage but as under

10   production?  Do you ever, on occasion, do that?

11   A    Frequently, yes.

12   Q    And why is it that you do that, Ms. Fisher?

13   A    Well, in two capacities.  Sometimes you have customers that

14   are interested in a specific home that isn't your model home or

15   you don't have an inventory.  So that would be an opportunity

16   when you would take them through another home in production to

17   help them visualize the floor plan.

18       Once they're under contract, I frequently have customers

19   come in and, "Hey, Amy, I have a question over the size of a

20   specific window.  Can you run to the house with me?"  And so I

21   frequently visit them under construction with current buyers in

22   addition to prospective buyers.

23   Q    Is that something you were trained to do?

24   A    Yes.

25   Q    Is that something you're encouraged to do?

1    A    Yes.

2    Q    What is shopping the competition?

3    A    Shopping the competition?  Monthly we are required to submit

4    to our sales leaders a -- we call it a competition study, and

5    it's a very detailed kind of Excel document that lists all of

6    the plans that we offer, the square footages, what type of rooms

7    are in those homes, like four bedroom, three bath, two-car

8    garage.

9        It breaks it down into price per square foot.  It's much

10   more in-depth and talks about how many sales you had in a given

11   month versus a competitor, and you complete it based on both

12   your information and your competitor's information.

13   Q    How is it that you go about shopping competition?

14   A    I visit the area competition.  I typically shop them

15   incognito.  I typically go on my day off.  I typically have a

16   baseball cap, and most of the times I have my two-year-old in a

17   stroller with me.  So I definitely look like a real customer and

18   just walk them through the sales process.

19       I want -- I want to hear their presentation.  I want to see

20   their product.  I want to get a plethora of information about

21   their incentives and their promotions and their product, and I

22   want to see their available homesites.  I typically present

23   myself as a customer, and that's how I capture that information.

24   Q    So besides the product itself, you also shop the salesperson

25   him or herself?

```
1   A   You bet I do.  Absolutely.

2   Q   Why do you do that?

3   A   Well, I -- I believe homes are bought from people, and it is

4   certainly very helpful to me to know what my prospective clients

5   are hearing when they go next door or go across the street.  I

6   need to know their personality.  I need to know their sales

7   technique.

8        Some people, their sales presentation is one of

9   negative-talking the competition.  So if I know that going in, I

10  can prepare a customer.  "Now, when you go next door, this is

11  what you're going to hear," and then I've already responded to

12  the objection before it's even come to me.

13       I think knowing the salesperson and knowing how they

14  present their home and how their home functions is just as

15  important as the -- you know, the bedroom count and the price.

16  Q   You -- I heard you mention the term "objection."

17  A   Yes.

18  Q   Is that a term that you learn in your training and, if so,

19  what is that?

20  A   Yes, I did learn it in my training; also, in my day-to-day

21  applications.

22       "Objection" is -- in training they'll tell you it's a

23  buying signal.  But what an objection is, is it's typically a

24  question posed or something about the home or the homesite or

25  the company that the buyer doesn't care for, and it's your
```

1    opportunity to either help them remove that as an area of

2    concern or explain it away or sometimes you can't.

3        Some objections you can't overcome.  You just have to talk

4    through and see if it's something they can compromise on.

5    Q    Now, considering all of the outside sales activities you do

6    that we talked about, whether it is -- involves realtor

7    outreach, community outreach, demonstrating a home, in the 2007

8    to 2010 time period, what percent of your time working is spent

9    performing those activities?

10           MR. PADILLA:  Objection, Your Honor.  Leading, assumes

11   a fact and builds on a legal conclusion.

12           THE COURT:  Well, the end part of the question is just

13   what percentage of your time was spent for -- outside of the

14   model home or what?

15           MR. BROWN:  Correct, Your Honor.  It is a factual

16   question.  I'm asking her --

17           THE COURT:  I'm asking what your question was.

18           MR. BROWN:  Yeah.

19           MR. PADILLA:  Your Honor, the predicate to all that

20   was let's talk about how much inside sales versus outside sales

21   you did.  I mean, the whole question is basically calling for a

22   legal conclusion.

23           THE COURT:  I'll ask you to say -- I'll let you say

24   what percentage of your time was spent outside the model home

25   during that time period.

1           THE WITNESS:  Okay.

2    A    It does vary on a day-to-day basis, but I would say probably

3    60 percent of it is outside the model home, 40 percent is

4    within.

5    BY MR. BROWN:

6    Q    60 percent is outside of the model home?

7    A    Uh-huh.  Within -- with some capacity, showing a homesite,

8    walking a home under construction, realtor outreach.  You know,

9    some capacity.

10   Q    A related question:  Of all the homes that you sold, what

11   percent of those homes is somehow connected to an outside sales

12   activity?

13   A    I don't know if I understand exactly what you're asking.

14   I'm sorry.  Could you clarify?

15   Q    Sure.  Of all the homes that you have sold --

16   A    Okay.

17   Q    -- can the sale be attributed to an outside sales activity

18   that you performed in some way?

19           MR. PADILLA:  Objection, Your Honor.  Calls for

20   speculation and a legal conclusion.

21           THE COURT:  Sustained.

22   BY MR. BROWN:

23   Q    Ms. Fisher, we briefly spoke about Bobby Allen.

24       You said Bobby Allen was a supervisor of yours for a period

25   of time?

1    A    Yes, that was his title.

2    Q    Do you recall what period of time he was your supervisor?

3    A    I truly don't.  I know I was in a community called Telfair,

4    so it would have been, I believe, somewhere in the 2007, 2008

5    window, but I -- I honestly don't remember the exact timeline.

6         But he was my sales leader for -- I want to say just maybe

7    a year or just shy of a year.  It was a couple of months.  But I

8    don't remember the specific dates, I'm sorry.

9    Q    As a supervisor, what was your impression of Mr. Allen?

10   A    Nice man, seemed very family oriented.  I never -- I never

11   felt him to be like a sales manager.  We never discussed my

12   performance or any type of development, never discussed

13   objections or tried to offer me really anything that would

14   enhance what I was already doing.

15        Typically, he would randomly pop by and be on his way to

16   getting his oil changed or his tires rotated and never really

17   seemed to be a manager, at least not the managers that I'm

18   accustomed to working for outside of Bobby Allen.

19   Q    Did Mr. Allen ever discipline you or reprimand you for any

20   reason during your employment?

21   A    I've never been disciplined or reprimanded by any sales

22   director ever.

23   Q    Including Mr. Allen?

24   A    Including Mr. Allen.

25   Q    Was there ever an occasion when he came to your sales

1   office, found you to be absent from your sales office, and then

2   questioned you later about where you were during that two-hour

3   period of time?

4   A    Not that I recall.

5   Q    You don't recall ever -- an instance like that happening?

6   A    No.  Typically, whenever I am planning to be out of the

7   community for longer than showing a lot or showing a house, I

8   alert my management team that I've got a realtor function

9   scheduled or something to that capacity.

10       So I -- I can't see how that would ever happen, and no, I

11  don't ever recall being questioned about really anything I've

12  done.  I --

13  Q    Okay.  What is the purpose of you alerting your sales

14  manager if you're going to be away for a prolonged period of

15  time?  What is the purpose of you doing that?

16  A    I mean, I think it's -- it's smart business to be sure that

17  your superiors know where you are.  If something were to happen,

18  I'd like for someone to know where I was.

19       We frequently get visited by customers that we don't know

20  are coming.  We leave our model homes open for those situations,

21  but should a customer come that has a question and they call the

22  corporate office, they should be able to say, "Well, she's at a

23  realtor function, and let me get your phone number and have her

24  call you back."  I mean, that's why I would do it.

25  Q    Ma'am, those are my questions.  Thank you for your time.

1          MR. BROWN:  Pass the witness.

2          MR. PADILLA:  May I proceed, Your Honor?

3          THE COURT:  Sure.

4                    **CROSS-EXAMINATION**

5    BY MR. PADILLA:

6    Q    Good afternoon, ma'am.

7    A    Good afternoon.

8    Q    You and I met earlier for the first time today.  I actually

9    took your deposition for about an hour and a half earlier today,

10   right?

11   A    That's correct.  I remember.

12   Q    Mr. Chevazz Brown was sitting next to you in the deposition,

13   right?

14   A    He was, yes, sir.

15   Q    He was present --

16   A    Yes, he was.

17   Q    -- right?

18        And prior to that time neither me nor anyone that represent

19   any of the plaintiffs had ever met you, right?

20   A    That's correct.  No, I've never met anyone.

21   Q    But about six to eight weeks ago Mr. Brown came to your

22   community at 8:30 in the morning, right?

23   A    Uh-huh.

24   Q    And he and Ms. Williams met with you for about an hour,

25   right?

1   A   About an hour, yes.

2   Q   And then Kathy Silver, I think she dialed in and talked to

3   you on the phone, right?

4   A   We called her, I believe, kind of at the end of our

5   conversation.  We called in, and they kind of gave her a brief

6   recap and introduced me to her and --

7   Q   Yeah.  Any --

8   A   Yes.

9   Q   Any idea how they zeroed in on you, ma'am?  Out of all the

10  Meritage salespeople, any idea how they zeroed in on Amy Fisher?

11  A   My assumption -- and it's just that.  No one has told me

12  why -- why I'm here today.  But my assumption is probably

13  because I'm the second most-tenured person in the company

14  from -- from a sales capacity.

15  Q   You've been there a long time, right?

16  A   I have.  Almost 12 years.

17  Q   You want to be there a lot longer, don't you?

18  A   I do.  I love Meritage.

19  Q   You would like to retire from there, wouldn't you?

20  A   That'd be great.

21  Q   You've gotten some of the primo assignments at Meritage,

22  haven't you?

23  A   I've had a good collection of communities, both start-up,

24  both closeout and, yes, I've --

25  Q   You were -- you were assigned to a community called

1  Telfair --

2  A    Uh-huh.

3  Q    -- in -- in Sugar Land, which was the fourth best-selling

4  community in the country, wasn't it?

5  A    Well, I opened Telfair.  I opened it when we were in a

6  trailer and had dirt.

7  Q    You were --

8  A    It grew to the number four, yes.

9  Q    Right.  Well, you were there -- are you saying you weren't

10  there with the model home, ma'am?

11      You there were with two different model homes at two

12  different time periods, right?

13  A    That's correct.  I was in Telfair for almost five years.

14  Q    Right.  So you weren't there with just a trailer, right?

15  A    No, no.  We built a model home and --

16  Q    That's right.

17  A    -- developed the community, yes.

18  Q    Right.  And there were other builders there, right?

19  A    There were 13 of us, yes.

20  Q    It's a master planned community that's promoted by both the

21  developer and the builders, right?

22  A    Yes.

23  Q    And as a result of its location and the schools and those

24  things, that was one of the top-selling communities in the

25  country, right?

1   A    Yes.  It was a great location, yes.

2   Q    And currently Meritage Homes has you in Westlake in Katy,

3   which is another top-selling community with very high-end homes,

4   right?

5   A    Correct.  Yes.

6   Q    Higher-priced homes, higher commissions, right?

7   A    Yes.  They go hand in hand, yes.

8   Q    You've gotten some of the primo assignments, haven't you?

9   A    Yes, I have.

10  Q    Yeah.  And you're friends with Jeanne Conger, aren't you?

11  A    Jeanne Conger was the vice president of sales for a period

12  of time in that window.  I worked underneath her during that

13  time period.  I wouldn't consider her to be a personal friend,

14  but we've stayed connected on Facebook and watched each other's

15  children grow, and it's been a relationship in that capacity.

16  Q    Okay.  And so have you ever worked in the same community

17  with Ms. Armstrong, Mr. Lipnicki or Mr. Gonzalez?

18  A    No, I have not.

19  Q    And, in fact, what you -- what contact you have had from

20  them is them actually sending their customers to your community

21  to look at your Nicholas model in Telfair, right?

22  A    I don't recall a specific customer, but yes, that's a

23  frequent practice.  So that certainly is normal, yes.

24  Q    Right.  Well, it's a frequent practice and, in fact -- in

25  fact, you sent an e-mail to David saying, "Your couple was out

1    today to see the Nicholas.  They loved it and indicated they are

2    writing it up.  Good luck," right?

3    A    Correct.  That's what it says, yes.

4    Q    So both Ms. Armstrong, Mr. Lipnicki and others frequently

5    sent people out, their customers, by themselves to look at the

6    model home in your communities, right?

7    A    Yes.  It -- it's common.  Many salespeople --

8    Q    Right.  And you never went with Ms. Armstrong for a realtor

9    visit or Mr. Lipnicki or Mr. Gonzalez for a realtor visit.

10   That's something you did, right?

11   A    I would be promoting myself and my community, so two

12   salespeople typically would not go to the same function

13   together.

14   Q    Bottom line is you don't know what, if any, realtor

15   functions the plaintiffs in this case ever went to, do you?

16   A    No, of course not.

17   Q    And you don't know what, if any, outreach they ever did to

18   realtor -- for realtors, do you?

19   A    No, sir.

20   Q    But what you do know is that you hosted five or six realtor

21   events in your model homes, right?

22   A    Over various model homes, yes.

23   Q    Right.  What you do know is that you routinely e-blasted out

24   to realtors, right?

25   A    Yes, that's regular.

1   Q    And what you do know is that those e-blasts routinely

2   resulted in realtors coming to your model home and having

3   face-to-face encounters with you where you could register them

4   and put additional information into C-Sales, right?

5   A    Among other things.  You have to have rapport built in order

6   for an e-blast to be opened and effectively used.

7   Q    You sent e-blasts, didn't you?

8   A    I believe you said e-blast.  I repeated, yes.

9   Q    Right.  You did that from your model home sales office,

10  didn't you?

11  A    Yes.

12  Q    You called and followed up with realtors and customers and

13  prospects from the model home sales office, didn't you?

14  A    I've called and followed up and e-mailed prospects and

15  realtors from a thousand different places.

16  Q    All right.

17  A    It's -- today's technology makes that possible.

18  Q    So you didn't do it from the model home sales office?

19  A    No, it's one of many places that I follow up with customers

20  from.

21  Q    Do you know where Mr. Lipnicki or Mr. Gonzalez or

22  Ms. Armstrong -- how they went about contacting realtors?

23  A    No.

24  Q    Right.  So we'll have to leave it to them to tell the jury

25  where they did it, right?

1    A    Correct.  I can only account for myself and my efforts.

2    Q    Right.  You can only account for how you did your job,

3    right?

4    A    That's correct.

5    Q    All right.  Now, Telfair, you talked about -- I believe

6    while I was taking your deposition -- I popped in and -- just

7    before your deposition, and I saw Mr. Harding talking about some

8    trees, so I thought I'd ask you.

9    A    About trees?

10   Q    About trees.

11        Telfair -- if I understand Telfair correctly, Telfair

12   started as a plantation, right?

13   A    It was a parcel of land owned by one of the prisons.  I

14   believe it was corn fields --

15   Q    All right.

16   A    -- and there was a large building that was acquired with the

17   property.  I -- I don't recall it to be a plantation.  I

18   represented it as a farmhouse and where they used to store, you

19   know, mowing equipment and plows and --

20   Q    Fair enough.

21   A    Correct.

22   Q    But other than a few trees around that farmhouse, Telfair

23   has got no trees -- or had no trees, right?

24   A    Nor pool or -- a lot of things, yes.  We started it from the

25   ground up.

1    Q    There were no trees, were there?

2    A    Not that I can recall that the developer didn't plant.

3    Q    Now, in terms of shopping the competition, you can't speak

4    to how Ms. Armstrong, Mr. Gonzalez or Mr. Lipnicki did that, can

5    you?

6    A    No.

7    Q    And in terms of interacting with the construction team, you

8    actually had six construction managers assigned to your

9    community, right?

10   A    Yes.  I have six construction managers, a project manager,

11   and an area manager.

12   Q    All right.  And once a week you sit down in the model home

13   sales office with the construction manager, and the construction

14   manager gives you an update on the progress of homes in the

15   model home sales office, and you get the customer on the phone

16   so that you can tell them together what the status of their home

17   is, correct?

18   A    That's correct.  It's one of the services we provide.

19   Q    And if we walked into your model home sales office in

20   Westlake today, what we would see is that you have a number of

21   kiosks, if you will, items demonstrating energy efficient

22   features of the homes, things like that, right?

23   A    Yes.  We've got in the -- in the lobby, we have a rendering

24   that kind of gives you tidbits on the -- the low VOC, volatile

25   organic compound, like paint that we use and carpet that we use.

1   It just kind of gives you some tidbits on the products.

2       And then in my second model home I have what's called a

3   learning center.  It's an area that's devoted to showing the

4   insulation and the windows and the lighting and kind of the

5   sciences behind our home.

6   Q   All right.  And in your model home sales office you, of

7   course, have a desk, a computer, printer, copier, fax machine,

8   Internet connection, all that stuff, right?

9   A   Yes, sir, I do.

10  Q   You have a file cabinet, right?

11  A   I do.

12  Q   You have blueprints that you use --

13  A   I do.

14  Q   -- to go over with customers, right?

15  A   I do, uh-huh.

16  Q   You have a plat map, right?

17  A   I do.

18  Q   And you have -- by the way, on a -- you also have a big

19  blowup picture of the community, right, that shows where all the

20  schools are and the churches are and roads and trees and that

21  kind of thing, right?

22  A   We do, yes.

23  Q   And, of course, the -- there's -- you also have a map that

24  shows where the greenbelts, if any, are, right?

25  A   Yes.  It's -- I mean, it's typically vague.  It typically is

1  just blocked out as green space, and then you have to explain

2  kind of what it is.  But, yes, we've got that type of rendering.

3  Q   Right.  And you have all the typical stuff in your office

4  that I think others have talked about.  You have elevations.

5  You have spec sheets.  You have price sheets.  You have a number

6  of pieces of paper that you use as tools to sell homes,

7  including brochures, in the model home sales office, correct?

8  A   That's correct.  Yes, sir.

9  Q   And you have a beautifully decorated model, right?

10 A   I do.

11 Q   You have a beautifully decorated model that you know

12 actually won an award for those model homes that had $70,000

13 worth of furnishings, right?

14 A   If you're referring to PRISM, yes, and I was at that event,

15 yes.  One of our model homes won for best merchandising, which

16 is furniture and decor and ambience, basically.

17 Q   And one of the things you told me in your deposition is

18 that, in addition, you also encouraged your buyers to use MTH

19 Mortgage, correct?

20 A   Yes.  I encourage my buyers to use MTH Mortgage, our

21 preferred lender.

22 Q   Right.  And if they use MTH Mortgage and if you get enough

23 customers to use MTH Mortgage and you meet that 80 percent

24 capture rate, all of your commissions go up by 2.5 percent,

25 don't they?

1    A    That is one of many pieces of criteria that we have to

2    achieve in order to get the bonus, but yes, that's a component.

3    Q    And, in fact, from your model home sales office you fax and

4    receive a number of documents, including mortgage loan

5    applications to the MTH lenders, including worksheets and that

6    type of thing, right?

7    A    Yes.  At the time period that you're referencing, we were

8    not allowed to handle any type of clients' personal information.

9    We were not allowed to handle social security numbers or fax tax

10   returns or things to that capacity.  We had to connect them

11   directly with the lender.

12        That is no longer the case.  We now can handle those

13   documents, and I do, but that hasn't been the whole time.  So I

14   wanted to clarify that.

15   Q    You prepare good-faith estimates sitting at your desk in

16   your model home sales office, don't you?

17   A    I've never prepared a good-faith estimate.

18   Q    Ever?

19   A    No.

20   Q    Do you prepare closing memos?

21   A    Do I prepare closing memos?

22   Q    Yes.

23   A    I do.

24   Q    At your model home sales office?

25   A    Yes.

1   Q   And do you exchange faxes with the design center at the

2   model home sales office?

3   A   I do, uh-huh.

4   Q   Do you print contracts and sit people down, have them sign

5   contracts in the model home sales office?

6   A   Yes, sir.

7   Q   Now, you talked about, you know, "My customer might want to

8   know where there's a fire hydrant," right?  Do you think a

9   customer can see the fire hydrant without you saying, "Here's a

10  fire hydrant," for example?

11  A   Customers don't typically ask where a fire hydrant is.

12  Typically, it's the insurance companies that do.

13       Could they see it without me?

14  Q   Sure.

15  A   Sure.

16  Q   Okay.  Now, in your deposition I asked you about whether or

17  not you worked yesterday.

18  A   Yes, you did.

19  Q   We established you were wearing black pants, right?

20  A   Uh-huh.  Yes, sir.

21  Q   What color shirt were you wearing?

22  A   I was wearing a black-and-white blouse, three-quarter

23  sleeves.

24  Q   Okay.  We established that you drive a black Infiniti SUV,

25  right?

1   A    That's correct.

2   Q    We established that you have -- had a trainee with you that

3   drives a dark-colored Lexus, right?

4   A    I said I believed it to be a Lexus, but I wasn't certain of

5   the model.   It is definitely a four-door sedan.

6   Q    Right.   And I asked about your outside activity yesterday,

7   right?

8   A    You asked me about all my activity yesterday, yes.

9   Q    Right.   And I asked you if we looked at your workday

10  yesterday, Sunday, the day before you testified, would that give

11  us a good representation of a typical weekend day and how you

12  divided your time between inside and outside.   I asked you that,

13  and you said yes?

14  A    Correct.   On a typical weekend, yes.

15  Q    And then you told me about a number of activities that you

16  claimed you did outside yesterday.   Do you remember that?

17  A    Correct.

18  Q    And you told me that between the hours of 12:30 and 5:30 --

19  A    Uh-huh.

20  Q    -- you got in your black SUV, right?

21  A    Correct.

22  Q    And you took three different sets of customers out in the

23  community, right?

24  A    Correct.

25  Q    In fact, you even told me what streets you took them to.   Do

1    you remember that?

2    A    Yes, I do.

3    Q    You told me their names?

4    A    Yes, sir.  I told you the names of two.  I couldn't recall

5    the third, but yes.

6    Q    Right.  You told me you took two to see a spec home, right?

7    A    I took two to see a different spec home, one home in our

8    80-foot section; one in our 70.  And then the third customer was

9    not an inventory home.  It was a home under construction.

10   Q    Right.  And then you told me that you had -- I think you

11   told me you had about eight people come through, and that if it

12   had been 25 people, that would have been a fantastic day, right?

13   A    Yes, sir, would have been a great day.

14   Q    But you didn't have anywhere close to 25 people is what you

15   told me?

16   A    No.  No, that's correct.

17   Q    And then I asked you -- and I think -- and I clarified that

18   these three people you said you took out were after you unlocked

19   the other two model homes, right?

20   A    Yes, sir.  We open at 12:00, so my model homes were all

21   already open and ready to go.  But my first customer arrived at

22   12:30.

23   Q    You told me you got there at 11:15, right?

24   A    That's correct.

25   Q    You told me you worked until about 6:15, right?

1  A   That's correct.

2  Q   You told me that it was a Sunday, but you no longer have to

3  submit separate traffic reports on Sundays, unlike when the

4  plaintiffs worked there at Meritage, right?

5  A   Correct.  We no longer submit traffic, you know, directly.

6  It's -- we have a computer system now that as customers come, we

7  click, you know, that a unit has come or a be-back has come, and

8  it automatically tabulates it for us now.  I don't have anything

9  that I have to send in above and beyond that.

10 Q   Right.  You used to have to, but you don't have to do that

11 anymore, right?

12 A   Correct.  Yes.  We used to have to provide traffic reports.

13 Q   Right.  You told me that you sometimes work past 10:00 p.m.,

14 right?

15 A   You asked me if I had, and yes, I had.  I -- I don't

16 frequently anymore.  I've got two small children now.  But, yes,

17 I've sometimes had to stay late.

18 Q   Tell us about why you would have to work on your days off

19 even if you had a sales assistant.

20 A   Well, sales associates [sic] don't -- don't sell houses.

21 They're -- they support, but a sales associate doesn't

22 typically -- or at least in my experience doesn't -- doesn't

23 write a contract, doesn't meet with the buyer that's upset or

24 having, you know, a problem with their home.  Those are the

25 situations that I would personally attend to.

1  Q    You also told me in your deposition that you took another --

2  a number of people and you walked them outside your model home,

3  and then you walked them into the other two model homes --

4  A    Correct.

5  Q    -- and you walked around the inside of the other two model

6  homes with them?

7  A    That's correct, yes.

8  Q    So you told me that in addition to getting in your car and

9  letting people follow you three times -- at 12:30, approximately

10  2:00 or 3:00, and again at 5:00 --

11  A    Uh-huh.

12  Q    -- prior to turning off the lights at 6:15, you left in your

13  car three times, right?

14  A    That's correct, yes.

15  Q    And you walked with people to the other model homes, right?

16  A    That's correct.

17  Q    And that this was a typical weekend day for you in terms of

18  your inside versus outside activities, right?  Sunday was?

19  A    Yes.

20  Q    Yesterday was?

21  A    Yes.

22  Q    Right.

23          MR. PADILLA:  Your Honor, may we approach?

24          THE COURT:  Yes.

25      (Discussion at bench.)

1        MR. PADILLA:  Your Honor, I had this witness under

2   surveillance during her entire workday yesterday.  She never

3   left the model home.  I have a videotape of it and a former

4   investigator from HPD that was there the whole time.  I'd like

5   to play the video to at least prove up that's her car, her model

6   home, ask her a few questions and ask -- I have an

7   investigator --

8        THE COURT:  Any objection?

9        MR. MCLAUGHLIN:  I'd like to see if we can make

10  sure -- I don't know what he's talking about.

11        MR. PADILLA:  I don't think they should be allowed to

12  talk to her about it.  I think she's on the stand.  She needs to

13  look --

14        THE COURT:  You represented it was taken yesterday as

15  an officer of the Court?

16        MR. PADILLA:  Yesterday.

17        THE COURT:  All right.  You can ask her, sure.

18     *(End of discussion at bench; video playing.)*

19  BY MR. PADILLA:

20  Q   Ma'am, do you see the model home in that videotape?

21  A   I believe so, yes.

22        MR. PADILLA:  Your Honor, could we have the lights?

23  Sorry.

24        THE COURT:  Mr. Rivera --

25  A   Oh, no, it's okay.  I can see now.

1    MR. PADILLA:  I'm having some difficulty.

2    A    It's in focus now.

3    BY MR. PADILLA:

4    Q    Okay.  All right.  So is this your model home on the far

5    left?

6    A    Yes, it is.  That's --

7    Q    Is that where your model home sales office is?

8    A    Yes.  That's the sales office right there.

9    Q    Right.  Do you see your black Infiniti in that videotape?

10   A    I see a number of vehicles in the videotape.

11   Q    Right.  You told me that you tried to park your black

12   Infiniti between the -- your model home and the one next to it

13   typically, correct?

14   A    Correct.  Yes.

15   Q    All right.  And you see it there, don't you, ma'am, on the

16   right side?

17   A    I do, yes.

18   Q    You also see the dark vehicle that your assistant was -- or

19   your trainee was driving?

20   A    Hers is the one parked on the right-hand of the street.

21   It's not very visible from this picture, but it was just in

22   front of that second tree on the right-hand side of the street.

23   Q    All right.

24   A    I don't know what time of day this is, but yes, that's --

25   that's where she parked her vehicle yesterday.

1    Q    Right.  And, in fact, this looks like we're looking at your

2    model home yesterday, doesn't it?

3    A    Yes, it does.

4    Q    All right.  Now, again, you told us that you got there.  You

5    unlocked the two other model homes, right?

6    A    That's correct.

7    Q    And then your -- first person you took out was about 12:30,

8    right?

9    A    That's correct.

10   Q    And then if you were to walk people to the other model

11   homes, you would walk them out of your model home sales office

12   here (indicating), down on the sidewalk and inside the doors of

13   the other models, correct?

14   A    So there's a front walkway that's interconnected between the

15   three, and the backyards are all open to each other as well.  So

16   there's -- it's all open to one another.

17   Q    All right.  Now, would it surprise you to know that you were

18   under surveillance yesterday from roughly 11:30 till about 6:15?

19   A    Would it surprise me?  No.

20   Q    All right.

21   A    I guess not.

22   Q    Well, you didn't know anyone was surveilling you yesterday,

23   did you?

24   A    Correct.  No, I did not.

25   Q    All right.  Now, do we have to watch this entire tape, or

1   will you admit, ma'am, that you did not leave the model home one

2   time yesterday between the time of 11:30 -- 11:45, right, and

3   6:15?

4   A   That I did not leave the model home one time between -- no,

5   sir, that's not the case.

6   Q   All right.  You are maintaining and continuing to maintain

7   that you did not leave the model -- or that you left the model

8   home three times in that black SUV and drove people around the

9   community --

10   A   I did not drive anyone around the community.

11   Q   Well, you followed them?

12   A   Yes.  Typically, my clients follow me.  I have two car seats

13   in the back of my car.

14   Q   All right.  And you continue to maintain --

15   A   Oh, and there was one time before -- I'm sorry.  It's not --

16   never mind.

17        THE COURT:  Let him answer the -- ask the question.

18   A   I'm sorry.  Go ahead.

19   BY MR. PADILLA:

20   Q   And you continue to maintain, ma'am, that you also walked

21   people from the model home sales office to the other model

22   homes?

23   A   I maintain -- I told you that I demonstrated to various

24   people.  I said that I popped back and forth.  I had clients in

25   each different model at different times for different reasons.

1    I had two clients that weren't traffic connected to my community

2    that were there from other neighborhoods.  I did not demonstrate

3    either model home to them, but I checked on them to see if they

4    had any additional questions.

5        I popped back and forth to -- I went to the Monterey model

6    at one different point.  I was back there at 6:15 last night.  I

7    mean, I floated back and forth between all three.

8    Q   Okay.  And you continue to maintain that you -- that there

9    were only about eight groups that came out to see the model home

10   yesterday, right?

11   A   No, I did not say eight.  I said I believe ten that I --

12   Q   Ten?

13        All right.  But nowhere close to 25, right?

14   A   No, not 25.

15   Q   All right.  And this certainly looks like a tape from

16   yesterday, Sunday, the day before you testified in this case,

17   right?

18   A   I mean, it was dreary and overcast yesterday, but yes, I

19   guess.

20        MR. PADILLA:  Your Honor, at this time we pass the

21   witness, but we reserve the right to recall the witness after

22   bringing in our impeachment witness to talk about the videotape.

23        THE COURT:  All right.

24        Mr. Brown?

25                    **REDIRECT EXAMINATION**

1    BY MR. BROWN:

2    Q   Ms. Fisher, we saw snippets of this video.

3        Were you aware that you were under surveillance yesterday?

4    A   No, I was not.  But one thing I did remember after he said

5    something that I wanted to add is when I arrived, I turned into

6    the model park and went around the model park and then

7    remembered that I had promised a realtor that I was going to

8    walk a client's house.  There were some questions that I had

9    about completion, one of my homes on Creek Ledge.

10       So I turned around and went back to Creek Ledge, walked

11   that home, came back, drove down Blushing Hollow and Oakwood

12   just to see if the brick had been completed on a house and then

13   went back to the model.  I forgot about that circle there in the

14   beginning, so I'm sorry.

15   Q   That's okay.

16       Your deposition was taken immediately before you took the

17   stand today, correct?

18   A   That's correct.  Yes.

19   Q   Okay.  Were you being truthful in the answers that you gave

20   during that deposition?

21   A   To the best of my ability, yes.

22   Q   Were you being -- are you being truthful today in the

23   answers that you're giving us today?

24   A   Yes.

25   Q   Okay.  Okay.

1    MR. BROWN:  No further questions, Your Honor.

2    THE COURT:  Just so everyone's clear, how many

3  times -- once you got there and arrived, how many times did you

4  follow the customers to the -- in your car?

5    THE WITNESS:  It's not a practice of mine to count

6  every single time I step foot outside of my model home.  I --

7    THE COURT:  I'm just talking about getting in the car

8  for now.  How many times did you get in the car yesterday and

9  follow people to homesites?

10    THE WITNESS:  I went to one residence by myself, drove

11  that by myself.

12    I don't recall an exact number.  I don't -- I don't

13  want to say something incorrect if it's being actually counted.

14  I didn't count every single step I took yesterday.  I can --

15    THE COURT:  All right.  Mr. Padilla, it's your turn if

16  you want to follow up.

17    MR. PADILLA:  Yes, Your Honor.

18                    **RECROSS-EXAMINATION**

19  BY MR. PADILLA:

20  Q   In your deposition you told me it was three times, and you

21  specifically identified the names of the couples, didn't you?

22  You said there was a couple, and you gave me their names?

23  A   Uh-huh.

24  Q   You said there was a wife and a husband, who was not there,

25  right?

```
 1   A    No, it was the opposite.  It was a husband whose wife and

 2   daughter remained in the car because it was raining outside, and

 3   I did not leave the model park with him.  He is a customer that

 4   came in to seek information, and we interacted there in the

 5   lobby.

 6   Q    No, ma'am.  You told me that -- and we can go through page

 7   and line, but you told me that you actually -- you identified

 8   three separate buyers that you -- or potential buyers.  You went

 9   to two different spec homes, you told me the -- you told me the

10   plan name --

11   A    Uh-huh.

12   Q    -- the street name, and the customers' name, right?

13   A    Correct.

14        MR. BROWN:  Your Honor, if I may, if he's going to use

15   the deposition transcript -- it's not even final.  We just had

16   it -- I would ask that --

17        THE COURT:  Well, the reason we just had it -- and the

18   jury doesn't need to worry about all this.  This is lawyer

19   stuff.  But for various reasons, Ms. Fisher was identified late

20   in the case as a witness, so I let Meritage call her but with

21   the condition that plaintiffs would have to take a last-minute

22   deposition.  So, again, this is all lawyer stuff that --

23        THE WITNESS:  Sure.

24        THE COURT:  I'm talking to the jury -- that shouldn't

25   concern ladies and gentlemen of the jury, but I just don't want
```

1  anyone to think either side did anything improper leading to the

2  deposition.

3          But given that's the best we have, Mr. Padilla, if you

4  want to show it to her and ask her if that's what she recalls

5  this morning.

6          MR. PADILLA:  Yes, Your Honor.

7  BY MR. PADILLA:

8  Q    You also -- let me give you a copy, ma'am.  And we'll locate

9  it, okay?  It's a rough draft.

10 A    Sure.  No problem.

11 Q    But we'll locate it, and we'll talk about it, okay?

12 A    Okay.

13      *(Document handed to the witness.)*

14 BY MR. PADILLA:

15 Q    Okay.  Can you turn to page 8, please?

16 A    Okay.

17 Q    And, again, you're going to see some typos in here because

18 it's rough, okay?

19 A    No problem.

20 Q    Now, I ask you at line eight, "How many spec homes did you

21 show on Sunday?"  And you said, "On Sunday, two."

22      Do you see that?

23 A    Yes, I do.  Uh-huh.

24 Q    And I said, "Where were they located?"  And you answered,

25 "Both within my community.  One was in our" -- something,

1    something section, and it says "methods death section," but

2    obviously that's not right.

3        Do you know what you meant -- what you said there?

4    A    Yes.  I said the Monterey, which is the gated 80-foot

5    section within the community.  It was -- 3614 Scarlett Crest is

6    the property address.

7    Q    Okay.  And you said, "I don't know the exact address.  It's

8    lot seven on Leaning Willow.  It's a plan called the Redbud,"

9    right?

10   A    That's the one that's in the 70-foot section, yes.

11   Q    And then I asked you when you did that at lines 20 and 21.

12   You said, "Probably the 3:00 o'clock window," right?

13   A    Yes.  I told you I didn't remember the exact time but

14   somewhere in that window, and I wasn't watching the clock.

15   Q    But you said, "Maybe 30, 35 minutes.  I didn't time it,"

16   right?

17   A    Correct.

18   Q    And you said, "They followed me in their vehicle.  I drove

19   my own vehicle," right?

20   A    Correct.

21   Q    And I asked you what kind of vehicle?

22   A    Though -- I'm sorry.  The Monterey customer came to the

23   model home first.  I was with another client and caught up with

24   them there.  They didn't follow me.

25        You'd asked if I had taken them in my vehicle, and I had

```
1   not taken -- I didn't drive anyone in my vehicle yesterday.

2   I've got two car seats in the backseat.

3   Q   Right.  We talked about that.  But you did --

4   A   Right.

5   Q   -- drive your vehicle, right, to go out with the customer to

6   lot seven on Leaning Willow according to your testimony, right?

7   A   Yes.  The one on the -- yes.

8   Q   All right.  And then on page 9 at line 12 through 14, I

9   asked you about the second spec home you showed, "Where was

10  that" --

11  A   Uh-huh.

12  Q   -- right?

13       And you said, "It's a plan called the" -- and it's a typo.

14  It says P-H-E-R riot, and it's got a -- an address, right?  You

15  told us the address in your deposition, right?

16  A   Correct.  Uh-huh.

17  Q   And I asked you, "How long did the Monterey home take to

18  show," and you said it was closer to 20 minutes at line 24,

19  right?

20  A   I told you it was a very brief encounter.  Very quickly we

21  identified that the home wasn't a fit for them, so we continued

22  looking for a few minutes -- again, I didn't time it -- and then

23  went back to the model and we discussed other plan options that

24  would work for them.  That particular home didn't.

25            THE COURT:  Mr. Padilla, what does your transcript say
```

1    she said?

2            MR. PADILLA:  "How long did the Monterey home take to

3    show?"  Answer, "It was actually a much quicker -- probably

4    closer to 20 minutes."

5            THE COURT:  Is that what you recall saying this

6    morning?

7            THE WITNESS:  Yes, uh-huh.  And then I explained that

8    it was identified early that it didn't work for them.

9    BY MR. PADILLA:

10   Q    Then at page 9, line five and six, "Did they follow you

11   around in the car?"  Answer, "They followed me," right?  That's

12   what you said?

13   A    Yes, that is what I said.

14   Q    All right.  And then we got to page 10 at lines 18 and 19,

15   and I asked you, "Did you drive over to both homes?"

16        "I did, yes."

17        Right?

18   A    Yes.

19   Q    And, "Do you remember how many people were in each family?"

20        "Both times it was just husband and wife."

21        Did I read that correctly?

22   A    That's correct.

23   Q    Then I asked you, "Were those two husbands and wives, was it

24   their first time in the community?"  And you said, "Pamela and"

25   -- it's a typo.  It says, "Colleen, yes.  It was their first

1   time to the community."  I guess maybe that's Colleen, right?

2   A    Correct.

3   Q    And then on page 11 at the bottom, it's actually -- there's

4   a "13" in the middle for the page.  It says, at line three,

5   "There was a third family that I took to see a" -- it says "jazz

6   man," but I think it was Jasmine, right?

7   A    Jasmine, uh-huh.

8   Q    "That's not an inventory home.  It's just one of our homes

9   in production."

10  A    That's correct.

11  Q    You said, "Probably 30 minutes or so on the house.  The home

12  is on Creek Leg [sic] is the name of the street, but I don't

13  remember the physical address."  Correct?

14  A    Correct.  Yes.  Same address as the home I had walked that

15  morning but a few doors down.

16  Q    And turning to page 12, you said, "That occurred at about

17  12:30," correct?

18  A    Again, I -- I wasn't timing anything to be specific.  I'm --

19  I mean, it was around that time period, yes.  It was shortly

20  after I had gotten there.

21  Q    Okay.  And then if we turn to page 20 -- I'm almost done --

22  if you look at line 16, you said that you probably spent about

23  an hour and a half out of the day yesterday outside the model

24  home, right?

25  A    You came up with that figure, and I told you I wasn't

1    counting but sounded around -- around that period of time, yes.

2    Q    Okay.  Well, let's look at the question if you're saying I

3    came up with the number.  Let's look at page 20, line 12.

4         "How many" -- "how many time total" -- I presume that was

5    how much, or I'm having trouble with my syntax.

6         "How many time total were you out" -- and it says "in the

7    model home," but I believe it was out of the model home -- and

8    you asked -- turned to Mr. Brown and said, "Am I supposed to

9    answer?"  And he said, "You can still answer."

10        And you answered, "Like I said, I don't time these things,

11   but I would say probably about an hour and a half out of the day

12   yesterday was spent out of the model."

13   A    Correct.

14   Q    All right.  And then we honed in, and on page 22 -- and we

15   talked about the timing of your trips.  And you said, on line 4,

16   "One at 12:30, one around 2:00ish" -- I asked you, "One at

17   12:30, one around 2:00ish, and one around 5:30?"

18        And you said, "Correct."

19        And I was summarizing what you had told me, correct?

20   A    Yes.  Correct.  I remember the last one was towards the

21   close of the day because it was getting dark.

22   Q    And then I asked you, "When did you turn off all the lights

23   and all that?  Would that have been once you were completely

24   done?"  And you said, "Yes, about 6:15" --

25   A    Uh-huh.

1  Q   -- "began turning the lights off in the model."

2  A   Well, Zeba (phonetic) and I closed them together.  She began

3  turning off the lights in the first two.  I stayed behind

4  finishing up some other work and turned off the -- the Monterey

5  model home, the one at the very end.

6  Q   So do you think now you've had an opportunity to explain to

7  the jury when you claim you were outside the model home

8  yesterday?

9  A   Yes.

10  Q   Okay.  Thank you very much.

11       MR. PADILLA:  Pass the witness again, Your Honor.

12  Reserve the right to recall after the impeachment witness.

13       THE COURT:  Mr. Brown, anything else?

14       MR. BROWN:  No further questions, Your Honor.

15       THE COURT:  All right.  You can step down, but

16  plaintiffs might want to call you again is what that meant.

17  So --

18       THE WITNESS:  I understand.

19       THE COURT:  -- go ahead and stay.  If you can --

20  outside the courtroom, you can stay out where you were

21  beforehand.

22       THE WITNESS:  Okay.  Thank you.

23       THE COURT:  All right.  We're at --

24       THE WITNESS:  Do I leave this here?

25       THE COURT:  What's that?

1      THE WITNESS:  Do I leave this here?

2      THE COURT:  Is that your personal --

3      THE WITNESS:  He set it down.  I didn't know if I was

4  supposed to leave it.

5      THE COURT:  You can leave it.

6      All right.  Call your next witness.

7      *(Jury trial continues.)*

8      THE COURT:  All right.  Ma'am, come forward.

9  Mr. Rivera will swear you in.

10      *(Witness sworn.)*

11      MR. PADILLA:  May I proceed, Your Honor?

12      THE COURT:  Yes.

13                **PLAINTIFFS' EVIDENCE IN REBUTTAL**

14          **MICHELE SCHIEBE, PLAINTIFFS' WITNESS, SWORN**

15                    **DIRECT EXAMINATION**

16  BY MR. PADILLA:

17  Q   Good afternoon, Ms. Schiebe.  Please tell the jury your

18  name.

19  A   Michele Schiebe.

20  Q   And, Ms. Schiebe, are you a former police officer?

21  A   Yes, sir.

22  Q   Please tell the jury briefly about your tenure with the

23  police department.

24  A   I retired from the Houston Police Department in December of

25  2006.  I had 31 and a half years; ten years in the homicide

```
1    division, eight years in the Office of Inspector General where I

2    investigated internal complaints involving City of Houston

3    contractors, politicians and records department; investigative

4    assignments in the narcotics division, vice division, juvenile

5    division, sex crimes, jail vice, juvenile --

6              THE REPORTER:  Would you please pull the microphone a

7    little closer?

8    BY MR. PADILLA:

9    Q   Ma'am, are you a licensed private investigator now?

10   A   Yes, sir.

11   Q   And do you have any fraud investigation or examination

12   certifications?

13   A   Yes, sir.

14   Q   Can you tell the jury about that?

15   A   I'm a certified fraud examiner.  I became one while working

16   with the city auditor in 2006, and I've been practicing since

17   then -- practicing, but, you know, doing.

18   Q   Ma'am, did I ask you to conduct certain surveillance on a

19   witness in this case?

20   A   Yes, sir.

21   Q   And did you do so?

22   A   Yes, sir.

23   Q   And when did you do it?

24   A   Part of the day Saturday and all day Sunday.

25   Q   Okay.  And were you able to locate Ms. Fisher on Saturday?
```

1    A   Yes, sir -- well, no, sir.

2    Q   When were you able to locate her?

3    A   Sunday.

4    Q   Okay.  And on Sunday where did you -- let me put up a

5    videotape here.

6              MR. PADILLA:  Is it the first one?

7              THE COURT:  Does it have a number?  Is it marked?

8              MS. WILLS:  103.

9              THE COURT:  Plaintiffs' 103?

10             MR. PADILLA:  Well, Your Honor, I think we're going

11   to -- kind of needing to get oriented, and I think we're just

12   going to introduce -- or move to admit the videos that are on

13   the camera if -- this is actually on --

14             THE COURT:  All right.  As long as we get it on the

15   record official.

16             MR. PADILLA:  Okay.  Could we have the lights,

17   Your Honor?

18        (Video playing.)

19   BY MR. PADILLA:

20   Q   Now, Ms. Schiebe, is this part of the surveillance tape you

21   took yesterday?

22   A   Yes, sir, appears to be.

23   Q   All right.  And did you go out to a model home -- model home

24   park out in Katy, Texas?

25   A   Yes, sir.

1  Q   I think it's called the Westlake subdivision.  Is that

2  right?

3  A   Yes, sir.

4  Q   Okay.  And if you look over here, there's a home with some

5  flags.  And is there signage there identifying that as a

6  Meritage home?

7  A   Yes, sir.

8  Q   And then I think there -- is it two or three additional

9  homes to the right of it that are model --

10  A   There's two additional homes.

11  Q   Okay.  When you went out to conduct this surveillance, were

12  you there when a black S -- a black Infiniti SUV arrived?

13  A   Yes, sir.

14  Q   And did you see --

15          THE COURT:  You're sitting in your car right there, is

16  that right, or where are you taking this from?

17          THE WITNESS:  There's a cul-de-sac on the end of that

18  street, and I'm parked in -- up there.

19  BY MR. PADILLA:

20  Q   Now, I think in this -- if we look real closely, you can see

21  the black SUV -- the Infiniti SUV in this film; is that right?

22  A   I can't see it from -- oh, I see.  I see.  Yes.  I'm sorry.

23  Q   All right.  And where is it?  I think there are two black

24  SUVs.  Let's see if we can fast-forward a little bit.

25          THE COURT:  You might be able to touch the screen,

1    ma'am.

2              THE WITNESS:  Sir?

3              THE COURT:  You might be able to touch the screen.

4              No, we don't -- oh, it's not activated.  Some screens

5    are able to do that.  This one does --

6              MR. PADILLA:  Oh, there we go.  Okay.  There we go.

7              THE WITNESS:  Oh, now -- glasses help.

8    BY MR. PADILLA:

9    Q    Okay.  So did you identify the black Infiniti SUV arrive on

10   the scene?

11   A    Yes, sir.

12   Q    About what time did it arrive?

13   A    I think it got there, the first time, around 11:30.

14   Q    Okay.

15   A    Then it didn't stop.  It just drove, came down the street,

16   drove around the cul-de-sac, paused a moment right in front of

17   the house maybe 15 seconds max, and then drove off.  And then it

18   returned again at 11:46, and then --

19   Q    Okay.

20   A    -- went inside.

21   Q    All right.  So at 11:46 did a woman come out of that SUV?

22   A    Yes, sir.

23   Q    And what was she wearing?

24   A    She had on black pants, a big white top with vertical black

25   stripes, and she had dark hair, and her hair was up.

1  Q   All right.  And did she open the Meritage model home on the

2  end where the flags are?

3  A   Yes, sir.

4  Q   Did she subsequently exit that Meritage model home and

5  unlock the other two Meritage model homes?

6  A   Yes, sir.

7  Q   At about what time was that?

8  A   I'd have to refer to my notes.

9  Q   Do you have your notes handy?

10  A   I do.

11     11:54.

12  Q   All right.  And then did she go back into the Meritage home

13  with the flags?

14  A   Yes, sir.

15  Q   And did you take a -- any kind of restroom break that day?

16  A   Yes, sir.

17  Q   And how long was that restroom break?

18  A   That was probably about ten minutes apiece.

19  Q   Okay.  So two restroom breaks, ten minutes each?

20  A   Three.

21  Q   Three?

22  A   Three.

23  Q   At ten minutes each?

24  A   Uh-huh.

25  Q   All right.  And was there someone else in the car with you

1    when you took that restroom break?

2    A    Yes, sir.

3    Q    And who was that?

4    A    Gary Schiebe.

5    Q    Okay.  Is that your husband?

6    A    It is.

7    Q    All right.  Now, after the woman got out of the SUV, went

8    into the home, came out, unlocked the other two and then

9    returned, I think you said about -- about ten till 12:00 I think

10   that is; is that right?

11   A    11:54 is when she opened the last one down the street, and

12   then she walked down there and entered.

13   Q    Okay.  And entered the model home with the flags?

14   A    Yes, sir.

15   Q    Okay.  Did she or the black SU -- did she ever get in her

16   black SUV and drive off prior to closing down the model home at

17   6:15?

18   A    No, sir.

19   Q    Okay.  And did you constantly run your videotape

20   surveillance on this area in order to show that?

21   A    Yes, sir.

22   Q    And did you confirm with Gary Schiebe when you came back

23   that the SUV had not moved?

24   A    Yes, sir.

25   Q    The entire time that and you Mr. Schiebe were there, did --

1    did Ms. -- you understand this is Amy Fisher?

2    A   Yes, sir.

3    Q   Did you ever see her come out of her model home?  Did she

4    ever come out of her -- the first model home and walk customers

5    to any of the other two model homes?

6    A   No, sir.

7    Q   So did Ms. Fisher, starting from -- did you see her leave at

8    6:15?

9    A   Yes, sir.

10   Q   Between 11:54 a.m. yesterday and 6:15 p.m., did she turn off

11   the lights in the model home?

12   A   She turned off the lights in the garage where the sales

13   office were, and the -- and -- but the interior lights on the

14   others stayed on.

15   Q   All right.  And what time did she turn off the lights on her

16   model home sales office?

17   A   Let's see.  Hang on.

18       6:15 -- about 6:15.

19   Q   Okay.  And so Amy Fisher -- am I correct in understanding

20   that Amy Fisher, between 11:54 and 6:15, never left that model

21   home?

22   A   She left one time to walk outside --

23   Q   Okay.

24   A   -- briefly.

25   Q   All right.  And what did she do?

1  A   She turned to the left, like going to the direction of the

2  second -- the middle model home --

3  Q   Uh-huh.

4  A   -- had a folder or something in her hand, walked about

5  20 feet and just turned around and walked back in.

6  Q   Other than that, did she ever leave her model home between

7  these two times?

8  A   No, sir.

9  Q   Okay.  And did you document that on your cameras?

10  A   Yes, sir.

11  Q   These look like your cameras?

12  A   Yes, sir.

13  Q   You want to open it up and make sure they're your cameras?

14  A   Looks like them.

15  Q   Okay.  Now, on the video cameras, as I understand it,

16  there's a -- a SIM card but also hard drive memory on the

17  cameras; is that right?

18  A   Internal memory.

19  Q   Okay.  Did you put -- did you save this video to both the

20  hard drive and the internal memory -- I mean, the internal

21  memory and the SIM cards?

22  A   Different parts of the video.  And it would fill up the

23  internal memory, and then the -- the SD card is -- will capture

24  it.

25  Q   The rest?

1   A    Right.

2   Q    Okay.  So is your surveillance -- is your surveillance of

3   Ms. Fisher on those two cameras?

4   A    Yes, sir.

5   Q    All right.  Now, as I understand it, as it turns out there

6   might be a couple of little family things on one of those hard

7   drives?

8   A    Yes, sir.

9   Q    Anything personal?

10  A    There shouldn't be.

11  Q    Any objection about submitting those to the jury?

12  A    Not at all.  Not at all.

13          MR. PADILLA:  Your Honor, we move to admit

14  Ms. Schiebe's videotape footage into evidence as --

15          THE COURT:  As what number?

16          MR. PADILLA:  -- Exhibit No. 103.

17          THE COURT:  Any objection?

18          MR. MCLAUGHLIN:  Subject to having a copy, no

19  objection, Your Honor.

20          THE COURT:  All right.  It's admitted.

21  BY MR. PADILLA:

22  Q    Now, Ms. Schiebe, did you see customers walk into the model

23  home and, on their own, walk out and walk into the other two

24  model homes?

25  A    Yes, sir.

1    Q   And how many visitors would you say you observed actually

2    walk in to -- drive up, park and walk into the model home sales

3    office on Sunday?

4    A   I would say, conservatively, about 30 -- at least 30.

5    Q   Okay.

6          THE COURT:  You're saying 30.  You mean families or

7    people?  You know, people go in as three, how are you counting

8    them?

9          THE WITNESS:  I don't know exactly.  Just a lot of

10   people were coming and going.

11   BY MR. PADILLA:

12   Q   Do you have a sense of how many cars actually came and

13   parked with groups that entered the model home sales office?

14   A   I don't really have a sense.  I think some cars came and

15   they would leave and return again, and then just a lot of cars

16   were coming.  There would be, you know, seven, eight, nine cars

17   there at one time.  Sometimes there would only be three cars in

18   addition to the -- the employees' cars.  It was just constant

19   cars coming and going.

20   Q   And then I also notice that there's a dark Lexus.

21   A   Yes, sir.

22   Q   Did that dark Lexus sedan ever move?

23   A   No, sir.

24   Q   Thank you very much, Ms. Schiebe.

25          MR. PADILLA:  Your Honor, pass the witness.

1           THE COURT:  Okay.  Any cross?

2           MR. MCLAUGHLIN:  No questions, Your Honor.

3           THE COURT:  All right.  Thank you, ma'am.  You're free

4   to go.

5           THE WITNESS:  Thank you.

6           THE COURT:  You're excused.

7           Call your next witness.

8           MR. PADILLA:  Your Honor, at this time we recall

9   Amy Fisher --

10          THE COURT:  All right.

11          MR. PADILLA:  -- in rebuttal.

12          THE COURT:  Let's get Ms. Fisher.

13          MR. MCLAUGHLIN:  Ms. Fisher should be on her way,

14   Your Honor.

15          THE COURT:  Okay.  So I think I told you before that

16  Ms. Hall does realtime transcripts, so that's what I have right

17  here.  I can look at what was just said.  Not that a judge would

18  ever fail to pay attention, but if that were to happen, I've got

19  it at my fingertips.

20          And when I was trying cases here the judge, you know,

21  was just -- I was wondering the whole trial as a lawyer what's

22  the judge looking at, what's the judge looking at, and my last

23  witness that testified was the FBI agent.  I was a federal

24  prosecutor, so the FBI agent was sort of our -- our main client.

25          And he testified, and the witness could see the

1    judge's computer even though the lawyers couldn't.  So he got

2    finished testifying, and I said, "What's the judge -- what's he

3    doing the whole time?"  He said, "Oh, he's ordering bow ties off

4    the Internet."  So I can tell you I'm not -- I'm not looking at

5    bow ties.

6            Working and stuff.  Sometimes other cases,

7    sometimes -- sometimes the transcript here, so...

8        *(Amy Fisher enters courtroom.)*

9            THE COURT:  All right.  Ms. Fisher, come forward.

10   I'll remind you you're still under oath from earlier in the day.

11   You can take the stand again.

12           THE WITNESS:  Okay.  Thank you.

13           THE COURT:  Whenever you're ready, Mr. Padilla.

14           MR. PADILLA:  Thank you, sir.

15                   **AMY FISHER, PLAINTIFFS' WITNESS**

16                        **DIRECT EXAMINATION**

17   BY MR. PADILLA:

18   Q   Ms. Fisher, as I understand it, yesterday when you were at

19   work you were wearing black pants and a white shirt with some

20   black stripes.  Correct?

21   A   Yes, that's correct.

22   Q   All right.  Now, Ms. Fisher, have you ever -- on your

23   Facebook page, have you ever posted a post where you said --

24   where you had a picture of the model home sales park that we

25   have shown up here today earlier -- you were here when we showed

1    that -- and stated, "2014 Model Home Park of the Year.  So

2    honored to call this my home away from home"?  Have you ever

3    that said on Facebook?

4    A   Yes, I -- I do recall that post.

5    Q   Back in 2009, Ms. Fisher, did you post on Facebook, "I am

6    trying to determine if it would be unprofessional to drag my

7    desk outside onto the sidewalk.  Such a nice day"?  Did you post

8    that back in 2009 while you were working at Meritage, ma'am?

9    A   Yes.  I -- I don't recall the exact day, but that does sound

10   like something I've jokingly said many times on gorgeous days.

11   Q   All right.  Maybe we could look at it.

12              MR. PADILLA:  May I approach, Your Honor?

13              THE COURT:  Yes.

14   BY MR. PADILLA:

15   Q   On November 6, 2009, you said precisely that on your

16   Facebook page, didn't you?

17   A   Yes.

18   Q   Ma'am, yesterday between the time of 11:54 and 6:15 when you

19   closed that model, you never got in your car and drove with

20   anybody to any spec home, any inventory home, any home recently

21   constructed anywhere did you, ma'am?

22   A   Can you clarify the time period one more time, please?

23   Q   Yes, ma'am.

24   A   Because there was activity prior to...

25   Q   Well, and we just heard from Ms. Schiebe, and she said that

1    you came -- you weren't -- didn't have the benefit of being in

2    here, but she said you came and you drove up, didn't get out of

3    your car -- you drove up about 11:30, you drove off, and then

4    you came back.

5        Then, before 12:00, you walked into the model home.  You

6    unlocked the model home.  You unlocked the other two.  That puts

7    us at about 11:54.

8        Between that time, 11:54 and 6:15 when you left, you never

9    left that model home neither to take anyone to see a spec home,

10   neither to take anyone to see any kind of inventory home, not to

11   walk anyone into the other model homes; isn't that right, ma'am?

12   A    I -- I'd like to plead the fifth.

13   Q    Okay.  Today, earlier, you lied to this jury when you told

14   them that you went to go show spec homes on Sunday in order to

15   protect your employer, Meritage; isn't that true, ma'am?

16   A    There's no intent to protect my employer.

17   Q    But you lied to the jury, didn't you, ma'am?

18   A    Again, I'd like to plead the fifth.

19            THE COURT:  When you say, "the fifth," you mean your

20   right against self-incrimination?

21            THE WITNESS:  That's correct.

22   BY MR. PADILLA:

23   Q    And before we had your deposition today, you sat with the

24   Meritage lawyer for an hour in a conference room in this

25   courthouse, didn't you?

```
 1    A    I've -- they've been very clear that they are not -- they

 2    are not representing me, that he's not [sic] a Meritage lawyer.

 3    Q    A lawyer in this courtroom, Mr. Brown, sat with you --

 4    A    Correct.

 5    Q    -- for an hour in a private conference room in this

 6    courthouse before I took your deposition.  True or false?

 7    A    That is correct.

 8    Q    Thank you very much.

 9             MR. PADILLA:  Pass the witness.

10                       CROSS-EXAMINATION

11    BY MR. MCLAUGHLIN:

12    Q    Good afternoon, Ms. Fisher.

13    A    Good afternoon.

14    Q    Did you talk to any -- well, did you -- well, first off, do

15    you have counsel here today?

16    A    Do I have counsel?

17    Q    Yes, ma'am.  Do you have a lawyer here for you personally

18    today?

19    A    I've -- I have spoken to someone, yes, and she is here

20    today.

21    Q    Did that occur after your testimony earlier?

22    A    It did.

23    Q    Did Mr. Brown here or any lawyers representing Meritage try

24    to get you to say anything that wasn't true?

25    A    No.
```

1    Q    Did -- I understand you've taken the fifth, and I'm not

2    asking you to repeat any answers.  But did -- did any of these

3    Meritage lawyers, I mean, based on the questions Mr. Padilla

4    just asked, including me, have any idea that you may have been

5    up here saying something that wasn't accurate?

6    A    No.

7    Q    Thank you, ma'am.

8              MR. MCLAUGHLIN:  I'll pass, Your Honor.

9              THE COURT:  Anything else, Mr. Padilla?

10             MR. PADILLA:  Yes, Your Honor.

11             THE COURT:  All right.

12                      **REDIRECT EXAMINATION**

13   BY MR. PADILLA:

14   Q    Jackson Walker lawyers, the defense lawyers in this case,

15   came to your community six to eight weeks ago.

16   A    That's correct.

17   Q    You spoke with two lawyers in person, another lawyer on the

18   phone; is that true?

19   A    That is correct, yes.

20   Q    Again, before your deposition you met with a Jackson

21   lawyer -- Jackson Walker lawyer, defense lawyers in this case,

22   correct?

23   A    You're referring to this morning before the deposition?

24   Q    Yes, ma'am.

25   A    It -- yes.  It wasn't a meeting.

1   Q    And -- it wasn't a meeting.  You sat in a private conference

2   room for an hour?

3   A    Sure.  Yes.

4   Q    Now, out of all the salespeople in Houston, Texas, Meritage

5   handpicked you, Amy Fisher, to come to this courtroom and

6   testify about how you do your job; is that true or false?

7   A    It appears to be the case, yes.

8   Q    Thank you very much.

9               MR. PADILLA:  Pass the witness.

10              MR. MCLAUGHLIN:  Nothing further, Your Honor.

11              THE COURT:  Anything else?

12              All right.  You can step down.

13              THE WITNESS:  Thank you, sir.

14              THE COURT:  Why don't you wait outside for a few

15   minutes, Ms. Fisher.  We'll be done here soon.

16              Call your next witness.

17       *(Jury trial continues; jury out at 5:06 p.m.)*

18              THE COURT:  All right.  Everyone can be seated.

19              Can someone get Ms. Fisher again?

20              I'll talk to her a minute, and then we'll let her go.

21       *(Ms. Fisher enters.)*

22              THE COURT:  Come forward, Ms. Fisher.

23              All right.  You took the fifth, which is your right,

24   and so I would suggest you not really say anything now.  I just

25   wanted to mention a few things.

1    You know, in hundreds of courtrooms across the country

2    every day there's trials, and the trials depend on people living

3    up to that oath when they say, "I swear to tell the truth, the

4    whole truth and nothing but the truth."  In these trials, you

5    know, a lot of money's at stake, people's reputation is at

6    stake, and even more than that the whole justice system and its

7    ability to produce truthful, just results is at stake.  So it's

8    a serious matter.

9    I'm not making any conclusions, but obviously what's

10   come to light today suggests that there are some things for you

11   to be worried about.  I also hear criminal cases, and I'm

12   actually sentencing a woman in three weeks who was charged and

13   pled guilty to lying as a witness in a civil employment case.

14   So this is a serious matter.

15   You said you've -- now have counsel.  I think you need

16   to keep that counsel, and it sounds like the lawyers explained

17   to you after this happened that, you know, these lawyers

18   represent the company.  You need this lawyer who represents you.

19   So, again, I don't recommend you say anything, but if

20   you want to you -- you can.  But I just basically wanted to tell

21   you that this is a serious matter and that I think you're wise

22   to get counsel and should continue to keep that counsel because

23   this -- you know, there may be ramifications from this.

24   THE WITNESS:  Yes, sir.

25   THE COURT:  All right.  With that, you're free to go.

1    You're excused from the trial.

2              THE WITNESS:   Thank you.

3         *(End of requested transcript.)*

4                        -o0o-

5         I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above matter.

7

8    Date:  December 2, 2014

9                             /s/ Heather Hall
                              _____
                              Heather Hall, CSR, RMR, FCRR
10                            Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25