```
1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS
2                            HOUSTON DIVISION

3    _____
                                      )
4    DAVID LIPNICKI, ET AL.,          )
                Plaintiffs,           )
5                                     ) CIVIL ACTION NO.
     VS.                              ) 3:10-CV-605
6                                     )
     MERITAGE HOMES                   )
7    CORPORATION, ET AL.,             ) 9:25 A.M. TO 10:07 A.M.
                Defendants.           ) 10:24 A.M. TO 11:16 A.M.
8    _____)

9

           CLOSING ARGUMENTS OF COUNSEL DURING JURY TRIAL
10              BEFORE THE HONORABLE GREGG COSTA
                      NOVEMBER 18, 2014
11
     APPEARANCES:
12
     FOR PLAINTIFFS:
13   MS. RHONDA HUNTER WILLS,
     MS. GENEVIEVE ESTRADA, AND
14   MR. ANTHONY WILLS
     Wills Law Firm, PLLC
15   1776 Yorktown, Suite 570
     Houston, Texas  77056
16   (713)528-4455

17   MR. JOHN M. PADILLA, AND
     MR. J. MOISES CEDILLOS
18   Padilla & Rodriguez, L.L.P.
     1776 Yorktown, Suite 110
19   Houston, Texas  77056
     (832)740-4301
20
     FOR DEFENDANTS:
21   MR. SCOTT ROBERT MCLAUGHLIN,
     MS. MARLENE WILLIAMS,
22   MS. KATHERINE SILVER, AND
     MR. CHEVAZZ BROWN
23   Jackson Walker LLP
     1401 McKinney, Suite 1900
24   Houston, Texas  77010
     (713)752-4200
25
```

```
1    APPEARANCES CONTINUED:

2    ALSO PRESENT:
     MR. DAVID LIPNICKI
3    MS. DONNA ARMSTRONG
     MR. TIM GONZALEZ
4    MR. MARK HOPKINS
     MR. MARK REYNOLDS, ESQ.
5    MS. LAURA GOODWIN
     MR. TIM HERNDON

6
     COURT REPORTER:
7    Heather Alcaraz, RMR, FCRR
     Official Court Reporter
8    515 Rusk, Room 8004
     Houston, Texas  77002
9    (713)250-5584

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

# I N D E X

JURY TRIAL

NOVEMBER 18, 2014                                          PAGE

Closing Argument by Ms. Wills                                4

Closing Argument by Mr. McLaughlin                         34

Rebuttal Closing Argument by Ms. Wills                     62

1          THE COURT:  So with that we're ready for closing

2     arguments.

3       Ms. Wills, you're going to go first.  Whenever you are

4     ready, you can begin.

5          MS. WILLS:  Thank you, Your Honor.

6          THE COURT:  Give you a minute to set up.

7          I think what we'll do, ladies and gentlemen:  After

8     Ms. Wills goes, we'll take a break -- short break and then go

9     through the rest of the closing arguments.  And then, like I

10    said, we'll order lunch for you.

11         Art, did we get the order forms?

12         THE CASE MANAGER:  I have them.

13         THE COURT:  Okay.  So during the break, you can take

14    care of that.

15         All right.  Ms. Wills, whenever you're ready.

16         MS. WILLS:  Thank you, Your Honor.

17         Good morning, ladies and gentlemen.  Well, it's been

18    about a week, and it's been a very interesting week.  And I

19    really want to thank each and every one of you for coming here

20    early every morning, sitting here patiently listening to all the

21    evidence, listening to the witnesses, carefully paying attention

22    to everything that was going on because I can tell you that this

23    case means a great deal to these three plaintiffs that we're

24    here representing.

25         This case means a great deal to Donna Armstrong, to

1    Tim Gonzalez and to David Lipnicki, and I'd like to thank you on

2    their behalf for coming here, for listening to the evidence, for

3    keeping an open mind, and for paying such close attention.  We

4    thank you so much.

5              This is my opportunity to kind of summarize for you

6    the things that the evidence has shown, what we believe were the

7    really important key pieces of evidence, and to point out to you

8    some of the things that we believe, based on the Court's

9    instructions, will help guide you in making the right decisions

10   here.

11             So as Judge Costa just told you, there are -- there

12   are two basic issues, right?  The first issue is:  Were the

13   plaintiffs inside salespeople or were they outside salespeople?

14   And you really can't be both.  You're either inside salespeople

15   or you're outside salespeople.

16             And I submit to you, based on all the evidence that

17   you've heard from the witness stand, from the deposition clips

18   that you've seen of witnesses that also testified under oath,

19   this was an inside sales position.

20             The second question that you're going to be asked is:

21   How many hours did these plaintiffs work?  And the judge just

22   told you it's based on an estimation.  There are no records.

23   It's not their fault that there are no records.

24             Meritage didn't keep records.  They could have kept

25   records, but they didn't.  So now we're left with their

1   reasonable estimation, and that's -- that's our only burden, to

2   give you a reasonable estimation of the number of hours that

3   they worked.

4          So I'd like to talk about this very first question

5   that you're going to need to answer.  Were the plaintiffs inside

6   salespeople or were they outside salespeople?  And I will tell

7   you that the answer to that question of this being an outside

8   salesperson job is absolutely no.

9          So the judge just went over the jury instructions with

10  you, and I just want to hit on some of the key ones.  I noticed

11  you-all were paying very close attention when he read them, but

12  I just want to focus on some of the key instructions.

13         So what is the outside sales exemption?  It has two

14  basic components.  First, the plaintiffs have to have a primary

15  duty of making sales, and here we agree that was the their

16  primary duty, making sales.  And we believe and it's our

17  position and the evidence has shown that they actually had two

18  products that they had to sell.

19         First, they had to sell the new homes, and, secondly,

20  they had to also sell the Meritage MTH mortgages.  Meritage

21  required them and actually gave them an uptick on their

22  commissions if they not only sold the new house, but they also

23  sat them down and convinced them to buy a Meritage mortgage as

24  well.  So that was their primary job duty.

25         Now, the second issue is whether the plaintiffs were

1    customarily and regularly engaged away from the employer's place

2    of business in performing their sales duties.  So what's the

3    employer's place of business?

4            Well, as the judge just outlined, the employer's place

5    of business includes any fixed site, whether it's the

6    plaintiff's home or whether it's an office.  And for purposes of

7    this case, that model home that you've heard so much about,

8    including the sales office that's within the model home, that's

9    inside sales.

10           The Houston corporate office that you've heard about

11   where they had the Monday morning meetings, they did the

12   call-a-thons and the phone solicitations and sometimes they'd

13   have realtors come there to the corporate office, that's all

14   inside sales.  The time that they spent in these places, that's

15   inside sales.

16           So what does "customarily and regularly" mean?  Well,

17   what does that mean?  Well, the phrase "customarily and

18   regularly" means it has to be a frequency that's greater than

19   occasional.  In other words, if you think it's just occasional,

20   you know, maybe they did some sales activity occasionally,

21   that's not enough.  If you think it was just something that

22   happened occasionally, that's not outside sales, and that's not

23   customarily and regularly.  It has to be greater than

24   occasionally.

25           Customarily and regularly includes work that is

1    normally and recurrently -- normally and recurrently performed

2    every workweek.  Workweek after workweek after workweek,

3    normally and recurrently.

4          As the Court also just instructed you, when you're

5    looking at outside versus inside -- what's happening outside and

6    what's happening inside, you have to look at the amount of time.

7    Where were they spending their time?  Were they spending their

8    time inside -- inside that model, inside their sales office or

9    inside the corporate office, or were they spending their time

10   outside?  You've got to look at where was their time being

11   spent.

12         And then you have to also look at the relative

13   importance of anything that they did if they ever were outside.

14   Were they outside doing something important, something critical,

15   something that mattered, or were all of the important things

16   being done inside that model home sales office, inside the

17   model, in the corporate office?

18         If you believe that they're spending most of their

19   time inside, that the important things are being done inside,

20   these ladies and gentlemen are inside salespeople and the

21   outside sales exemption does not apply to them.

22         So as you get this charge and as you think about this

23   case, ask yourselves -- you heard them all testify.  You heard

24   them say the word "rarely."  Rarely.  You heard them say that

25   they rarely did anything outside of that office.

1          They were required to be there.  That's where they

2     were supposed to be.  That's where they made their sales.  In

3     considering customarily and regularly, ask yourself:  Were any

4     outside things being done normally and recurrently workweek

5     after workweek after workweek?

6          I think the evidence is exactly the opposite.  If you

7     look at what they were doing normally and recurrently, that was

8     all inside the office, inside the model, inside the retail store

9     that they were supposed to man, they were supposed to operate.

10    That's what this job is about.  That's what the evidence has

11    shown.

12         And then, finally, when you're trying to decide

13    customarily and regularly, you need to weigh the amount of time.

14    Are they spending their time inside of the office, or are they

15    spending their time outside of the office?  Where are they

16    spending their time?

17         You heard them testify.  They're spending their time

18    in that office because that's where they were required to be.

19    That's where they had to be if they wanted to get an "up," if

20    they wanted to get any sales.  They had to be inside.

21         And then, also, you need to weigh:  Where are the

22    important things being done?  Are the important things being

23    done inside where they have all their tools, where their model

24    is, where their showroom is, where their retail store is?  Are

25    the important things being done inside the office?  And if the

1    important things are being done inside, these are inside

2    salespeople and the outside sales exemption does not apply to

3    them.

4          So I'd just like to kind of remind you of some of the

5    facts as to why these people are inside salespeople because,

6    again, you can't be both.  You can't be inside salespeople and

7    outside salespeople.  You can only be one or the other.

8          And these people, Donna Armstrong, Tim Gonzalez and

9    David Lipnicki, they were inside salespeople.  So they worked

10   inside of this beautiful model home.  I know you guys are

11   probably tired of hearing about the "wow" factor and how

12   beautiful it is, but they really are stunning and they really

13   are gorgeous.  And they're done that way for a reason.

14         You heard about all the psychoanalytical data that

15   goes into just selecting which model home you're going to have.

16   They actually have study groups and marketing people.  They

17   spend thousands and thousands of dollars just trying to make

18   sure that they build the right model home because this model is

19   critical.

20         This is the heart of what they do.  They spend 60, 70,

21   $80,000, and that's a lot of money just to furnish and decorate

22   these models.  This is the heart of what they do, and that's

23   where these people were working, and that's where they were

24   required to work.  They are inside salespeople.

25         All of their tools -- and I won't go into this

1    *ad nauseam*, but you've heard repeatedly about their sales tools.

2    That's where they are, okay?  You can't sell somebody a home

3    until you sit down with them and you go through your floor

4    plans, you go over the elevations, you go through the feature

5    sheets, you go through the price list, you go through the plat

6    maps.

7            After you figured out a floor plan, after you figured

8    out an elevation, after you figured out the features, then you

9    have to sit down with the plat map, figure out where you have an

10   available lot and whether or not you can even build that home on

11   that lot.  And all of this, ladies and gentlemen, happens inside

12   because these are inside salespeople.

13           The lot fit analysis, which is what really has to be

14   done before you ever know if the home is actually going to fit

15   on a lot, again, all done inside, ladies and gentlemen.  The

16   community information, the tax rates, all of that -- again,

17   these are tools that are inside, ladies and gentlemen.

18           And it has been unequivocal, unquestionable, all the

19   contracts -- and you can't have a sale unless it culminates in a

20   contract.  You've got to have a contract.  Every single contract

21   is done inside the model home sales office.  Those form

22   contracts are right there on the computers.  The salesperson

23   sits there with the buyer, types in the information into the

24   form on the computer.

25           They print it out right there in the sales office.

1   They sit there in the sales office.  They go through the

2   contract with the buyer, and the buyer signs and executes that

3   contract right there inside the sales office.  These are inside

4   salespeople.

5           I mentioned to you earlier that they had two products

6   that they were selling, and you've heard about this over the

7   last week.  The second product that they had to sell was the

8   mortgage.  And I don't care if Meritage wants to couch it as

9   encouraging, explaining, trying to get them to do it.  Bottom

10  line is they required them, as a part of their job evaluation,

11  to sell the mortgage.

12          They required a sit-down rate.  For everybody that

13  came in there to buy a new home, they had to also try to

14  convince them to buy the Meritage mortgage through MTH Lending,

15  and they would have the mortgage applications right there in the

16  sales office.

17      *(Excerpt of video deposition of Mr. Wade Thomas played*

18      *as follows)*

19  Q   (BY MS. WILLS)  And the time that these salespersons spent

20  encouraging, trying to get, trying to capture, trying to get

21  these folks to not just buy that new house but to buy that MTH

22  mortgage as well, that time was spent in the sales office,

23  wasn't it?

24  A   Uh -- oh, first of all, you know, their responsibility was

25  to encourage, uh, and I -- I believe, for the most part, that

1    that time would be in a sales office.

2    Q   Do you believe or did Meritage believe that its new home

3    salespersons were customarily and regularly selling the

4    mortgages outside of the sales office?

5    A   No, ma'am.

6    Q   (BY MS. WILLS)  So then Meritage knew that their

7    salespersons were not customarily and regularly selling the

8    mortgages outside of the sales office?

9    A   That's correct.

10      *(End of deposition excerpt.)*

11        MS. WILLS:  So you -- you heard it from the vice

12    president of human resources for Meritage, out of his own mouth,

13    that Meritage knew that the mortgage work was all being done

14    inside of the sales office.

15        He was specifically asked were they customarily and

16    regularly selling mortgages outside, and his answer was

17    unequivocally no.  These are inside salespeople, ladies and

18    gentlemen.

19        Now, you've heard this model home referred to as a

20    Meritage store, and you've heard evidence over the last week

21    that -- that they had to man this store, that that's where they

22    had to be because they were there to man a store.  Just like if

23    they worked at Dillard's or Macy's, they had to man a store, and

24    this store had to be pristine.

25        They had to even pick up -- it was apparently

1    unacceptable if there were a couple of pieces of litter right

2    there in the flower bed as you walked in.  They had to fluff

3    pillows.  They had to straighten towels.  This place had to be

4    pristine.  It had to be perfect because this was the Meritage

5    store.  This model, that's -- that's how they sold homes and

6    mortgages.

7            It was even compared to being a store by -- you saw

8    her -- Laura Goodwin, their sales trainer.  She -- one of her

9    sales jolts that she sent out was, "If I worked at a department

10   store, would I be able to leave early to take care of a personal

11   matter if no one else were there to take care of my customers?"

12           This was a store, ladies and gentlemen, and Donna

13   Armstrong, Tim Gonzalez and David Lipnicki, they were working

14   inside of that store manning that store.

15       *(Excerpt of video deposition of Mr. Richard Harvey played*

16        *as follows.)*

17   A   It's our model home.  It's what we're using to sell homes,

18   so it needs to be pristine.

19   Q   Because that's what Meritage wants to do with its model

20   homes, they want to have a showcase?

21   A   Yes.

22   Q   Why is that?

23   A   Because that's representing our product and so it's our --

24   it's the way that we -- it's -- it's a -- a -- I guess the

25   physical vehicle we use to sell homes.

1          *(Excerpt of video deposition of Mr. Jeff Grobstein played*

2            *as follows.)*

3     Q    Is it important to you as a regional vice president that if

4     you go and visit a sales office in a community that you're

5     responsible for, that the sales office and model home appear

6     neat and tidy?

7     A    Yes.

8     Q    Why is that important?

9     A    Because it is our -- it's our store, it's our showroom.

10    It's, you know, where people come and learn about what we do.

11         *(Excerpt of video deposition of Mr. Steve Harding played as*

12           *follows.)*

13    A    It's a retail store and so we would, ideally, allow our

14    prospects to come through those -- those sales offices during

15    those two days a sales associate would be off.

16    Q    In other words, because it is a retail store, you need

17    someone to man the store during business hours?

18    A    That would be ideal.

19         *(End of video deposition excerpts.)*

20         MS. WILLS:  So, ladies and gentlemen, you heard it

21    from Rick Harvey.  He's the guy that's been with Meritage 25

22    years.  He's over all of Texas, not just Houston.  He's over all

23    of Texas.

24         Rick Harvey, the very first man that you saw, he said,

25    "This is our store.  This is what we're using to sell homes."

1   Then you heard from Jeff Grobstein, an officer of the company, a

2   regional vice president.

3            He said, "It's our store."  And then you heard from

4   Steve Harding.  You also heard from Steve Harding here on the

5   witness stand.  He is the current Houston division president.

6   There's no question that that model is the store, and they were

7   supposed to be manning the store.  This is an inside sales job.

8            We also know from the compensation agreement that they

9   were required to be present at the sales office.  They had to be

10   present there for all business hours on all days.

11            They were responsible for this Meritage model, this

12   store, seven days a week, and the only way they could get two

13   days off is if they had someone to cover the store when they

14   were going to be out.  This is an inside sales position that

15   required them to man this store.

16            They were also subject to being written up if they

17   were out of the store, outside of the model.  You heard Bobby

18   Allen talking about he could remember the 11 people that he

19   actually counseled for being outside of the model.  You heard

20   Jeanne Conger tell you, "It's a possibility.  I could have

21   written somebody up for being out of the model."

22            If we look at this one disciplinary action form, this

23   salesperson is being written up and told that she has to make

24   sure the sales office is covered daily from 10:00 to 7:00 and

25   that she would have to inform them prior to being out of the

1    office for any reason.  Any reason that she's out of that

2    office, she's got to give prior notice to management.

3          She's told in this formal written disciplinary action

4    form that this is a serious situation and that she has to make

5    immediate improvement.  And this is a written -- you've heard

6    write-ups were done with human resources.  You couldn't just

7    write somebody up.

8          You had to have human resources.  It had to be

9    documented.  This is a serious situation, and she's being told

10   in writing if you're going to be out for any reason, you must

11   notify management before you can be gone for any reason.

12         Here's another disciplinary action form.  "Dan is

13   expected to be on time to work every day and work regular

14   business hours."  This is an inside sales job.  You've got to

15   show up, and you've got to work regular scheduled business

16   hours.

17         He's also told in this formal disciplinary action

18   form, "The model home must be attended at all times" -- "all

19   times during business hours.  Leaving the model unattended by a

20   salesperson and unpresentable leads to a potential loss in sales

21   and a decrease" -- "decrease in profitability for the company."

22         It's clear, ladies and gentlemen, Meritage wanted

23   their salespeople to be inside that model home sales office.

24   This is an inside sales job.  All of the evidence points to this

25   being an inside sales position.

1           Now, you've heard the evidence.  The plaintiffs were

2    paid on a straight commission basis.  They didn't get a sale,

3    they weren't going to get a commission.  And you -- you heard

4    Steve Harding say, "You know, sometimes we'd give them a draw."

5           A draw was basically a loan, which meant that Donna

6    Armstrong could sit there running the Meritage model for 55, 60,

7    70 hours a week, and at the end of that week she could actually

8    be in the hole to Meritage.  She could be there for up to 70

9    hours that week, and at the end of that week, if she hasn't sold

10   anything, the only thing she might get, if she's lucky, would be

11   a loan from Meritage that she would have to pay back to Meritage

12   later.

13          That's the way the Meritage system -- their

14   compensation worked.  Now, the only way -- the only way under

15   Meritage's system -- and you've heard it repeatedly.  The only

16   way you could possibly get a sale was to be present in that

17   sales office.  If you weren't there, you weren't going to get a

18   sale, you weren't going to get an "up."

19          So it is, frankly, preposterous and it strains

20   credibility to believe that somebody is going to be out, I don't

21   know, running around the neighborhood with a walk book and a big

22   plat map or, I don't know, maybe going by a realtor office and

23   dropping off some fliers where they're going to call the call

24   center, that they're going to be out doing those things when the

25   only way -- the only way they're going to earn a commission is

1    to be right there in the sales office.

2           Not only are they contractually required to be there,

3    not only will they be written up if they're not there, but it's

4    the only way that they're going to earn a commission.  It's the

5    only way under the system that Meritage has devised.

6           In order to get a commission, you must be the person

7    right there to register traffic when it comes in, to get that

8    prospect to fill out a guest card.  That's the only way that

9    you're going to get a commission.  And the only evidence you've

10   heard is that those guest cards are done right there in the

11   model -- inside the model, inside sales activity.

12          Under their "up" system, there is no question that a

13   prospect is somebody who physically walks into the sales office.

14   The sales consultant that is onsite that day is the person who's

15   going to get the commission.  So if you're not the person that's

16   onsite that day, you're not going to get a commission.

17       *(Excerpt of video deposition of Mr. Steve Harding played as*

18       *follows.)*

19   Q   So it's really the person who's in the office that's going

20   to get the prospects, typically?

21   A   What I would characterize that with is -- yes.

22       *(Excerpt of video deposition of Mr. Jeff Grobstein played*

23       *as follows.)*

24   Q   Do you believe that getting an up or a prospect that walks

25   in the door, being the person to get to greet that person, do

1   you believe that that's important to a salesperson?

2   A    Yes.

3   (By Ms. Wills)

4   Q    Why?

5   A    If you don't have an up, you don't get a sale.

6        *(End of video deposition excerpts.)*

7            MS. WILLS:  If you don't have an "up," you don't get a

8   sale, and if you're not in that model home sales office, you're

9   not going to get an "up."  This is an inside sales position.

10           Now, I wanted to point out something else from the

11  instructions that Judge Costa just read to you.  I think it's

12  really important that you understand that in order to be exempt

13  outside sales work, you have to only look at the work that --

14  that an employee does with respect to their own outside sales,

15  their own solicitations, their own sales efforts.

16           So, for example, if they're dropping off a flier at a

17  realtor's office, if you even consider that to be important --

18  because you're supposed to weigh is this important or is this

19  not important.  But -- but even if -- if you were to believe

20  that's important -- I'll tell you it didn't seem important to

21  me.

22           But if you were to do that and somehow they got stuck

23  in a box, didn't get thrown in the trash can, they're going to

24  be not trying to develop their own sales, this is for Meritage.

25  The evidence is going to show that these fliers they drop off,

1    they direct people to call who?  To call this Jennifer lady, the

2    online person.  And you heard Steve Harding.  Now they have them

3    call the call center.

4          This isn't work that they were doing to -- if they did

5    it on a rare occasion, to promote their own sales.  This was to

6    promote Meritage.  And in order to be considered outside sales

7    work, it has to be something in conjunction with their own

8    sales, not something where maybe somebody else is going to get

9    the phone call or maybe somebody else is going to get the sale.

10   It has to be their own work, their own sales.

11         Which means that all that teamwork you've heard

12   about -- Meritage believes in teamwork.  Hey, you got to do

13   teamwork.  I don't care if you're not going to get the

14   commission.  I don't care if it's not your sale.  You still got

15   to pitch in and do teamwork.

16         That means customer comes in, they're not your buyer,

17   you still got to help them regardless.  That means you've got to

18   do customer service even if you never even sold these people a

19   home.  They're calling, you got to help them.  You've got to do

20   warranty work.  They're not my buyer, you still got to do

21   warranty work.

22         All those things, ladies and gentlemen, those are

23   inside sales activities.  The only way they can be outside

24   exempt sales activities is if it's somehow specifically for

25   their own sales.

1          Now, you heard a lot about marketing.  And I'm not

2     going to belabor this, but needless to say, this is a big

3     outfit, okay?  They're pretty sophisticated.  They've got the

4     realtor relationship manager or business development manager

5     people, whatever you want to call them, but those are the folks

6     that are going out actually forming the relationships with

7     realtors.

8          They're the ones taking people out to lunch.  They're

9     the ones taking people to play golf.  They're the ones

10    developing this relationship.

11         These people didn't even have a budget for something

12    like that -- didn't have a budget.  You saw the e-mail.  We're

13    not paying any money for you to do any realtor relationship

14    things.

15         No, the -- the only thing that these folks were

16    allowed to do was maybe have some donuts in their model and

17    invite some realtors to come.  You know, host some events right

18    there in their model.  That -- that was -- that was what they

19    did, or, you know, they -- they would interact with realtors

20    when they come in with their customers.

21         I mean, that's the best time to interact with them.

22    Here they are.  They're in your model.  They're in your store.

23    You can show them your product.  That's when you interact with

24    them.

25         They also call them right there from the model home

1   sales office.  They e-mail them right there from the model home

2   sales office.  Inside sales.  This is an inside sales position.

3         All of the big marketing stuff -- you saw the "wow"

4   commercial -- wow -- the billboards, the advertisements, the

5   website, the call center, the promotions, all of that, that's

6   all done by the marketing department.  And what's the marketing

7   department trying to do?  They're trying to drive people to go

8   to the model home sales office where that's where they're going

9   to find the salespeople.

10        Now, the plaintiffs are inside salespeople.  Just to

11  summarize, they worked in a model home sales office selling new

12  homes and mortgages.  They were responsible for operating the

13  store.  They rarely took customers out for any reason.

14        So when you're looking at customarily and regularly,

15  it has to be more than occasional.  This doesn't even rise to

16  the level of occasional.  It has to be more than occasional.

17        It has to be normally and recurrently done workweek

18  after workweek after workweek.  The evidence that you've seen --

19  the only evidence you've seen is that if they ever took anybody

20  anywhere, it was very rare.  And if they did, I mean, I don't

21  even know that it was anything important.

22        You heard from one home buyer of Tim Gonzalez who

23  said, "Yeah.  I came in.  He had the one perfect home for me.  I

24  knew immediately that's the home I want.  I want to go see this

25  house."

1         Now, she wasn't from that area.  Her realtor wasn't

2    from that area.  So Tim Gonzalez took them over and showed them

3    that inventory home.

4         Now, that's one buyer, only buyer that Meritage

5    brought in here to you.  Now, you heard that an average week,

6    about ten people come into a model home sales office.  That's

7    average.  Frankly, that's probably low.  But that means that

8    over 500 buyers are going to come in a year, and you heard Tim

9    Gonzalez worked there two years.

10        So in two years he saw over a thousand prospective

11   buyers, and they provided you with one person out of over a

12   thousand where he took her and showed her and her realtor this

13   inventory home -- one in a thousand.  He told you he could

14   remember three occasions, and we're talking about over a

15   thousand prospective buyers.

16        That is not customarily and regularly.  I would tell

17   you that is the rarest of rare, and that does not rise to the

18   level of outside sales.

19        It's very clear that they rarely even dropped off

20   these fliers and gave them to the receptionist, but if they did,

21   they weren't making presentations.  The realtors weren't even

22   there.  They were dropping off some fliers where maybe -- maybe

23   one day they'd get a call from that, but more likely than not

24   they were going to call the number on there, which went to the

25   toll free number to the online center.

1    The evidence is also undisputed that they never ever

2    went to any customer's home or any customer's place of business

3    in order to sell them a new home or a mortgage.

4        So the very first question you're going to get -- the

5    very first question, question No. 1, is going to be on the

6    outside sales exemption.

7        Do you find that Meritage -- not us, Meritage.  We

8    didn't have to say a thing.  This is Meritage.  Meritage has to

9    prove to you by a preponderance of the evidence that these three

10   plaintiffs, Donna Armstrong, Tim Gonzalez and David Lipnicki,

11   that they were employed in the capacity of an outside

12   salesperson under the outside sales exemption, and they can't be

13   both.

14       You're either inside sales or you're outside sales.

15   And it's very clear here that the outside sales exemption does

16   not apply to these three plaintiffs.  So we would ask, when you

17   get this question, for all three of them please check "No."

18       So the next question you're going to be asked is how

19   many hours did they work each workweek.  You heard Donna

20   Armstrong's testimony.  She conservatively estimated that she

21   worked an average of 55 to 60 hours a week.

22       I would submit that Donna deserves to get the higher

23   end of that because she was being conservative in her estimate.

24   Tim Gonzalez estimated 70 hours a week.  David Lipnicki

25   estimated 65 to 70 hours a week, and, again, he was being

1    conservative.  I would submit that he should get the higher end

2    of that estimate.

3           So what are hours worked?  Hours worked include all

4    time spent by an employee that was primarily for the benefit of

5    the employer or the employer's business, and it's whether or not

6    the employer knew or had reason to believe that the employee was

7    doing the work.

8           Well, the evidence shows that -- that they knew.  They

9    knew the long hours that they were working.  They knew that that

10   sales office was going to be open 363 days out of the year.

11   They only close two days, Christmas Day and Thanksgiving Day.

12          That means that New Year's Eve, New Year's Day,

13   Mother's Day, Father's Day, Fourth of July, Labor Day, Easter,

14   that sales office was open and these folks were working.

15          Now, in terms of coming up with a number of hours, I

16   don't want you-all to believe that somehow they have to give you

17   some sort of figures.  They can't do that, and the reason that

18   they can't give you an exact number is because Meritage didn't

19   keep time records.

20          You heard them say they could have kept time records.

21   They even looked at alarm codes.  They could have kept records,

22   but Meritage did not follow their requirement to keep records.

23   The law requires the employer to keep the records.

24          Because they failed to keep records, now we only have

25   their reasonable estimation.  And that's all the law requires,

1    that they give you a reasonable estimate of the number of hours

2    that they worked.  That's all, just a reasonable estimate.

3         Now, their reasonable estimate is based on the fact

4    that they worked beyond even the stated business hours.  They

5    would arrive early to do those opening procedures you heard

6    about.  They worked through lunch.

7         They would stay late.  Then they would do the closing

8    procedures.  Sometimes they worked six to seven days a week.

9    They worked holidays, and they worked weekends.  And Meritage

10   knew this.

11        *(Excerpt of video deposition of Ms. Jeanne Conger played as*

12        *follows.)*

13   Q   And how many hours a week did your husband work when he

14   worked at Pulte?

15   A   Probably 70 hours a week.

16   Q   With your experience in the industry, did you find your

17   husband's work hours of 70 hours a week as a salesperson to be

18   pretty much the norm for the industry?

19   A   Yes.

20        *(Excerpt of video deposition of Mr. Steve Harding played as*

21        *follows.)*

22   Q   (BY MS. WILLS)  So it's true that some salespeople work more

23   than five days a week?

24   A   That is possible.

25   Q   Isn't [sic] also true that in advertising for this position

1   Meritage says that salespersons must be able to work over 40

2   hours a week, work weekends and nights if necessary?

3   A    Yes, ma'am.

4   Q    And, in fact, they also advertise this position as being one

5   where they have to be available to work, as needed, seven days a

6   week?

7   A    Um, yes, ma'am.

8         (End of video deposition excerpts.)

9            MS. WILLS:  So the very next question you're going to

10  get -- after you answer question one "no," the next question

11  you're going to get is:  How many hours did they work?  And the

12  very first person's going to be Donna Armstrong because it's in

13  alphabetical order, and you're going to have a workweek for each

14  week that's within the relevant time period.

15           So you're not going to have a workweek for the entire

16  time that she worked there.  It's only going to be for the time

17  that the Court has determined is the relevant time period.

18           So you're going to have to put a number into each and

19  every one of those blanks in order for Ms. Armstrong to be able

20  to recover for those hours worked.  We're asking that when you

21  get to this question two for Donna Armstrong, that you fill in

22  the number 60 in each and every one of those blanks for each and

23  every week because that is Donna Armstrong's reasonable

24  estimate, and the law says that's -- that's all she's required

25  to do, give you a reasonable estimate.

1          Her reasonable estimate has in no way been

2    contradicted by Meritage.  They've not contradicted her

3    reasonable estimate.  Jeanne Conger, who was over Houston who

4    actually worked with Donna -- didn't supervise her but was two

5    levels above her -- said 70 hours is the norm.  So 60 hours for

6    Donna is certainly reasonable.

7          Then you're going to get also as a part of question

8    two -- and Donna Armstrong's going to be two or three pages of

9    just blanks with weeks.  Then you're going to get to Tim

10   Gonzalez, which is a shorter period.

11         We're asking that for each and every blank there for

12   Tim Gonzalez, that you put 70 hours in for Tim, which is the

13   reasonable estimate that he gave.  And that's basically what

14   Jeanne Conger told you, 70 hours is the norm for the industry.

15         Same thing for David Lipnicki.  We're asking that you

16   put 70 hours in for each week for David Lipnicki.

17         Now, I'd like to conclude by sort of stopping where

18   Mr. McLaughlin started with you last week.  Do you remember when

19   he did his opening statement?  He told you that this case was

20   going to be about credibility, and I believe that it is about

21   credibility.

22         And based on everything you've sat here and listened

23   to, what you've seen, what you've heard, I want you to ask

24   yourselves about the credibility of Meritage.  Let's look at

25   their credibility.  Now, they would have you believe that the

1  outside sales exemption applies to this clearly inside sales

2  position, so let's take a look at what they did in order to try

3  to one day convince a jury like you of this.

4          Well, on the very first page of their compensation

5  agreement, they have something that, frankly, defies all

6  credibility.  They say, "The associate must customarily and

7  regularly take customers to see model homes."

8          Well, they're stationed in a model home.  They're not

9  going to customarily and regularly take anybody to see a model

10  home because that's where they are.  And the evidence has shown

11  that if they wanted somebody to see another model home, they

12  give them directions and send them over to that model home so

13  that the other salesperson could do teamwork and help with

14  somebody else's sale.

15          Then they go on to say they're also supposed to take

16  them to see sites.  Well, ladies and gentlemen, the only way to

17  pick out a site was to select a floor plan, an elevation, and to

18  use that plat map.  It completely defies logic that you're going

19  to go out there with some kind of a weird tool kit that nobody

20  ever provided to them with some cones -- and Donna's going to be

21  out there.  She's going to put on her boots.  I think Amy Fisher

22  said her boots were knee high.

23          You're going to put on some boots and some spray, and

24  you're going to spray out the pool and have some rope.  That's

25  not -- that's not credible at all.  That's not even logical.

1        You're not going to take folks out there when you need

2   a surveyor, you need construction people, you need an engineer.

3   They can't go out there and tell you where your house is going

4   to be built.  Completely illogical.

5        Then they go on to say -- just to show you what little

6   credibility Meritage has, they go on say then they're supposed

7   to call upon customers at their homes.  Have you heard a shred

8   of evidence of any salespeople going to somebody's house to sell

9   them a new house?  Absolutely defies all credibility.

10        And then they say --

11        THE COURT:  About five minutes, Ms. Wills.

12        MS. WILLS:  -- you're supposed to travel to various

13   locations -- thank you, Your Honor -- in order to conclude the

14   sales transaction.  Ridiculous.

15        The only evidence that you heard was that the

16   contracts -- which is obviously how you're going to conclude a

17   sales process, right?  You got to get the contract -- they

18   happen 100 percent of the time inside of the office.

19        You heard their vice president of human resources

20   admit the mortgages, 100 percent of the time those were done in

21   the office.  They already knew, no, they're not customarily and

22   regularly out selling mortgages.

23        I ask you to look at the credibility of Meritage and

24   what they brought before you and the kind of evidence that they

25   brought in this courtroom before you.  Look at their

1    credibility.  They're telling you the outside sales exemption,

2    ladies and gentlemen, they don't even know what the outside

3    sales exemption is.

4         I want you to listen again to Rick Harvey, the guy

5    who's over all of Texas.  Twenty-five years he's been with

6    Meritage.  I want you to listen to what he has to say about the

7    outside sales exemption.  Then I want you to listen to Jeff

8    Grobstein, regional vice president, officer of Meritage.

9         I want you to listen to what they have to say about

10   the outside sales exemption, and then I want you to evaluate the

11   credibility of Meritage.

12       *(Excerpt of video deposition of Mr. Richard Harvey played*

13         *as follows.)*

14   Q    What's the outside sales exemption?

15   A    I don't know.

16   Q    So is it fair to say that you have never undertaken to do

17   anything to determine whether or not any of the salespersons

18   working, in any of the divisions that you've been in charge of,

19   whether or not they are workers that would fall under the

20   outside sales exemption?

21   A    Uh, I -- I haven't done anything personally, no.

22   Q    (BY MS. WILLS)  Do you know of anything that's been done?

23   A    No.

24   Q    As you sit here today, do you have a belief as to whether or

25   not the outside sales exemption applies to the -- all those

1   salespersons that work in your various divisions that you're

2   responsible for?

3   A   I don't know what that is.

4   Q   (BY MS. WILLS)   So you have no idea whether that exemption

5   would apply to them?

6   A   I have no idea.

7        *(Excerpt of video deposition of Mr. Jeff Grobstein played*

8        *as follows.)*

9   Q   What's the outside sales exemption to the Fair Labor

10  Standards Act?

11  A   I don't know.

12       *(End of video deposition excerpts.)*

13       MS. WILLS:  The reason that they don't know, the

14  reason they've never heard of it is because it doesn't apply.

15  These are inside salespeople, ladies and gentlemen, and we ask

16  that when you get that jury form, you indicate on there this is

17  not an outside sales position.

18       They don't even know what it is.  They don't know what

19  it is because it doesn't apply.  They're inside sales.

20       I'd like to thank you for your time and your

21  attention.  And I'll get one more opportunity to talk to you

22  again, but, again, we ask that you look at the credibility of

23  Meritage.  Look at what they did.  Look at the evidence that

24  they gave you and ask yourselves whether or not you can believe

25  anything that they say.

1          *(Other matters discussed pertaining to jury trial.)*

2          *(Recess taken from 10:08 a.m. to 10:20 a.m.; Discussion had*

3          *regarding student visitors in courtroom.)*

4     *(Jury in at 10:23 a.m.)*

5          THE COURT:  All right.  Be seated, everyone.

6          All right.  Ladies and gentlemen, we have some more

7     guests in the courtroom.  Some students were touring the

8     courtroom today, and they heard we had a trial, so they've come

9     to watch the closing argument.

10          So with this bigger audience, Mr. McLaughlin, whenever

11     you're ready, you can go ahead.

12          MR. MCLAUGHLIN:  Thank you, Your Honor.  May it please

13     the Court, counsel, good morning, ladies and gentlemen.  Nice to

14     be able to talk to you-all again.

15          First, I want to thank you for your service, paying as

16     close attention as you paid during this trial and the time

17     you've put into it.  You've been a very attentive jury.  Thank

18     you very much for that.

19          Now, as you all know, when you come here, you bring

20     something special with you.  You bring your common sense.  You

21     bring it in here every day.  It's something you use every day of

22     your lives, and it guides you in the decision-making analyses,

23     judgments, et cetera.  And in this case common sense is going to

24     play a major role in the decision you reach.

25          You've heard a lot of testimony, obviously, seen a lot

1  of evidence.  You've seen documents.  You've seen videos.  Now

2  you get to sum all that together and decide what it all means.

3       I want to start by talking about the sales agreements

4  real quick, and we've already talked about those.  These are --

5  Defendants' Exhibit 19 is the one I'm talking about right now,

6  but as you know there are several in the record.

7       Now, why do you suppose the plaintiffs never put these

8  two things on the screen together?  I did it in opening, as I

9  recall, or talked about them both in opening, and they're still

10  germane.  You have 2A that you heard about plenty that talks

11  about the sales manager customarily and regularly taking

12  customers to see model homes and sites, and you have the other

13  provision about presence in the sales office.

14       You've seen both of these.  You've seen them together.

15  You've seen them separate.

16       It is preposterous to take the position that a

17  contract that requires the plaintiffs to leave the office

18  prohibits the plaintiffs from leaving the office.  This is just

19  one example of the inherent inconsistency that runs through

20  their entire case.  Again, I raised it in opening.  I want to

21  raise it now.

22       They want to cherry-pick from documents.  They want to

23  cherry-pick from -- from a holistic view of the world and just

24  pick out certain things and tell you-all that those certain

25  things are the only things that matter and you should ignore

1    everything else.

2           I also want to talk quickly about the commissions part

3    of this.  You've heard a lot about the plaintiffs being paid

4    commissions.  The only point I want to make with it right here

5    is that out there in the real world, compensation drives

6    behavior.  It always does.

7           The manner in which someone is paid will affect how

8    they behave, how they perform.  And all I'm saying by that is

9    someone who is paid only by commission is, by the nature of the

10   beast, going to do everything conceivable to behave in a manner

11   that creates more opportunity.  People who are paid with a

12   commission, especially a commission only, are not people who sit

13   around on their hands hoping that opportunity knocks.

14          Instead, they go out and they find opportunity, and

15   these folks have testified that they're go-getters.  They're not

16   folks who just sit around.  They're folks who are incentivized

17   to succeed, and they've talked about the sales of houses and all

18   that.  I'll talk a little more about it, but that's really the

19   point I want to make on commissions.

20          Now, another part of the contract I want to talk about

21   real fast is paragraph 8 in the standards of excellence.  You

22   may recall there was a lot of testimony about this escorting a

23   customer to a homesite.  And if the plaintiffs could, they would

24   rewrite this to say, "I understand that escorting a customer to

25   a plat map is the highest and best use of some of my time," but

1   it doesn't say that, does it?

2           It says a homesite, folks.  A homesite is a homesite,

3   and it's okay if there's dirt on it.  I think, as Ms. Conger

4   pointed out very articulately, that even this courthouse rests

5   on dirt.  There's nothing wrong with dirt.

6           A homesite's a homesite, not a plat map, okay?  And

7   I'm going to get to that a little bit more, but right now I want

8   to -- I want to pause, and I want to note another thing about

9   this case that is really fascinating.

10          It's fascinating that they are here telling you that

11  they did not do a job they were trained to do.  They did not do

12  the job they were supposed to do.  They did not do the job they

13  agreed to do, and yet they want you to give them overtime for

14  not doing what they were supposed to do.  There's a tad bit of

15  irony wrapped up in that concept, and it's another inherent

16  inconsistency that runs throughout their case.  It's a problem

17  they cannot escape.

18          I want to talk now a little bit about admissions from

19  the plaintiffs, and I started this case in opening talking about

20  some -- what I'd call blackboard statements.  You know, back in

21  the day when I was a football player and coach and you talk

22  about the other side made a blackboard statement, that means you

23  go back -- in the old days, you know, you have chalkboards and

24  all that stuff, and you'd write whatever they said on a

25  chalkboard.

1    We're going to see -- we're going to see if that

2 lasts.  How's it going to be in the fourth quarter?  Where we

3 are -- pardon the football analogy, by the way -- in the fourth

4 quarter, and you still can't sell a house over the phone.  And

5 they know it, and they've run away from it.  They're their

6 words, and they've run away from it because they're untenable.

7 That's Ms. Armstrong.

8    You know, your next statement -- blackboard statement

9 is Mr. -- Mr. Lipnicki.  "To be a highly motivated sales

10 professional who is well organized as well as detail oriented, I

11 also look to continue to utilize my sales experience and my

12 training in the Gold Tier program."

13    You may not remember, but I asked Mr. Lipnicki -- he

14 was sitting right there (indicating), and I asked him,

15 "Continue" -- "'Continue' means you've been doing it, and you're

16 going to do it some more, right?"  And he couldn't answer the

17 question.  He ultimately just, "I can't answer the question."

18    Well, no, you can't because the question completely

19 undermines your case.  That's why you can't answer the question.

20 Because you can answer questions unless the answer's fatal, and

21 it's fatal to Mr. Lipnicki to admit that that was a true

22 statement.

23    He can't admit it's a true statement, so he has to

24 take a position that he just can't answer it because he's also

25 not willing to say it was a lie.

1          You have another statement like this from

2   Mr. Gonzalez, "I have visited schools, day cares, churches,

3   local shops and realtor offices."

4          That's a lot of places and a lot of pleurals, and he

5   turned those pleurales into two trips, as I recall -- two trips.

6   That is a blackboard statement.  And, you know, it's great that

7   there's e-mail these days, right, because if we were 20 years

8   ago and there's no e-mail, I don't know how you capture all

9   this.

10         But what we have in these statements -- and I'll talk

11  about this a little more -- are captured moments in time.  It's

12  like a photograph.  They said something.  They wish they could

13  take it back.  They can't because it's captured.

14         And let's talk about that a little more.  The other

15  thing I really want to point out -- well, let's go to the next

16  slide.  We'll talk about their declarations.

17         And y'all may remember Ms. Laura Goodwin talked a

18  little bit about the declarations from the plaintiffs, and what

19  you have -- I'm going to give you exhibit numbers -- in the

20  record, Defendants' Exhibit 14, 15, 38, 39, 49 and 50.  Those

21  are six declarations from these three plaintiffs, and I want to

22  talk a little bit about how those changed over time, okay?

23         The first thing you'll note is that the first

24  declaration from 2010, you see in paragraph 4, "In a typical

25  week I spent over 90 percent of my normal workday in the sales

1    office."  Now, query.  Is that a true statement?  I say it's

2    not.

3            I say they spent far more time outside than inside.  I

4    say they spent over 60 percent of their time in the sales

5    office, but we'll get to what is my basis for that in a minute.

6    If you take that as a baseline, and if they claim they worked

7    70 hours a week, you're somewhere around six hours a week

8    engaged in outside sales activities.  And I'll submit to you

9    right now, six hours a week engaged in outside sales activities

10   is customarily and regularly, and Meritage wins right there.

11           But I'll move -- I'll move on, and I'll build on that.

12   The next thing you see is this "rarely" -- I don't know if the

13   word "rarely" has ever been used so much in four days of trial.

14   Rarely.  What does "rarely" mean?

15           Now, you remember Mr. Lipnicki was sitting up here,

16   and I asked him what it meant.  And he basically said it means

17   two to three times a month, and we talked about -- you may or

18   may not remember -- a litany of activities two or three times a

19   month.

20           Two to three times a month -- and, again, granted that

21   my math isn't good.  I think we talked about 12 to 18 times a

22   month, Mr. Lipnicki and I, on cross-examination on "rarely."

23   And we were talking about showing spec homes, showing homesites,

24   going to see realtors, showing homes under construction, touring

25   the community with a buyer, and you may recall that from the

1    mystery shop where all you saw was the sky and some clouds, if

2    you remember the video.

3           So what do these rarelies [sic] add up to?  These

4    rarelies add up to 12 to 18 times a month, and they all use

5    "rarely."  Now, look, I think -- I think that they have to

6    concede -- and I challenge them to explain this to you, by the

7    way.  How does "rarely" in paragraph 6 become "very rarely" in

8    paragraph 4?  Why did that happen?

9           I -- you go from, "I rarely left the sales office to

10   show prospective homebuyers spec houses and vacant lots," to, "I

11   very rarely left the model home for any other purpose."  In a

12   typical week -- how did over 90 percent at the top there turn

13   into well over 90 percent on the bottom?  What's going on?

14          Why can't they just say one thing and stick to it?

15   Why does it keep changing?  If it's truth, it doesn't change.

16   Truth is what it is.  It's not relative, okay?  It doesn't, a

17   couple years later, turn into something more favorable for my

18   case.  That's not how the system works.

19          And I'm going -- I've got some time to spend on

20   credibility, as Ms. Wills pointed out, and I'll tell you right

21   now Meritage paints with a broad brush.  Anyone who took that

22   stand and didn't tell the truth, got to flush their testimony

23   because that's not okay.

24          So moving on to the next part of the declaration --

25   and, again, you can compare these for yourself.  And, by the

1    way, do you recall Mr. Gonzalez over there sitting up here and

2    saying that he -- I think he said he typed his declaration or

3    wrote it or whatever.  I think he said it was his words, and he

4    wrote it up.

5            I wonder if he wrote the other ones because guess

6    what?  They -- if they're not identical, they are as close as

7    you can get.  I don't want to say they're identical because

8    there may be a word here or there that I'm wrong about, but

9    you'll have a chance to look at them.

10           And ask yourselves:  If Mr. Gonzalez wrote his, why

11   are they all the same?  That mean he wrote everybody's, or maybe

12   did everybody just get together and come up with the same

13   statement and then come up with another one later that's a

14   little bit different?

15           Anyhow, on this -- on this one, again, this is from

16   the first one.  "On average I would show prospective homebuyers

17   spec houses and vacant lots no more than two to three times a

18   month."  I'm just dwelling on this "two to three times a month"

19   and "rarely" because at a baseline position, that's enough.

20   That's enough to be customarily and regularly.  That's enough

21   for Meritage to win.

22           But, again, I think they recognize that too, and they

23   said, oh, oops, we got to come up with something different.  Now

24   it's, "I rarely, if ever" -- both those two words, "if ever,"

25   those are important words.  They're not in the first one.  Why

1    are they in the second one?  Again, does truth change, or is

2    truth what it is?

3          The other thing I think I ought to point out really

4    fast about this inconsistency is you recall all this stuff

5    about, well, we couldn't leave the model.  Contract prohibited

6    us from leaving the model.  Well, did or didn't?

7          Why is it that when Mr. Lipnicki's up here talking to

8    his lawyer, the word "present" in paragraph 2F means

9    accountable?  Why is it that when I asked him, "Oh, so present

10   means accountable?  You just knew you had to be accountable for

11   the sales office" -- why is it when I asked him that, he said,

12   "No, no.  I'm going to change my testimony.  It means physically

13   present."

14         I mean, in the span of 30 minutes you get two very

15   different stories.  And why is it that when Ms. Wills showed you

16   Briana Rogan's (phonetic) disciplinary action form, Plaintiffs'

17   Exhibit 25, why didn't she show you the rest of what it said in

18   there?  Because it doesn't say anything about being physically

19   attached to the model.

20         It says -- and you can look when you go back -- Briana

21   Rogan was gone for three hours for this, had a doctor's

22   appointment and didn't tell anybody, and it goes into this idea

23   that the model needs to be attended.  Not by Briana Rogan, just

24   attended.  Pick up a phone, call your boss, "I'm not going to be

25   there.  I need coverage," work it out.  That's what, you know,

1    grown-ups do with jobs, right?

2           The other disciplinary action form that she showed you

3    and didn't show you all of was one Daniel McManaman (phonetic).

4    If you read that when you go back there and look at the

5    evidence, you're going to see that he, too, was sort of AWOL.

6    It's not an issue of he wasn't sitting at his desk in the model.

7    It's an issue of he's not coming to work on time.

8           Now, there's something to complain about.  Gosh, we

9    got to come to work on time.  Isn't that awful?  I mean,

10   Meritage should be ashamed for requiring its employees to come

11   to work on time or to be -- you know, to be responsible for

12   covering the model home.

13          That's all we're talking about in this case is

14   coverage of the model home.  That's all we're talking about.

15   What they're telling you isn't true, and they know it.  And you

16   saw the training materials.  I'm not going to run through all

17   that stuff again.

18          But do you really think Meritage is training its sales

19   associates to go visit realtors, go do this, engage in the

20   preparation activities and the eight-step process, demonstrate

21   homesites, do all these things that clearly require you to be

22   out of the office, and yet they're prohibited from being out of

23   the office?  So I wanted to throw that in again because I think

24   it's very important.

25          Now, you heard this talk about a thousand prospects

1    just now.  Why did Meritage only bring one buyer?  Well, I got

2    two things to say about that.

3           First is we brought one buyer out of the three

4    Mr. Gonzalez referenced in his testimony, and that one buyer sat

5    here and said, "Oh, yeah, he showed me the house.  He took me to

6    the community," after he sat here and told you he didn't.

7           If we had one out of three that clearly shows he

8    wasn't telling you the truth and he did engage in those

9    activities, what would a thousand show you?  Is it even rational

10   to think that a thousand people came through in a couple of

11   years and saw Mr. Gonzalez and only one of them went out to see

12   a house with him?

13          You may remember when Mr. Lipnicki was up here, I was

14   talking about three in one week.  We were talking about that

15   one-week period, you had three come in.  We showed a little

16   exhibit on it.  Two of them were on a Saturday, one during the

17   week, and I was trying to establish, okay, so a baseline low

18   threshold of visitors would be, you know, three per week in a

19   given year.

20          I think the -- I think the Court judicially noted

21   3 times 52 equals something.  I don't remember.  Point is --

22   point is, that's a lot of people.

23          That is a lot of people, and that's why, when I said

24   90 percent of their -- over 90 percent of their time in the

25   sales office, no way.  No way, okay?  If you're seeing a

1    thousand people in two years, you're out way more than five or

2    six hours, although five or six hours, we win.  I'll talk about

3    that later.

4            Now, on the declarations, I just want to -- I want to

5    wrap up the declarations, and I want to note, again, what I'm

6    talking about right now is what they've admitted to, okay?  And

7    whether it's a declaration or whether it's sitting up here,

8    things like Ms. Armstrong saying she showed -- I believe it was

9    a spec -- when it made sense, things like that.

10           We've got testimonial items where they've admitted

11   certain things two to three times a month, what have you.  From

12   that I want to build into something that -- okay.  Now I want to

13   talk about the mystery shops real quick.  Those mystery shops

14   are, once again, captured moments in time.

15           And, you know, I'm going to -- if we could visualize

16   this captured-moments-in-time thing as a blank white board,

17   maybe like one of those back there (indicating) -- just a blank

18   white board, and every now and then we put a mark on it.  Maybe

19   the mark is for 12 to 18 times a month, if you put all those

20   marks on there.  Maybe the mark is for mystery shops, okay?

21           Mr. Lipnicki -- now, they started this case running

22   for the hills from mystery shops.  You may or may not recall,

23   but in opening statement they dealt with it because mystery

24   shops scare them to death.  So they had to tell you, oh, that's

25   fake.  It's not a real buyer.  I don't know how many times you

1    heard that, a bunch of times.

2           Well, why?  Why does it matter?  I mean, why are they

3    worried about it?  If they really never left, why didn't they

4    just say, well, you know, these mystery shops reflected a real

5    thing, and we were just lying to our employer.  We were just

6    misrepresenting to the company that this is how we do our job.

7    We're sorry.  We probably shouldn't have, but we never left.

8           Why didn't they just say that?  They didn't say that.

9    In fact, Mr. Lipnicki, again, agreed -- you know, they went

10   through the whole fake thing.  And I asked him, "Mr. Lipnicki,

11   even though you say that was a fake thing, was your performance

12   real?"

13          Answer:  "Yes."

14          "And that reflected the truth about how you did your

15   job, didn't it?"

16          Answer:  "Yes."

17          Captured moments in time, more admissions.  These

18   mystery shops are these plaintiffs representing to Meritage back

19   in the day how they did their job, and you should accept those

20   representations as true.  And if those mystery shops are how

21   they did their job, it's not just how they did their job on the

22   mystery shops, it's how they did their job every time a buyer

23   visited who wanted to see something.  And if there's a thousand

24   buyers, there's a lot of visits where a buyer wants to go look

25   at a house.

1          And does anybody seriously think that a buyer's

2     content to look at a plat map on a wall and say, "Yeah, those

3     look like nice lots.  Sign me up"?

4          No chance.  No chance.  You want to see the dirt.  You

5     want to see the trees.  You may even want to see the horse farm

6     Mr. Harding talked about.  Maybe not, but that's real life.

7     That's real-world stuff.

8          You also -- they talked a lot -- well, I'm going to --

9     run away.  They're running away from the mystery shops.  They're

10    caught on the mystery shops, and those are real.

11         Now, what else have they done that you can

12    realistically consider fleeing, fleeing from the scene, kind of?

13    Here's one.  Why all this talk about the "up" system?  Who

14    cares?

15         Mr. Lipnicki never had a sales partner.  Mr. Gonzalez

16    never had a sales partner.  Ms. Armstrong never testified that

17    she had a sales partner although counsel referred to it when

18    talking to Ms. Conger.  So your record there's just sort of

19    nebulous.

20         Maybe she did, maybe she didn't.  Maybe she did for

21    just a little period of time near the end of her employment.

22    Record's not real clear.  But why -- and you remember Bobby

23    Allen?  And I asked Mr. Allen who -- you know, we had our

24    differences, I guess.  We'll get to that.

25         But I asked Mr. Allen, "Mr. Allen, does it make sense

1   to sit in here and talk about the 'up' system when none of the

2   plaintiffs experienced it?"

3          And even Mr. Allen had to agree with me on that, so

4   why are we talking about the "up" system?  Why are they spending

5   time on stuff that doesn't matter, doesn't pertain to the case?

6          Why are we talking about fluffing pillows?  I'll bet

7   you there's an hour spent on fluffing pillows and turning lights

8   on and listening to music and, I don't know, picking stuff up

9   off the floor, whatever it was.  Remember that checklist of

10  all -- have you heard anyone from Meritage say they don't do

11  those things?  I don't think you have.

12         In fact, I know you haven't because they do them.

13  It's fine.  They do some things inside.  They do some things

14  outside.  Meritage is very comfortable with that.  You know why?

15  Because that's reality.  That's how it went down.

16         Fluffing pillows is a distraction.  The "up" system is

17  a distraction.  Look over here, don't look over here.  Look at

18  the "up" system.

19         Selling mortgages is a distraction.  Who cares?  Who

20  cares?  Being at work on time, whining about that, that's a

21  distraction, okay?  And, again, look at the exhibits, and you'll

22  see that they say much more than what Ms. Wills told you about

23  when she was up here.

24         The last thing I'll say about the mystery shops is

25  Mr. Gonzalez doesn't have one, okay, and we've acknowledged

1    that.  We had something better, though.  We had Ms. McClellan,

2    who was a buyer and who told you how Mr. Gonzalez did his job.

3          Now, I want to move over to credibility.  I -- as I

4    said at the beginning of the case, credibility is the most

5    important thing in this case.  And you as the jurors have the

6    unique ability and province of determining credibility of

7    witnesses.

8          And I believe we have a -- I believe you have in your

9    charge an instruction from the Court on credibility, and this is

10   it.  "As the sole judges of the facts, you must determine the

11   credibility or believability of each witness and what portion of

12   his or her testimony you accept and what weight you attach to

13   it."

14         Now, I'm going to start with Amy Fisher, who you heard

15   from yesterday.  Amy Fisher was not credible, to say the least,

16   and there is no running away from that.  And we were shocked and

17   disappointed by what we heard, and you should -- you should hold

18   that against her.  What she told you should not be anything you

19   consider as true because if a witness sits up here and says

20   anything that you don't think is true, you should abandon

21   everything else the witness told you, okay?

22         But as I said, we're going to paint with a broad brush

23   on credibility.

24         Now, before I -- before I move on on credibility, I

25   also want to talk about something Ms. Wills just told you-all.

1    She showed you a portion of the jury charge that pertained to

2    recordkeeping, and that portion of the charge reads -- it's on

3    page 15 of the charge when you get it.  "If employees are not

4    exempt under the FLSA," comma -- well, there it is.  The law

5    requires an employer to keep records of how many hours its

6    employees work, et cetera.

7            What she showed you did not include the clause "if

8    employees are not exempt under the FLSA."  Question:  Why not?

9    Why not show you everything?

10           Now, moving on, let's talk about credibility.  If --

11   oh, actually, before I do that, let me talk about Mr. Grobstein

12   and Mr. Harvey not knowing anything about the outside sales

13   exemption.

14           Do you remember that Ms. Wills played you video from a

15   guy named Wade Thomas, the vice president of human resources?

16   She didn't play you anything with her asking him anything about

17   the outside sales exemption, did she?  Instead, she asked a

18   bunch of division presidents who are worried about building

19   houses.  Why?  Why?  You know, look here, don't look here.

20           Now, Donna Armstrong up here took the position that

21   she did not have remote access until Ms. Silver pulled out one

22   of those e-mails again -- one of those inconvenient e-mails --

23   "I will check my e-mails while I am out of the office."  Well,

24   how would you do that if you didn't have remote access?  And why

25   would you sit up here and say you don't have remote access if in

1  fact you do?

2         You heard Mr. Harding talking about remote access

3  being available for all sales associates as of 2007.  Here's

4  why.  Here's why they won't admit they had remote access until

5  Ms. Armstrong had to.  They got a bunch of e-mails they want you

6  to look at that show they were sent after model home hours, and

7  they're trying to tell you those e-mails -- if one was sent at

8  10:00, let's say for example, that means somebody worked three

9  hours past 7:00, past the closing point.

10         So they had to take the position that they didn't have

11  remote access to make you believe that.  Oops, they did.  They

12  did, and that means they could have just sent a snippet of an

13  e-mail investing five minutes of time versus the three hours

14  they would claim on that day I gave you the example of.

15         Ms. Armstrong also took the position that you can --

16  that she could show homesites and inventory or spec homes in

17  several different ways.  "I can show it on my plat map."  So if

18  we had a plat map here -- and I won't get one -- say, well,

19  that's where the spec is, I'm showing a spec home.

20         So all those e-mails where -- Ms. Silver went through

21  them with her where she's saying I showed this, I showed that,

22  I'd love to show you this, et cetera, she had to come up with

23  some different meaning for the word "show" other than the common

24  sense contextual meaning you would take away from the e-mail.

25         And she had to do that because they don't want to

1    admit they were outside any more than what they've admitted.  So

2    "show" doesn't mean show, basically.  There's some other things

3    like that, and I want to move to those.

4            Mr. Lipnicki -- Mr. Lipnicki took the position that

5    the training Meritage gave him tempted him to violate his

6    contract by leaving the model home sales office.  He also said

7    that "take" doesn't mean take.  "Continue" -- I already talked

8    about that -- doesn't mean continue.  And you can visit people

9    by e-mail.

10           Now, when you see "visit" in the ordinary connotation

11   of the word and you -- and contextually we're talking about that

12   realtor relation stuff, go and visit realtors.  And he was

13   telling you, "Well, I did go visit when I sent him an e-mail."

14   "Visit" doesn't mean visit.

15           If we can't even get folks to get up here and say that

16   "visit" means visit and "take" means take and "continue" means

17   to continue, there's not a word that comes out of their mouths

18   that you can rely on.  It's not credible.  Why?  Why won't they

19   even grant common sense meaning to words they used back in the

20   day?  Why?

21           Now, Mr. Gonzalez -- and I got to tell you, this is a

22   personal favorite of mine.  Berry -- I remember Ms. Williams

23   asking -- and I'll confess I didn't know what was next.  But she

24   asked about "berry," and, you know, I'm thinking, okay.  And

25   Mr. Gonzalez said, "Well, those are strawberries," and I'm

1    thinking, okay, kind of a weird lunch, but okay, strawberries.

2           And then we move on to the Chili's receipt, and we see

3    that Berry is actually Mr. Berry, not a bunch of strawberries.

4    And at that point Mr. Gonzalez had to throw in the towel and

5    concede that he kind of didn't recall.  Berries, strawberries,

6    Mr. Berry?  I mean, if -- if you can't even rely on a witness to

7    sit up here and say, "Yeah, I took a Mr. Berry to lunch one

8    time" -- just one time -- if you can't even rely on that, how

9    can you rely on anything they say?  You can't.

10          All right.  Now, where am I going with all of that?

11   Well, I've talked about Ms. McClellan, so I'm going to tell you

12   where I'm going now.  I'm going to talk about inferences next

13   and why -- oh, I'm sorry, Bobby Allen.  I don't want to forget

14   Bobby Allen.

15          You guys remember Bobby Allen.  The first thing I want

16   to point out about Bobby Allen is you recall him saying it was a

17   hostile environment when -- when the lawyer came and took his

18   statement from me [sic].  That was hostile.  I -- you know, she

19   made stuff up.  She -- I was very offended that she used the

20   word "expectations" instead of suggestions because that's --

21   obviously, that's offensive, right?  I mean, that's a

22   horrible -- horrible thing for someone to do.

23          And then you can walk a spec home while you're sitting

24   in an office.  You can walk homes under construction while

25   you're sitting in an office.  This man sat up here and said this

1    under oath.

2          You can drive the community while you're sitting in an

3    office.  You can make at least one realtor visit a week while

4    you're sitting in an office.  Now, why did he -- why did he say

5    things that obviously preposterous?  It can't be that he just

6    misunderstood a question because it happened four times.

7    Just -- why I kept asking him.

8          Why would he accuse Ms. Becraft, whom you met, of

9    creating some sort of hostile environment to take a statement

10   from him?  You heard her saying, "Oh, no, he helped.  He was

11   cooperative.  He actually looked at it while I was typing it and

12   had input" and all of that.

13         Well, you talk about two widely different stories,

14   which one's believable?  Who has the agenda?  Who has the dog in

15   the fight?

16         You heard Mr. Allen saying, "Hey, if they lose, I

17   lose."  That's the same thing as saying I got to toe the line.

18   I got to say whatever they're saying, whatever they want me to

19   say, so I can live to fight another day.

20         Not only should you discount this stuff that's just

21   clearly incredible, you should draw some inferences from it,

22   okay?  When -- when I take someone to lunch or go somewhere in

23   my car with a guest -- as you might recall, the passenger seat

24   is always horizontal, okay, because I've got this 6'6"

25   15-year-old kid who does nothing but sleep on the way to school

1    and sleep on the way home.  I don't even know if my passenger

2    seat sits up anymore.

3         So people join me, and they're like, "Who's been

4    sleeping in your car?  That's weird."  And I'm thinking, how do

5    you know someone was sleeping?  Answer, well, I infer it.  You

6    got a horizontal passenger seat, I'm going to reach an inference

7    someone's sleeping in your car every day.

8         If these folks had come in here and made these

9    preposterous statements and testimony that I've just reviewed

10   with you, what can you infer from that?  Remember we had a

11   baseline when I was talking earlier of things they've admitted.

12   You can build on those admissions -- not that you need to

13   because we win without it, but you can build on those

14   admissions.  And you build on those admissions with inferences

15   that there is something they're hiding.  And what is that?

16        What they're hiding is the fact that mystery shops

17   showed a day in the life.  It showed how they did the job

18   regularly and customarily.  What they're hiding from is the fact

19   that all those e-mails that Ms. Armstrong had out there,

20   captured moments in time, shows how she did her job customarily

21   and regularly.

22        And if you think back to that white space like I'm

23   talking about over there and you mark all these captured moments

24   in time, you still have a lot of empty space.  How do you fill

25   that space?  You fill it with inferences.  You fill it with

1  inferences based on why these three people and Bobby Allen came

2  into this courthouse and told basically the same story over and

3  over again, a story that simply cannot be true.  It just cannot

4  be true.

5          THE COURT:  You used about half your time.

6          MR. MCLAUGHLIN:  Thank you, Your Honor.

7          So fill the white space.

8          Now, let's talk about the jury charge a little bit,

9  and I -- actually, I'm going to sit down way before my time's

10 up, give y'all a break, but let's talk about the jury charge a

11 little bit.  This is the part on inferences -- excuse me.

12         "While you are to consider only the evidence in the

13 case, you are permitted to draw such reasonable inferences as

14 seem justified in the light of common experience."  It is

15 justified to infer that the empty space is filled with

16 inferences that they were out all the time.  They were out a

17 lot.  Even their baseline admission is just the beginning, tip

18 of the iceberg.

19         Next, I want to talk about the customarily and

20 regularly portion of the charge.  And you see that this says,

21 "It means a frequency that must be greater than occasional but

22 which, of course, may be less than constant.  Tasks or work

23 performed customarily and regularly includes work normally and

24 recurrently performed every workweek.  It does not include

25 isolated or one-time tasks."

1          Now -- and I don't have the next sentence on there.

2     Ms. Wills has showed it to you.  She probably will again.  The

3     next -- the next sentence is the one that she's trying to tell

4     you requires some sort of amount of time component, and she told

5     you a lot of things that are not in the charge about this.

6          You're just concerned with were they out, was it --

7     were the functions they were engaged in relatively important --

8     that's how the language of the charge works -- and answer those

9     questions in conjunction with this.  Were they outside?

10    Clearly, they were outside.

11         And the next part of the charge tells you -- I want to

12    go down to -- well, I want to start there.  "Properties located

13    within the Meritage subdivision but outside the model homes,

14    such as other lots for sale, and places outside the Meritage

15    communities are not part of the employer's place of business."

16         In this case, the way this charge has been given to

17    you by the Court, Meritage's place of business is that sales

18    office model home -- the model home sales office and the

19    corporate office.  You heard some testimony that the plaintiffs

20    may have gone to the corporate office for training once a week

21    or whatever.  Those are the two places that are Meritage's

22    places of business.

23         Every spec home, any model home that wasn't a model

24    home from which they were officing, okay, lots, communities,

25    realtors, all of that was stuff away from the employer's place

1    of business, and it all counts, okay?

2         Now, the other thing I want to point out is the last

3    paragraph there.  "Exempt outside sales work includes work

4    performed incidental to and in conjunction with the employee's

5    own outside sales or solicitations."  Now, everything they did

6    was incidental to their own sales or solicitation.

7         They were not -- you heard no evidence that they were

8    working for someone else's sales.  Ms. Wills is trying to say

9    that the fact that they were out so much that Meritage had to

10   use a call center number, she's trying to tell you that means

11   the sales could have gone anywhere.

12        There's no evidence of that at all.  There's no

13   evidence of that at all.  All that shows you, the call center

14   stuff, is, as Mr. Harding said, they were out too much for us to

15   put a number for the model home sales office.  We had to put a

16   call center number, and the call center would direct the lead to

17   the sales associate.  Everything they did was work incidental to

18   their own sales or their own solicitations as it says right

19   there.

20        Now, the -- the fundamental sort of bottom line here

21   is the last question I want to talk to you about, and this is

22   the question that we're going to ask you to answer, and I'll get

23   to that in a minute.

24        "Do you find that Meritage has proven by a

25   preponderance of the evidence that the following plaintiffs were

1   employed in the capacity of an outside salesperson under the

2   outside sales exemption?"  Preponderance of the evidence, that

3   is -- if you use my lowbrow football analogy, that is crossing

4   the 50-yard line just barely.  That is 50.05 percent rather than

5   49.95 percent.

6          A preponderance is just more likely than not.  Is it

7   more likely than not that the following plaintiffs were employed

8   in the capacity of outside salespersons?  Capacity, there's an

9   interesting word.

10          Meritage certainly thought so, right?  And now the

11   plaintiffs are here saying, "Well, no.  You know, yeah, we

12   signed all that stuff.  We did the training.  We -- we performed

13   on the mystery shops.  We represented to Meritage by virtue of

14   our performance on the mystery shops that we were performing in

15   the capacity of an outside salesperson, but we would now like to

16   come into federal court and change our mind.

17          "We'd like to change our mind.  We'd like to change

18   our story.  We'd like to run away from everything we said back

19   in the day on all of our e-mails, the mystery shops, everything

20   else.  We've -- and our -- by that, our declarations, too.  We

21   didn't like our first set of declarations, so we did a second

22   set.

23          "We didn't love that, so when we came here, we kind of

24   nuanced that, too.  So our three or four stories we've told,

25   we'd like to run away from all of that, and we deny we were

1    employed in the capacity of an outside salesperson."

2           Now, I've said why I think Meritage wins and, again,

3    talking about what they've admitted, I layered on top of that

4    the credibility issue, and I've asked you-all to make some

5    inferences above and beyond what they've admitted.  And the

6    fundamental bottom-line truth here is they were employed in the

7    capacity of an outside salesperson, each one of them.

8           You should answer -- Meritage is asking you and I'm

9    asking you to answer each one of those questions yes.  Answer

10   each one of those questions yes, case is over, and that's how

11   this should end.  It should go no further.

12          In the off chance that you don't answer "Yes" and you

13   decide to go further, I have to address the hours issue because

14   I don't get to come up here again.  I'm done, and Ms. Wills has

15   got another 20 minutes.  And so you listening to me is over --

16   probably a good thing for you-all, but it's over now.  And so on

17   hours, all I want to say is remember remote access, remember the

18   tearoom.

19          I mean, how can they credibly take the position that

20   they worked all these hours?  They've got nothing to show you on

21   these hours.  They -- they're critical of Meritage saying, well,

22   Meritage doesn't have any records, and they forgot to tell you

23   that Meritage doesn't have to keep records for -- for exempt

24   folks, okay?  They didn't mention that.

25          So how does Ms. Armstrong have a second, whatever,

1   business -- a tearoom that she's going to quite a bit in these

2   captured moments of time?  You know she went a lot more than

3   what we caught her on.  How does Mr. Gonzalez have time to be

4   reading because no one's dropping by, and he has to tell you up

5   here, "Well, I was reading a lot of contracts"?

6          You know, how do they deny remote access when they had

7   remote access, and it's obvious?  It's all an effort to make you

8   believe they worked far more hours than they worked.  Granted,

9   Meritage has no records to show you how many hours these people

10  worked.  It didn't keep records.  It didn't have to because the

11  answer to that question is yes, and that's the end of the

12  inquiry.

13         Thank you very much for your time and for your

14  attention.  We really, really appreciate it.  Thank you.

15         THE COURT:  All right.  Ms. Wills, your rebuttal?

16         MS. WILLS:  Yes, Your Honor, just a brief rebuttal.

17         Ladies and gentlemen, one thing I'd agree that

18  Mr. McLaughlin said.  I'd like you to use your common sense

19  here.  He's right, your common sense.  I want you to use your

20  common sense and ask you:  Does your common sense tell you that

21  they're inside sales or outside sales?  Because they can't be

22  both.

23         You have to decide:  Is this an inside sales job?

24  Because if it's an inside sales job, Meritage should have been

25  keeping up with all those alarm codes that they were checking

1    that they can't seem to find these days.  Meritage should have

2    been keeping time records because this is an inside sales job.

3           Now, for some strange reason Meritage wants you to

4    believe that the "up" system was just something that only

5    happened when you had two people in an office and there were

6    altercations, which you heard about those.

7           People were fighting over customers.  They weren't

8    going to be out dropping off some fliers or, I don't know,

9    wandering around with that look book or wandering around with

10   that kit.  They were actually fighting over the customers that

11   came into the office.

12          The "up" system -- and you heard the executive say it.

13   Not my words, you heard the words straight out of their mouths.

14   The "up" system meant that you had to be present to get a sale.

15   There's no question about that.  If you weren't there, you

16   weren't going to get a sale.  You had to be there in the model

17   home sales office because this is an inside sales job.

18          Now, he made -- Mr. McLaughlin made a big deal of

19   saying Wade Thomas -- you remember him?  Vice president of human

20   resources.  I showed you the clip from him, Wade Thomas, vice

21   president of human resources.

22          Now, it's interesting that plaintiffs are the only

23   ones that showed you any testimony from Mr. Thomas.  He's their

24   vice president of human resources.  Why wasn't he here

25   testifying to you?

1            You know, I -- I showed you -- I showed you testimony

2    from the vice president of human resources, and I specifically

3    asked him the question about whether or not these mortgages were

4    being customarily and regularly sold outside of the office, and

5    he said no, of course not.  Meritage knew that.  This was all

6    inside sales work that they were doing with these mortgages.

7            We're not running away from anything, ladies and

8    gentlemen.  We're the only ones that showed you testimony from

9    their executives, and I mean the high-up executives.

10           I'm talking Rick Harvey, the guy that's been with

11   Meritage for 25 years who's over all of Texas, the guy that can

12   hire and fire a whole bunch of people, the guy that was in

13   charge of everything.  We're the only ones that presented his

14   testimony to you.

15           We're not the ones who are running away here.  We're

16   not the ones who are running away from the truth here.

17           Now, you've seen a lot of e-mails.  You're going to

18   get them.  You're going to have a chance to look at them.  When

19   you look at these e-mails, you'll see things like Donna

20   Armstrong, 8:09 at night, saying, "Sorry my report is late.  I

21   was working with a buyer that couldn't decide tonight."

22           Another e-mail she sent at 7:28 p.m.  "Sorry, David.

23   My last customer just left."

24           When you read those e-mails, it's going to be very

25   clear to you these inside salespeople, Donna and David and Tim,

1   they're in the office.  This is an inside sales position.

2          Now, I just want to be clear about customarily and

3   regularly.  We talked about that.  Customarily and regularly

4   must be greater than occasional, more than occasionally, okay?

5          If it's just occasionally, that's not enough.  It's

6   got to be more than occasionally.  It also has to be work that

7   is normally and recurrently performed every workweek -- normally

8   and recurrently performed every workweek.

9          And when you're trying to decide customarily and

10  regularly, you've got to do a balancing.  That's the Court's

11  instruction to you.  You're supposed to consider the relative

12  amount of time spent inside the office versus outside of the

13  office.

14         Now, Mr. McLaughlin showed you their declarations.

15  They've always maintained that, "I spent well over 90 percent of

16  my time in the model home sales office," and they later added

17  most of the other time was spent up at the corporate office.

18  Both of those are inside sales.  They're Meritage's places of

19  business.  We're not running away from anything.

20         What you didn't hear and what you haven't seen any

21  evidence of is -- they're the ones with the burden.  Why didn't

22  they come in here and show you what percentage of time they

23  claimed they're working outside of the office?  That's because

24  this is an inside sales position.

25         And then the other thing that the Court's instructions

1    tell you to do:  Look at the amount of time.  I mean, some

2    workweeks they told you, "I spent 100 percent of my time in the

3    sales office, in the model home or at the corporate office."

4          So the second thing you've got to do is you've got to

5    weigh the importance.  Where are the important things happening?

6    Are they happening inside Meritage's places of business, that

7    model home, that sales office, or are they happening outside?

8          You have seen it.  Everything that's important, that's

9    critical is happening right there inside that model home sales

10   office.

11         Even Mrs. McClellan, the homebuyer you saw, she sat

12   right there and told you, "It didn't matter whether Tim Gonzalez

13   showed me and my realtor that house or not.  I was going to buy

14   it.  What he did didn't matter.  That wasn't important to me."

15   No.  The important things here happened inside the model home

16   sales office.

17         Now, finally, I have to tell you I was shocked -- I

18   was shocked when I heard Mr. McLaughlin get up here and talk to

19   you about credibility, talk to you about fleeing the scene and

20   running away.  I think he just told you Meritage is now ready to

21   flush -- I think his words were "flush away" Amy Fisher's

22   testimony.

23         Amy Fisher, that young woman that you saw here, she

24   was handpicked by Meritage.  All the salespeople they had, they

25   went and they handpicked this young woman.  Six weeks ago they

1   had their lawyers meeting with this young woman.

2          Then, just before her testimony, they were sitting --

3   they were meeting with her.  These lawyers were meeting with

4   Amy Fisher, and now they're ready to flush her away.  They put

5   that young woman on the stand -- after meeting with her, sitting

6   down with her, talking to her, then they put her up here on the

7   stand.

8          This young woman worked there 12 years, and they

9   handpicked her.  They put her on that stand.  Their lawyers met

10  with her.  They talked to her, and then they put her up here.

11         And what did Amy Fisher do?  There's no question.  She

12  wasn't honest with you.  She was completely dishonest.

13         But Meritage put her on that stand.  The only reason

14  she got on that stand and she said the things that she did was

15  because she was trying to support a ridiculous story that

16  Meritage came into this courtroom to tell you.

17         So she sat up there, and she said, "Sunday" -- just

18  two days ago Sunday -- "was a typical workday for me, my normal,

19  typical workday," and from then on she lied about everything,

20  what she did that day.

21         She told you, "I took three customers out to see

22  inventory homes."  She told you their names, the addresses where

23  she took them, the inventory homes that she took them to see,

24  and she did all this because she was trying to support this

25  ridiculous story that Meritage wants you to believe.

1          So she sat up there saying all these things.  "Oh, my

2    gosh.  I had just a few pieces of traffic, and I was taking

3    people out and they were following me in my car.  And I had my

4    car seat in the back, and so they followed me."  I mean, a whole

5    story -- a whole fabricated story.

6          But we know what the truth is.  You actually got to

7    see, for the first time, a real day in the life of a Meritage

8    salesperson.  A real-world day, okay?  You heard from Shelly

9    Schiebe, HP -- former HPD officer, 30 years.  She does fraud

10   investigations.

11         You heard from her.  She put Amy Fisher under

12   surveillance.  We wanted to see what is a real -- what does a

13   real day look like.

14         She sat there, and she watched Amy Fisher go into that

15   model home at 11:54 a.m.  Amy Fisher never left the entire day.

16   She stayed in that model home sales office the entire day, and

17   she didn't leave until 6:15 when it was time for her to go home.

18         She didn't leave.  Her trainee assistant didn't leave.

19   They both were in that model home sales office the entire day,

20   and that's real world, and that's what really happens when

21   you're a Meritage home salesperson.  You can sit if you want and

22   watch the surveillance tape.  Her car doesn't move.

23         She doesn't go get in her car and go show anybody

24   anything.  She doesn't go out with a big bag of tools that

25   nobody seems to have.  She didn't do any of that.  She sat in

1    that model home sales office because that's a typical day.

2          That's what they do.  That's what this job is about.

3    And the sad thing is Meritage knew that, but they put that young

4    woman on the stand.

5          They put that young woman on the stand to support

6    their ridiculous story, and you saw her sitting up there.  And

7    at the end of the day, after this HPD former officer, 30-year

8    veteran, fraud investigator has put her under surveillance,

9    called her out, shown her to be completely fabricating her whole

10   story, she had to come back in here.  And that young woman that

11   Meritage put on the stand had to sit there and take the Fifth

12   Amendment to try to avoid incriminating herself on a possible

13   penalty of perjury.

14         That's what Meritage did.  That's what they did.

15   Those are the lengths that they are willing to go to to support

16   a ridiculous, fabricated story.  The day that we saw Sunday for

17   Amy Fisher, that is a typical day because this is an inside

18   sales position.

19         Please don't let Meritage get away with this.  Don't

20   let them get away with this.  We want you to do what's right.

21   This is an inside sales job, and what they did with Ms. Fisher

22   wasn't right.

23         It wasn't right.  They had their lawyers meet with

24   her, put her up there knowing full well that this is an inside

25   sales job.  It was not right.

1          What they're trying to do to Donna Armstrong, to Tim

2     Gonzalez, to David Lipnicki, it's not right.  We're asking you

3     to do what's right.  This is an inside sales job.  Please tell

4     them that this is an inside sales job.  Make them comply with

5     the law of how you're supposed to pay inside salespeople.

6          I thank you so much.  I thank you for listening to

7     this case because this case is so important to these

8     salespeople.  I appreciate your time and your attention, and we

9     are very hopeful that you-all are going to do the right thing

10    and not let Meritage get away with this.  Thank you.

11                              ***

12        *(End of requested transcript.)*

13                           -o0o-

14         I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above matter.

16

17    Date:  July 30, 2015

18                              /s/ Heather Alcaraz_____
                                Heather Alcaraz, RMR, FCRR
19                              Official Court Reporter

20

21

22

23

24

25